Case No: QB-2020-000322

IN THE HIGH COURT OF JUSTICE

QUEEN'S BENCH DIVISION

BETWEEN

**KARAM SALAH AL DIN AWNI AL SADEQ**

<u>Claimant</u>

**- and –**

**(1) DECHERT LLP**

**(2) NEIL GERRARD**

**(3) DAVID HUGHES**

**(4) CAROLINE BLACK**

<u>Defendants</u>

---

**PARTICULARS OF CLAIM**

---

<u>The Parties</u>

1.  The Claimant ("**Mr Al Sadeq**") is a lawyer and Jordanian citizen who is a resident of the United Arab Emirates (the "**UAE**").  For the past six years he has been incarcerated in Ras Al Khaimah ("**RAK**"), one of the constituent Emirates of the UAE, having originally been abducted and unlawfully detained in September 2014 for alleged involvement in fraudulent transactions allegedly committed against his former employer, the RAK Investment Authority ("**RAKIA**"), and having been subsequently convicted by the RAK criminal court after a prolonged period of solitary confinement and other inhumane treatment in breach of UAE law and his human rights under international law.  Mr Al Sadeq denies any involvement in wrongdoing and maintains that the charges against him were politically motivated on the part of the Ruler of RAK in an attempt to conceal the Ruler's own close involvement in RAKIA's activities and that he was convicted on the basis of false confessions obtained from him under duress by the Defendants.

1

2. This claim is brought expressly without prejudice to any future claims or proceedings (whether in this jurisdiction or any other, and whether by way of court proceedings, arbitration or any other form of action) Mr Al Sadeq may wish to bring against any person in relation to his convictions and / or the circumstances thereof, including the setting aside of those convictions and / or any claims for losses arising as a result thereof to the extent that such losses are not recovered in these proceedings.

3. The First Defendant ("**Dechert**") is a limited liability partnership registered in England & Wales with registration number OC306029, authorised and regulated by the Solicitors Regulation Authority of England and Wales, with its registered address at 160 Queen Victoria Street, London EC4V 4QQ.

4. The Second Defendant ("**Mr Gerrard**") is a solicitor of the Senior Courts of England and Wales, and a Partner in Dechert where he is global co-head of Dechert's white collar and securities litigation practice.

5. The Third Defendant ("**Mr Hughes**") is a solicitor of the Senior Courts of England and Wales, and currently a Partner at Stewarts Law. Prior to joining Stewarts Law in or around June 2017, Mr Hughes was a Partner at Dechert, working closely with Mr Gerrard.

6. The Fourth Defendant ("**Ms. Black**") is a solicitor of the Senior Courts of England and Wales and is a Partner at Dechert specialising in corporate investigations, working closely with Mr Gerrard with whom she joined Dechert from DLA Piper in around 2011.

7. All of Mr Gerrard's, Mr Hughes's and Ms. Black's acts as particularised herein are attributable to Dechert, and Dechert is responsible and liable for all wrongs committed by them or any of them, and the consequences thereof.

<u>Summary of this claim</u>

8. These proceedings concern serious wrongs committed against Mr Al Sadeq by persons including Mr Gerrard, Mr Hughes, Ms. Black and Dechert in relation to an investigation, led by Mr Gerrard, into the affairs of RAKIA and an alleged fraud committed by its former Chief Executive Officer, Dr Khater Massaad ("**Dr Massaad**"), allegedly assisted by *inter alios* Mr Al Sadeq and several other alleged co-conspirators.  Dr Massaad had been a close confidant of the current Ruler of RAK, but they fell out between 2010 and 2012.

9. These wrongs, involving breaches of UAE criminal law and procedure, the UAE Constitution and which are in breach of Mr Al Sadeq's human rights as a matter of UAE and international law, give rise to actionable claims under UAE law, as pleaded at paragraphs 220 to 229  below, and include the following:

2

9.1. Kidnap and extraordinary rendition of Mr Al Sadeq from Dubai to RAK;

9.2. Unlawful detention of Mr Al Sadeq in RAK without arrest or charge;

9.3. Mr Al Sadeq's detention in solitary confinement for around 560 days between September 2014 and April 2016, first at the General Headquarters of State Security in RAK (the "**GHQ**") and subsequently in a camp run by the Ruler of RAK's private militia, under a false name, without any or any proper due process, no access to legal representation, in unsanitary and inhumane conditions, and without adequate medical attention, exercise or access to his family, who were refused information as to his whereabouts.

9.4. Interrogation of Mr Al Sadeq by Mr Gerrard and Ms. Black during the period he was detained in solitary confinement in the GHQ and by Mr Gerrard, Mr Hughes and Ms. Black during the period he was detained in solitary confinement in the said militia camp. Mr Gerrard and Mr Hughes made it apparent by their words and actions that they had the power to improve his inhumane conditions if he gave them sufficient "cooperation".

9.5. Threats by Mr Gerrard and Mr Hughes to Mr Al Sadeq against him, his wife and children at various times as more specifically particularised herein to force him to "cooperate" in building a case against Dr Massaad, Mr Jihad Quzmar, (the former Legal Advisor to the Ruler, and an advisor of long standing) ("**Mr Quzmar**"), Mr Farhad Azima (a US-Iranian businessman who had dealings with RAKIA) ("**Mr Azima**"), and Mr Gela Mikadze (former General Manager of RAKIA's Georgia operations) ("**Mr Mikadze**") and other alleged co-conspirators by giving false evidence, including threats that Mr Al Sadeq's wife would be arrested and imprisoned and that neither of them would ever see their children again.

9.6. Pressure applied by Mr Gerrard and Ms. Black and Mr Hughes at various times as more specifically particularised herein to Mr Al Sadeq's wife to persuade Mr Al Sadeq to "cooperate" by giving false evidence, including by threatening her directly with imprisonment and by telling her that if Mr Al Sadeq told them what they wanted he would be released from detention and the inhumane conditions in which he was being kept.

9.7. Forcing Mr Al Sadeq to make knowingly false confessions prepared by Mr Gerrard and Mr Hughes containing evidence which Mr Al Sadeq told them was untrue, in return for promises, subsequently reneged upon, said to have been given by the Ruler of RAK, that he would be released and pardoned if he made the false confessions.

10. In summary, it is Mr Al Sadeq's case that Mr Gerrard and Mr Hughes and Ms. Black and Dechert were prepared to, and did, violate Mr Al Sadeq's rights, including by using threats and / or mistreatment and / or unlawful methods to force Mr Al Sadeq to give evidence and / or false evidence, as more specifically particularised below, in an attempt to build a case against Dr Massaad and his alleged co-conspirators at the behest of the ruler of RAK. In doing so, and thereby directing and/or being complicit in Mr Al Sadeq's ill treatment and / or torture, they caused Mr Al Sadeq physical, emotional, psychological, moral and financial harm, loss and damage for which compensation is sought in these proceedings.

RAK, RAKIA and Dr Massaad

11. From the 1980s Dr Massaad established and managed businesses in RAK including RAK Ceramics, of which both he and the current Ruler of RAK, Sheikh Saud Bin Saqr Al-Qasimi (the "**Ruler**"), were founders and significant shareholders.

12. In around August 2003 Dr Massaad was officially appointed adviser to the Ruler, who at that time had recently been appointed the Crown Prince and Deputy Ruler of RAK. From that point (at the latest) until around late 2010 Dr Massaad was the Ruler's close friend and confidant, in his presence on a daily, or almost daily, basis.

13. As a result of Dr Massaad's management, by 2010 RAK Ceramics was the world's largest ceramics manufacturer. The export success of RAK Ceramics provided RAK, a country with no oil or gas industry, with its most significant source of foreign exchange income. The Ruler obtained significant private wealth through his shareholding in RAK Ceramics.

14. RAKIA was established in 2005 by Emirati Decree No. (2)/2005 in order to promote investment in RAK and to promote various economic sectors in the Emirate.

15. From its establishment in 2005 until around 2012, RAKIA's Chief Executive Officer was Dr Massaad. Dr Massaad was in control of all day to day management of RAKIA, but at all material times worked closely with the Ruler, developing investment strategies and taking investment decisions with the knowledge, approval, and instructions of the Ruler.

16. Dr Massaad developed RAKIA, and the RAK Free Zone, using his financial and business expertise and borrowing, without any significant capital investment from the RAK state itself. By 2011 RAKIA made a net profit of 300 million UAE Dirhams ("**AED**") and was worth more than one billion AED.

17. In addition to promoting investment in RAK generally, by around 2010 RAKIA had, with the full knowledge and approval of the Ruler, very significant investment interests outside RAK, particularly in Georgia (developed after a visit of the Georgian Prime Minister to

RAK in 2006). The Georgian investments included shares in Poti Sea Port, the Sheraton Metechi Palace Hotel and Poti Port Free Industrial Zone, and a property development company called Rakeen Developments.

18. The background to these investments is that, prior to his succession in late 2010, the Ruler had been keen to build up RAKIA's investments outside RAK, and had directed that this be done, because he was concerned about his half-brother Sheikh Khaled bin Saqr Al Qasimi ("**Sheikh Khaled**") succeeding in any succession dispute which might arise upon the death of his father, the previous ruler of RAK, the late Sheikh Saqr Bin Muhammad Al Qasimi (the "**Late Sheikh**"). Hence, he wished to have considerable assets which he could control for his own benefit, with the assistance of Dr Massaad, outside RAK, should he not become the next Ruler, rather than holding assets within RAK / the UAE and which would therefore be within the direct reach of a future government of RAK with his brother Sheikh Khaled as Ruler.

19. In this regard, Sheikh Khaled was the Crown Prince and Deputy Ruler between around 1958 until around June 2003 when the Late Sheikh removed him and replaced him with the Ruler. This was an unpopular move in some quarters leading to street protests in favour of Sheikh Khaled in RAK, and he retained significant support in the Emirate to succeed the Late Sheikh.  Subsequently, Sheikh Khaled claimed to have been reinstated by an Emiri Decree, said to have been made by the Late Sheikh in 2004, although this was disputed by the government of RAK and the UAE. Upon being made Crown Prince, the Ruler promised that when he succeeded the Late Sheikh he would make his brother Sheikh Faisal the Crown Prince, and his other brother Sheikh Taleb would be made Deputy Ruler.

20. Sheikh Khaled continued to challenge the Ruler's legitimacy as Crown Prince and his entitlement to succeed the Late Sheikh. As a result, the Ruler was concerned that when his father passed away Abu Dhabi, the most powerful of the Emirates, might favour Sheikh Khaled and allow him to succeed to the throne of RAK in his place.

21. From around 2008 in the face of continued lobbying through the media by Sheikh Khaled complaining about the Ruler's policy of making overseas investment through RAKIA, which the Ruler was concerned might undermine his prospects of succeeding his father in due course, the Ruler directed that RAKIA should change the policy of foreign investment set in place by Dr Massaad, that he had previously approved and directed, and instead divest itself of its foreign investments, and invest the proceeds within RAK. Dr Massaad disagreed with this change of policy, but the Ruler overruled him. The sudden change of policy led

to the rushed sale of assets in Georgia at a premature stage with a detrimental effect on the return obtained from them.

22. In the event, when the Late Sheikh passed away in October 2010, the Ruler ultimately received the backing of Abu Dhabi over Sheikh Khaled and succeeded his father as Emir of RAK.

23. Upon his succession in October 2010, the Ruler appointed his son, Sheikh Mohammed, as Crown Prince instead of Sheikh Faisal, and abolished the role of Deputy Ruler meaning Sheikh Taleb could not take it up. In doing so he broke the promise he had made to each of them in 2003, causing animosity. At about the same time Sheikh Faisal was also removed from his role as Chairman of the Ras Al Khaimah Free Zone Authority and replaced by another of the Ruler's brothers, Sheikh Ahmed, who was considered more loyal to the Ruler.

24. As Crown Prince, Sheikh Mohammed wanted to become the Ruler's closest advisor in place of Dr Massaad, to take control of RAKIA, and to reduce Dr Massaad's influence in RAK. Ultimately Sheikh Mohammed succeeded in driving a wedge between the Ruler and Dr Massaad whose relationship soured, and the Ruler turned against Dr Massaad. Furthermore, with the RAK economy suffering as a result of the global financial crisis, and in circumstances where the Arab Spring movement was growing between 2010 and 2012, the Ruler continued to be concerned about domestic criticism and potential civil unrest in relation to RAKIA's investments outside RAK, initially, as pleaded at paragraphs 15 to 21 above, made at his direction for his own potential personal financial and / or political benefit.

25. In a process which took place from around 2008 until 2012, RAKIA divested itself of its key overseas assets. Dr Massaad was side-lined from RAK Ceramics and other RAK businesses during this period, although he continued to work practically full-time for RAKIA until he left RAK in around June 2012, on good terms and without any suggestion of wrongdoing. He returned to the UAE on several occasions thereafter until August 2014, including for meetings with the Ruler.

26. In 2012, Dr Massaad founded a business in Lebanon with around six investors, one of whom was Sheikh Faisal. As pleaded above, the Ruler had removed Sheikh Faisal as Crown Prince in 2012 and replaced him with Sheikh Mohammed, causing animosity between them.

27. The Ruler came to learn of Dr Massaad's business relationship with Sheikh Faisal in around 2014. As a result, the Ruler became concerned that Dr Massaad was working with Sheikh

Faisal and / or  Sheikh Khaled in order to destabilise the Ruler, and that Sheikh Faisal and / or Sheikh Khaled were plotting to remove the Ruler with the assistance of Abu Dhabi.

28. Since finding out about Dr Massaad's business relationship with Sheikh Faisal in 2014 and following on from the fall-out between Dr Massaad and the Ruler, and the Ruler's concerns about Dr Massaad's involvement in suspected moves to oust him by Sheikh Khaled and Sheikh Faisal, the Ruler with the assistance of the Defendants has pursued a vendetta against Dr Massaad and alleged co-conspirators such as Mr Quzmar, Mr Mikadze, and Mr Azima (including by recent proceedings in the English High Court).

29. The background set out above at paragraphs 11 to 28 is the context in which wrongs have been committed against the Claimant who has become collateral damage in the vendetta pursued by the Ruler against Dr Massaad, against whom RAKIA allegedly seeks to recover over USD 2 billion. The Ruler's motive in pursuing his vendetta is both to punish Dr Massaad for his supposed disloyalty by destroying his reputation and discrediting him, and also to attempt to conceal the Ruler's own personal knowledge and direction of RAKIA's foreign investments for his own personal and political benefit in the years before his accession. In this regard, it is a matter of public record that Mr Gerrard was appointed by the Ruler in order to investigate and pursue Dr Massaad;  and Mr Al Sadeq and his wife were told both by Mr Gerrard and Mr Hughes that the "Big Bastard" Dr Massaad, and his alleged co-conspirators, were the people they were really after, and that they merely wanted Mr Al Sadeq's "cooperation" to help them build that case. Despite several criminal sentences having been pronounced against Dr Massaad by the RAK courts *in absentia*, Dr Massaad maintains his innocence and presently lives and works in Saudi Arabia, an Interpol notice which had been lodged against him by RAK now having been removed, and an extradition request from RAK having been dismissed by the Saudi court.

Human rights abuses in RAK

30. RAK is regarded by international observers as having a record of human rights abuses including arbitrary detention, forced confessions, unfair trials, and mistreatment in detention.

31. A report by Amnesty International in 2014 (the "**2014 Amnesty Report**") gave several examples of abuse in Ras-Al-Khaimah. As to this:

    31.1.      Saleh Mohammed al-Dhufairi was detained at the palace of the Ruler for 133 days: "*He was charged in connection with his activities on Twitter but released on bail after two weeks in custody. He was at liberty only briefly. On 29 April 2012, plain-*

*clothed security officers arrested him without producing a judicial warrant and took him to the palace of Sheikh Saud Bin Saqr al-Qassimi, the Ruler of Ras al-Khaimah. He remained there without charge under armed guard for some 133 days. During this period, he was permitted visits from his family but they were prevented from discussing his whereabouts with anyone outside their immediate family. The authorities did not inform Saleh Mohammed al-Dhufairi of the reason for his detention, and under what law he was held, or whether they intended to bring charges against him. He was not allowed to meet with a lawyer or taken before any judge or court during this time. On 9 September 2012, the security authorities moved him to a new place of detention, whose location they did not disclose to his family, where they held him in solitary confinement in a freezing cold cell that they kept permanently lit, causing him extreme discomfort and making it difficult for him to sleep.*" (page 18).

31.2.   Sheikh Dr Sultan Kayed Mohammed al-Qassimi, a member of the Ruler's own family, was subjected to arbitrary detention in the Ruler's palace, then moved to a secret detention facility, and was denied access to legal representation and his family: "*Sheikh Dr Sultan Kayed Mohammed al-Qassimi, a senior member of the ruling family in Ras al-Khaimah emirate who helped found Ittihad University in the UAE and headed the board of directors of al-Islah, was arrested on 20 April 2012 by armed State Security officers who raided his home and failed to produce a judicial warrant for his arrest. They took him to the palace of Sheikh Saud Bin Saqr al-Qassimi, the Ruler of Ras al Khaimah, and then held him there without charge or trial for five months during which the authorities denied to his family that they were holding him there and refused to disclose any information as to his whereabouts. A victim of enforced disappearance, he was kept in solitary confinement in a locked room and watched over by armed guards. In September 2012, the security authorities moved him to a secret detention facility, where he remained until he went on trial as one of the UAE 94 defendants. Throughout his detention, the authorities denied him access to a lawyer and contact with his family.*"

31.3.   Dr Mohammed al-Mansoori, until 2009 the legal advisor to the Late Sheikh, was held in solitary confinement for 8 months, and at his trial a confession was produced which he denied signing:  "*Dr Mohammed al-Mansoori, a prominent lawyer and former head of the UAE's Jurists' Association, was detained by a group of State Security officers whose faces were concealed by balaclavas on 16 July 2012 near his*

*home in Ras al-Khaimah emirate. The officers took him first to his home, which they searched for six hours, and then to an undisclosed location where they detained him incommunicado and in solitary confinement for eight months. At his trial as one of the UAE 94, the prosecution submitted a "confession" that they said he had signed while he was held in incommunicado detention as evidence against him; he told the court that it was untrue that he had signed the statement and testified that he had not signed any documents when he was in pre-trial detention. The court took no steps to order an expert examination of the signature to verify it but accepted the confession as evidence. It then returned a guilty verdict against Dr Mohammed al-Mansoori and sentenced him to 10 years imprisonment, followed by three years' probation. He stood trial again with nine other UAE nationals and 20 Egyptian nationals and was convicted in January 2014, receiving an additional 15-month prison sentence, which he is to serve after his initial 10-year sentence is complete. In the second mass trial, he had refused, along with many of the other defendants, to attend a number of the court proceedings, in protest at not being allowed access to his case documents."*

31.4.      An expert panel appointed by the UN High Commissioner for Human Rights stated the following in relation to Dr Mansoor's treatment by RAK:

"*According to reports at our disposal, throughout his deprivation of liberty, Mr Mansoor has been kept in solitary confinement, and in conditions of detention that violate basic international human rights standards and which risk taking an irrevocable toll on Mr Mansoor's health," the experts said. "We implore the authorities of the United Arab Emirates to immediately grant him access to vital and consented medical care and to ensure that his conditions of detention conform to the United Nations' Standard Minimum Rules for the Treatment of Prisoners.*"

"*We are also alarmed at repeated and consistent reports that Mr Mansoor has not received a fair trial and call on the authorities to ensure his retrial in accordance with the fundamental judicial guarantees provided for in international human rights law, or his immediate release.".*

32. The 2014 Amnesty Report is damning in its assessment of the "confession culture" which prevails in the UAE:

"*By allowing the State Security to detain suspects indefinitely, in undisclosed detention facilities and in isolation from the outside world, UAE law effectively facilitates torture*

*and other ill-treatment and creates a "confession culture" whereby State Security investigators seek to obtain "confessions" and other incriminating statements from those in their custody as a basis for securing their conviction at trial. There is no independent oversight of the conditions in which the State Security holds detainees, often for many months, or the methods they use in seeking and obtaining "confessions."*"

33. As pleaded below, Mr Al Sadeq's treatment follows a similar pattern to the examples given above in that, *inter alia*, he was kidnapped, arbitrarily detained for over five years, subjected to torture and inhumane treatment while incarcerated in solitary confinement for around 560 days, denied access to legal representation, only occasionally allowed to see his family, his family was denied information about his whereabouts at all material times until April 2016, his family was threatened and he was forced to sign false confessions under duress which were used in order to convict him and to implicate others including Dr Massaad. The Defendants were aware of the abuse to which Mr Al Sadeq was subjected, which in the premises pleaded below was orchestrated by Mr Gerrard with the assistance of the other Defendants, at the behest of the Ruler.

Mr Al Sadeq

34. Mr Al Sadeq is a Jordanian national and Jordanian-qualified lawyer who was born in Dubai to Jordanian parents on 2 February 1980. Mr Al Sadeq studied law at Amman University, from where he graduated in 2001. He then became a member of the Jordanian Bar, and in 2003 obtained a Master's Degree in Law from the University of Western Sydney. Mr Al Sadeq subsequently completed a training contract with a Jordanian law firm before, in 2007, joining the in-house legal team at a Jordanian property development company.

35. Between November 2008 and 2012 Mr Al Sadeq was employed by RAKIA. His initial role was as a legal adviser. In around 2010 Mr Al Sadeq was promoted to Group Legal Director, reporting directly to Dr Massaad. In June 2011, Dr Massaad appointed Mr Al Sadeq as Deputy Chief Executive Officer of RAKIA, reporting directly to Dr Massaad.

36. During his work for RAKIA Mr Al Sadeq also had regular interactions with the Ruler and was well known to him. He would regularly visit the Ruler at his palace; and would speak to him on a very regular basis by telephone, often late into the evening.

37. While working for RAKIA, Mr Al Sadeq's responsibility was mainly to finalise deals to sell assets in order to return monies that had been invested outside of RAK to the Emirate, pursuant to the revised strategy required by the Ruler from around 2008 onwards as pleaded

at paragraphs 21 and 25 above. At all material times Mr Al Sadeq acted on instructions from Dr Massaad which to the best of his knowledge, in all significant respects, were known to and had been approved or given by the Ruler himself.

38. In late 2012 Mr Al Sadeq tendered his resignation from RAKIA in circumstances where it had been made clear to him that the role of CEO of RAKIA, which he had hoped would be his next career step (already being Deputy CEO) was going to be significantly reduced in scope.  RAKIA accepted his resignation, and he was given a severance package of UAE Dirhams 1 million and allowed to retain his medical insurance and UAE residency sponsorship on condition that he remain as an unpaid adviser to the Board of Directors for a six month "handover" period.

39. Mr Al Sadeq and his family thereafter moved to Dubai in around December 2012. At the time Mr and Mrs Al Sadeq had a 6 month old daughter and were expecting a son who was born in February 2013 in Dubai. Once in Dubai, after a period on sabbatical, Mr Al Sadeq started an investment business which quickly became successful.

Kidnap and rendition of Mr Al Sadeq from Dubai – 5 September 2014

40. Under Articles 5, 6, 7, 19, 23, 24, 26 and 29 of the UAE Federal Law No. 11 of 1973 regarding the regulation of the judicial relationships between the Emirates that are members of the Union ("**Federal Law No. 11**") any constituent Emirate wishing to question a person in relation to an offence who is not present in that Emirate must make a request to the authorities in the Emirate where that person is present for their arrest by the authorities in that Emirate, prior to extradition to the Emirate which made the request.

41. On 4 September 2014 Mr Al Sadeq and his wife Dima Al Sadeq ("**Mrs Al Sadeq**") returned to Dubai with their children after a vacation seeing family in Jordan. On their arrival back to their home in the Arabian Ranches area they noticed that somebody appeared to have attempted forced entry while they were away. However, nothing in the property appeared to have been disturbed, and they left soon afterwards for a social engagement in Dubai without reporting the matter to the police, leaving their children asleep with their nanny.

42. That evening when they returned home at around 1am on 5 September from their social engagement, Mr Al Sadeq and Mrs Al Sadeq found a vehicle very close to the entrance to the family home.

43. The occupants of the vehicle approached Mr Al Sadeq's side of the car and pulled him from the vehicle. One of the men showed Mr Al Sadeq an identity card stating he was from RAK State Security Investigations. Mr Al Sadeq challenged the said men and told them that they

had no authority within Dubai, and that they were infringing on the jurisdiction of Dubai. One of the men responded that Mr Al Sadeq could not lecture them about the law, and that they were going to take him to their headquarters in RAK.

44. Mr Al Sadeq was then forcibly restrained by these men and manhandled into their vehicle in front of Mrs Al Sadeq, who was screaming for help and telling the men she would not let them take her husband.  When Mrs Al Sadeq attempted to exit the family vehicle, she was shouted at by one of the men and told to go inside "*or else*".

45. Mr Al Sadeq was driven out of Dubai to the GHQ in RAK. During the journey he was allowed to call Mrs Al Sadeq and explained he had been told that the Ruler wished to speak with him.

46. No request had been made to the UAE federal or Dubai authorities by the RAK authorities for the arrest or extradition of Mr Al Sadeq pursuant to Federal Law No. 11, and he was taken against his will.  Accordingly, the kidnap of Mr Al Sadeq and his rendition to RAK and detention in the GHQ was unlawful under UAE law.

47. For the reasons pleaded at paragraphs 61 - 214 below, Mr Gerrard assisted by the other Defendants, showed repeatedly by their words and conduct that they were responsible for what subsequently happened to Mr Al Sadeq following his kidnapping. In the premises it is therefore to be inferred that the kidnapping of Mr Al Sadeq had been orchestrated by and / or was known about by Mr Gerrard (and therefore Dechert). Given their roles and conduct in the subsequent interrogation of Mr Al Sadeq it is likely that it was also done with the knowledge, contemporaneous or subsequent, of Mr Hughes and Ms. Black.

48. On arrival at the GHQ, Mr Al Sadeq was placed in custody in solitary confinement in a small, damp cell, without adequate ventilation or sanitation. He was not arrested and was not told what (if any) charges or allegations were being laid against him.

49. Mr Al Sadeq was kept in the same small cell that he had been placed in initially, in solitary confinement, between 5 September 2014 and 10 September 2014 without being presented to the prosecutorial authorities for questioning or investigation. This was in violation of UAE law: section 47 of the UAE Law of Criminal Procedure (as amended) (the "**Criminal Procedure Law**") provides that the police are obliged to interrogate the accused with 24 hours of apprehension and either to arrest or to order the release of the subject; and must present a suspect to the public prosecution service within 48 hours of apprehension.

50. In breach of his rights under UAE law as further particularised in paragraphs 230 to 293 below Mr Al Sadeq was held for the entire period of around 4 weeks at the GHQ in a cell in solitary confinement, without being permitted to contact a lawyer (despite his repeated

requests), and he was arrested only when he was presented to the public prosecutor on or around 10 September 2014.

51. During this initial period of detention immediately after his kidnap from Dubai and rendition to RAK, as pleaded below, he was questioned by, *inter alios*, Mr Gerrard, in an aggressive fashion and it was made clear to him that the objective of the interrogation was for him to "cooperate" by giving information falsely to implicate, in particular, Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and their alleged co-conspirators.  He was not allowed to change his clothes or clean his teeth during the approximately 28 days during which his was held at GHQ.

Interrogation without arrest or legal representation

52. The day after his kidnapping, Commander Hamad Al Awadhi, a security/police attaché from the Ruler's court, visited Mr Al Sadeq in the GHQ and told him he was representing the Ruler.

53. Commander Al Awadhi warned Mr Al Sadeq that, "*the Ruler and the Ruler's Court are sending you a message that either you cooperate with us or you will never see the light of day again*" (or words to this effect). He told Mr Al Sadeq that he was being accused of bribery, embezzlement, corruption, taking advantage of his position, fraud and forgery in connection with RAKIA.

54. Commander Al Awadhi then explained that the expected "cooperation" was that he provide evidence and testify against Dr Massaad and Mr Quzmar.

55. Mr Al Sadeq told him that if there were any specific questions about the individuals he mentioned which he could answer he would do so immediately, as he had nothing to hide or of which to be afraid.  However, he said that he would not speak falsely about them. In response to this, Commander Al Awadhi told Mr Al Sadeq that if that was the case Mr Al Sadeq would be staying with them for a long time.

56. The clear implication was, and as Mr Al Sadeq understood, that he would be detained unless and until he agreed to give whatever evidence he was told to give, true or false, in order to build the case against Dr Massaad and Mr Quzmar.

57. Commander Al Awadhi further indicated that Mr Al Sadeq should be glad to be alive and that by contrast, Dr Massaad, would be killed.

58. During this initial interrogation Mr Al Sadeq was forcibly pushed while his hands were tied behind his back, he was denied water, and he was verbally insulted.  Afterwards Mr Al

Sadeq was returned to a cell and continued to be held in solitary confinement at the GHQ: he ultimately remained in that cell, in solitary confinement, for around 28 days.

<u>Attempts by Mrs Al Sadeq to find out her husband's whereabouts</u>

59. The day after Mr Al Sadeq had been kidnapped, Mrs Al Sadeq went to the GHQ to enquire after her husband. She was told (incorrectly) that there was no one there by that name. Eventually she was sent home and told to expect a call.

60. Mrs Al Sadeq then received a telephone call from someone who introduced himself as Commander Hamad Al Awadhi (who was previously unknown to her). He told her that Mr Al Sadeq was with him and she should not panic because they would let him go soon; that her husband was being dealt with under the authority of the Ruler outside the judicial system; that there would be no criminal case against Mr Al Sadeq so long as he "cooperated" and told them what they wanted to know. Commander Al Awadhi also, as he, the Defendants, and the Ruler would repeatedly do, warned Mrs Al Sadeq not to involve the press or lawyers in relation to Mr Al Sadeq's situation.

<u>First contact with Mr Gerrard – 8 September 2014</u>

61. On around 8 September 2014, in the middle of the night, Mr Al Sadeq was interrogated by Mr Gerrard and Ms. Black in GHQ in the presence of the General Abdullah Munakhas, the Head of the Investigations Department in RAK. Mr Al Sadeq's request for legal representation was refused. At this point he had still not been arrested.

62. Mr Al Sadeq was not on this occasion (or ever) asked to consent to being interviewed by Mr Gerrard or the other Defendants, and no agreement could be sought from Mr Al Sadeq's lawyer because he had been denied access to a lawyer (and, as pleaded at paragraphs 60, 72, 89 and 101 hereof, Mrs Al Sadeq had been warned not to involve lawyers, although she in fact subsequently engaged a lawyer on her husband's behalf on 11 September 2014). Evidence given to the court by Mr Gerrard in cross examination on 28 January 2020 during the course of a trial between Mr Azima and RAKIA (High Court, Business and Property Courts (ChD) Claim No. HC-2016-002798) that detainees in RAK were only ever interviewed by him "*with their agreement and the agreement of their lawyers*", and that he had only conducted one interview himself with Mr Al Sadeq, is therefore untrue, and perjurious.

14

63. Mr Al Sadeq was blindfolded and his hands were tied behind his back at this interrogation. Mr Gerrard began by telling Mr Al Sadeq that "*we know more about you than you know about yourself*" and told Mr Al Sadeq that he needed to cooperate with them.

64. When Mr Al Sadeq asked him what right he had to interrogate him, and in what role, Mr Gerrard responded that he was in control of Mr Al Sadeq's fate, and that he was the one with whom Mr Al Sadeq should cooperate at that stage. Mr Gerrard made clear that if Mr Al Sadeq did not do so he would never be released and said that he was "*the law*" in RAK, or words to that effect. From these statements Mr Al Sadeq concluded that Mr Gerrard had been behind his kidnap and illegal rendition and was the person ultimately in charge of his detention and overall fate, alongside the Ruler.

65. During this initial interrogation Mr Gerrard threatened to have Mrs Al Sadeq arrested unless Mr Al Sadeq "cooperated" with them and made false claims that she was on the board of directors of a Lebanese airline (which she has never been: her career to that point was in media production and management) and had embezzled monies (which she has never done). Mr Al Sadeq denied this and said that his wife had never been on the board of a Lebanese airline and that it must be someone with the same name. In response, Mr Gerrard smiled and said "*no matter, we will arrest her until we figure out if it is the same name or not*" thereby indicating to Mr Al Sadeq that he was in control of the police and justice system in RAK.

66. Mr Gerrard conducted further interrogations of Mr Al Sadeq, accompanied by Ms. Black, while he was detained in the GHQ.

67. From this point on Mr Gerrard was the central figure in the interrogation and prosecution of Mr Al Sadeq, generally assisted and accompanied by Ms Black, with his then-colleague at Dechert Mr Hughes taking over from him at times. Mr Gerrard's indications that he was "*the law*" in RAK, which were borne out by the pivotal role he took in the treatment of Mr Al Sadeq and his wife and the degree of control over Mr Al Sadeq's treatment which he repeatedly demonstrated, give rise to the inference that he orchestrated the unlawful and abusive treatment of Mr Al Sadeq in order to pursue the Ruler's vendetta against Sheikh Faisal, Dr Massaad and Mr Quzmar, in addition to Mr Mikadze, Mr Azima and other alleged co-conspirators.  This treatment included making threats against Mr Al Sadeq and his wife.

Presentation to public prosecutor – 10 September 2014

68. On around 10 September 2014 Mr Al Sadeq, having been held unlawfully (as pleaded at paragraph 49 above) in detention for some 5 days, was formally arrested for the first time. He was taken to the public prosecutor, Mr Ahmad Zakhi ("**Mr Zakhi**"), in the middle of the night with his head covered with a black bag, and shackled by the wrists and ankles, on accusations related to his alleged involvement in an alleged fraud on RAKIA allegedly committed by *inter alios* Dr Massaad (albeit that he was not told at this stage what the specific charges were, and was not formally charged for many months).

69. Mr Al Sadeq was then interrogated by Mr Zakhi, for several hours about Dr Massaad, Jihad Quzmar and other alleged co-conspirators.

70. Despite his repeated requests Mr Al Sadeq was again prevented from contacting or being represented by a lawyer at this hearing. After the hearing he was returned to solitary confinement in the RAK General Police headquarters, where he was held, at all times in a solitary confinement cell until around early October 2014.

<u>Mrs Al Sadeq summoned to the Hilton Hotel in RAK to meet Mr Gerrard and Ms. Black</u>

71. On around 10 September 2014 Mrs Al Sadeq received a telephone call from Commander Al Awadhi, telling her to meet him at the Hilton Hotel in RAK, but giving her no detail as to the purpose of this meeting except to suggest that she might be able to see her husband. Accordingly, Mrs Al Sadeq packed a bag of clothes and toiletries for her husband, thinking that she would be able to see him and hand them to him.

72. Commander Al Awadhi met Mrs Al Sadeq in the lobby of the hotel and led her to a meeting room. As he was leading her to the room, Commander Al Awadhi warned Mrs Al Sadeq that she should not tell anybody what was happening to her husband, and again that she should not contact lawyers or the press (he specifically mentioned Al Jazeera the Qatari based broadcaster, for whom Mrs Al Sadeq had previously worked as a producer in Jordan and the UK), saying "*If you open your mouth you know that it will not end well for you*" (or words to that effect).

73. Inside the room were around ten people seated around a large table including (as she later learned) Mr Gerrard and two people who (she later learned) were his colleagues from Dechert, one of whom is believed to have been Ms. Black, and various individuals from RAKIA including Radina Amin ("**Ms. Amin**"), its internal legal counsel.

74. Nobody in the room introduced themselves (although Mrs Al Sadeq later came to learn that they were representatives of *inter alia* Dechert, local law firm Al Tamimi, and RAKIA.) Instead, Mr Gerrard (although she did not know his name at the time) slammed a large pile

of papers down on the table in front of her and started aggressively shouting at her, telling her that they had a lot of cases and a lot of evidence against her husband and that if she did not cooperate she would never see her husband again. He told Mrs Al Sadeq that she "*had the key*" to solving the whole issue, which she understood to mean that she should try to persuade her husband to do whatever was asked of him.

75. Mr Gerrard told her that it was not a question of going to court, that it was for Mr Gerrard and the Ruler to decide whether she would ever see her husband; and he repeatedly told her that if Mr Al Sadeq did not cooperate she would never see Mr Al Sadeq again. It was apparent to Mrs Al Sadeq that Mr Gerrard was in control of the meeting and that nobody spoke without his say-so, and she understood from his words and conduct that Mr Al Sadeq's fate, and her own, was in Mr Gerrard's hands.

76. Mr Gerrard then explained to Mrs Al Sadeq that it was not in fact Mr Al Sadeq that they were interested in pursuing, but that their target was Dr Massaad, to whom he referred as the "Big Fish", and Mr Al Sadeq's "cooperation" was sought in relation to building a case against Dr Massaad.

77. Ms. Amin accused Mrs Al Sadeq of owning property in Lebanon which was relevant to the allegations of fraud (which was untrue: Mrs Al Sadeq is Palestinian, and unable to own property in Lebanon, and has never owned property in Lebanon), and made allegations that she had been involved in wrongdoing (which was also untrue).

78. Throughout the meeting, Mr Gerrard was aggressive, intimidating and demeaning towards Mrs Al Sadeq, and shouted her down whenever she tried to challenge what Mr Gerrard said, and repeatedly told her that she might never see her husband again.

79. At one point Mrs Al Sadeq asked Commander Al Awadhi for details about her husband's whereabouts and well-being. Commander Al Awadhi deferred to Mr Gerrard, who refused to give Mrs Al Sadeq any information at all about the whereabouts or well-being of Mr Al Sadeq.

80. During this meeting, neither Mr Gerrard nor anyone else introduced themselves to Mrs Al Sadeq who only discovered Mr Gerrard's identity in November 2014 as a result of it being drawn to her attention by Mr Azima's U.S. lawyer, Mr Kirby Behre.

81. The meeting lasted around 20 minutes, and Mrs Al Sadeq left shaken and in tears. She left the bag she had packed for Mr Al Sadeq and was much later informed by Mr Al Sadeq that he was shown the bag and told his wife had sent it, and that it had then been placed in sight but out of reach for him during part of his incarceration, presumably in order to torment him.

Search of Mr and Mrs Al Sadeq's home residence in Dubai

82. On or around 17 September 2014 Mr Al Sadeq was taken out of the GHQ, accompanied by Ms. Black and two of her other colleagues from Dechert, and taken to his office and his home in Dubai. Both these locations were searched by a large team of around 50 investigators wearing forensic clothing in his presence with Dubai police also in attendance. Ms. Black was in charge of the search of both properties and was directing the investigators what to take. Indeed, so closely involved was Ms. Black in the search of Mr Al Sadeq's home that she would tell the investigators "*I want this*" pointing to items.

83. The searches undertaken were indiscriminate. Under the direction of Ms. Black, all possessions from Mr Al Sadeq's office and many from his home were taken (including papers relating to his business, clothing, jewellery belonging to his wife and children, and items of sentimental value such as Mr and Mrs Al Sadeq's honeymoon photographs) and have never been returned. During the search of Mr Al Sadeq's family home all electronic items were taken, even those belonging to his children. Mr Al Sadeq later learned that they had been taken to London to be analysed by a company called Control Risks.

84. Mrs Al Sadeq and her children were present during the search of their home and saw Mr Al Sadeq briefly. This was the first time that they had seen him since his kidnap on 5 September 2014 and Mrs Al Sadeq did not see Mr Al Sadeq again (or have any contact with him) until she saw him, along with his mother, in the Attorney General's office on 2 December 2014, as explained at paragraph 113.2 below.

85. After the searchers left Mr Al Sadeq's home, Mrs Al Sadeq received a telephone call informing her that they were now at Mr Al Sadeq's office and asking where his laptop was which had not been found in the office. Mrs Al Sadeq explained that she had given it to her brother for safekeeping. She was then told to retrieve it and bring it to Mr Al Sadeq's office. She met her brother on the way to Mr Al Sadeq's office who gave her the laptop, and she then took it to the office.

86. Upon Mrs Al Sadeq returning the laptop to the office, Ms. Black shouted at Mrs Al Sadeq angrily, claiming (wrongly) that she was obstructing a criminal investigation. In fact, Mrs Al Sadeq had committed no crime in giving her husband's laptop to her brother for safekeeping and there was no proper basis for this allegation, as Ms. Black must have known. Ms. Black then instructed the RAK police to hand Mrs Al Sadeq over to the Dubai

police for questioning, thereby showing her and the other Defendants' degree of control over the legal authorities of RAK. Mrs Al Sadeq was thereafter taken to a police station in Dubai and only released (without any charge) at 3am the following morning.

87. As with all the other items taken during the search, the laptop has never been returned.

88. In all the circumstances the search was carried out in breach of Article 55 of the Criminal Procedure Law, as further pleaded at paragraph 248 below.

Interrogation of Mrs Al Sadeq

89. On 23 September 2014, a few days after the search of her home, Mrs Al Sadeq was summoned by a telephone call from Commander Al Awadhi to be interrogated by Mr Gerrard and Commander Al Awadhi at the GHQ.  On this call, or another call at around the same time, Commander Al Awadhi repeated to Mrs Al Sadeq the warning he had given to her at the Hilton, that she should not involve lawyers or the press, otherwise things would get "*complicated*"; he also told her, untruthfully, that Mr Al Sadeq did not want to speak to a lawyer. He told Mrs Al Sadeq that her husband would merely be briefly interrogated and that they were just using him to get to Dr Massaad, and so long as he cooperated fully he would be released.

90. On arrival at GHQ Mrs Al Sadeq was taken to a small room with only Mr Gerrard and Commander Al Awadhi present. She was told to sit on a stool, and Mr Gerrard then took the lead in speaking to her.

91.  Mr Gerrard's manner was again aggressive and threatening.  He accused Mrs Al Sadeq of owning a company which was implicated in thefts in which he alleged that Mr Al Sadeq had been involved and told Mrs Al Sadeq that she was therefore a partner in the thefts and was under suspicion. These allegations, as with the allegations made by Ms. Amin at the meeting at the Hilton referred to at paragraph 77 above, were incorrect, and Mrs Al Sadeq had never had any interest or involvement in the company alleged, or in any wrongdoing.

92. When Mrs Al Sadeq told Mr Gerrard that she did not know anything about any wrongdoing by Mr Al Sadeq, Mr Gerrard said: "*You are still insistent on not helping your husband. Tell us everything about him, his work, his foreign accounts.*" Mrs Al Sadeq responded that it was for Mr Gerrard to ask her proper questions. In reply Mr Gerrard threatened Mrs Al Sadeq, saying "*You and your husband's stubbornness will not get you anywhere, except increasing his punishment and you will be put in prison also and you will not see your children ever again.*" (or words to that effect). Mr Gerrard told Mrs Al Sadeq that he personally had the power to put her behind bars for 25 years, even without any formal case

being brought against her, and that all he had to do was to call the Ruler to make that happen, thereby again showing his control over everything which happened to Mr Al Sadeq and his power to harm Mrs Al Sadeq as well if he so chose.

93. Mr Gerrard then started laughing with Commander Al Awadhi, telling Mrs Al Sadeq that she would never see the daylight again and would never see her children again unless she and Mr Al Sadeq fully "cooperated" and did whatever they were asked to do.

94. Mr Gerrard told Mrs Al Sadeq  that she could be imprisoned for obstructing an investigation because she had given Mr Al Sadeq's laptop to her brother for safekeeping. In fact, Mrs Al Sadeq had committed no crime, and there was no proper lawful basis for such threat.

95. When Mrs Al Sadeq pointed this out to Mr Gerrard he shouted at her "*do you think this is funny? I will have you jailed for 25 years, if I advise the Sheikh to do so, and you will never see your kids.*"

96. Mr Gerrard's questions to Mrs Al Sadeq at this interrogation concerned primarily Dr Massaad and Mr Quzmar, rather than Mr Al Sadeq himself or his own actions. He repeated several times that if she and Mr Al Sadeq did not "cooperate" by providing evidence about these individuals then he would never be released, and she would be imprisoned for 25 years.

97. During the interrogation Mrs Al Sadeq was told by Mr Gerrard that a travel ban would be imposed upon her, and that all the assets held in either her name or Mr Al Sadeq's name were frozen and she could not deal with them.  These threats subsequently proved to be correct. As to this:

   97.1.     Mrs Al Sadeq and her children were prevented from leaving the UAE until 10 July 2016;

   97.2.     During the period from September 2014 to her exit from the UAE in July 2016 Mrs Al Sadeq had serious difficulties in making ends meet financially or in accessing education, medical care or other public services for her or her children because their residency permits in Dubai had expired and Mrs Al Sadeq was prevented from taking the necessary steps to renew the residency permits in Dubai via her employer, but was made to transfer her residency to the RAK authorities under the name of an investor so as to remain at the mercy of RAK, and to prevent her from earning a living to support her children.

98. This appears to have been part of a concerted effort (which ultimately succeeded in early 2016), orchestrated by the Defendants, and Mr Gerrard in particular, to put Mr Al Sadeq under duress in order to force him to "cooperate" by signing false confessions implicating

himself and Dr Massaad and alleged co-conspirators in corrupt activities, and to put pressure on Mrs Al Sadeq to persuade him so to do.

99. Commander Al Awadhi also told Mrs Al Sadeq words to the effect that Mr Al Sadeq used to cheat on her "every day" with other women (which was also untrue) and that he did not understand why Mrs Al Sadeq was trying to save him.

100.   Mrs Al Sadeq was upset, shocked, and taken aback by the claims made by Commander Al Awadhi about her husband and by Mr Gerrard's threats.

101.   At this interrogation, Mr Gerrard asked whether Mrs Al Sadeq had contacted a lawyer or the press in relation to Mr Al Sadeq's situation. Commander Al Awadhi indicated that he had already advised her not to and Mr Gerrard confirmed this, telling Mrs Al Sadeq that it would not be in her interests to instruct a lawyer on Mr Al Sadeq's behalf.

102.   Mrs Al Sadeq left the interrogation in tears and badly shaken.

103.   After this interrogation, cars started regularly to circle around the Al Sadeq family home in Arabian Ranches where Mrs Al Sadeq continued to reside with her children, and men would loiter in the streets apparently watching the property. On one occasion on 10 October 2015, Mrs Al Sadeq complained to Commander Al Awadhi, who did not deny that these were agents from RAK but arranged for a female police officer to attend the property with a box of chocolates.  Given that Mr Gerrard had indicated by his words and actions to Mr Al Sadeq that he was orchestrating everything happening to him and had told Mrs Al Sadeq he had the power to have her put behind bars even without any charges being laid against her, it is to be inferred that Mr Gerrard and/or the other Defendants were responsible, directly or indirectly, for these attempts to intimidate Mrs Al Sadeq.

104.   Further, as a result of Mr Gerrard's participation in this and subsequent interrogations of Mrs Al Sadeq between 23 September 2014 and about July 2016 as detailed below, Mr Gerrard's evidence given under cross-examination in the proceedings pursued by RAKIA against Mr Azima referred to at paragraph 62 above that he and Dechert did not interview Mrs Al Sadeq was untrue and perjurious.

Transfer to Al Barirat Camp

105.   In around early October, during the middle of the night, Mr Al Sadeq was transferred to a place he much later came to know was the Al Barirat Camp in Al Ashqar in RAK ("**Al Barirat**"). This is a camp for the Ruler's private militia and is not an official prison within the RAK criminal justice system.

106.    During his transfer from the GHQ to Al Barirat, Mr Al Sadeq was blindfolded with a hood over his head, and the vehicle transporting him drove in circles so that he was disorientated and unable to tell where he was travelling to and from, presumably in an attempt to ensure that he was not able to guess the location of where he was being held. This tactic would be repeated frequently during Mr Al Sadeq's journeys to and from Al Barirat.

107.    He was placed in a cell attached to the camp, once again in solitary confinement. The cell was empty, measuring about 2 metres by 2.5 metres, and although it had a window this had been covered so that no natural sunlight entered. Mr Al Sadeq was detained in this cell for around 560 days. The only time he left his cell was for interrogation, ablutions when permitted, or court visits.

108.    During his time in Al Barirat, Mr Al Sadeq was kept under a false name, and his health reports were also kept under a false name.

109.    When he complained about being held in Al Barirat, Mr Al Sadeq was told by the Defendants, and in particular Mr Gerrard, that he should be thankful for the Ruler's mercy, and that he was being held in Al Barirat for his own protection because of the terrible conditions in the RAK Central Prison which was full of murderers and rapists

Conditions in Al Barirat

110.    During the first part of Mr Al Sadeq's detention in Al Barirat he was kept in particularly inhumane and unsanitary conditions. For example:

110.1.    He was not allowed clean clothes.

110.2.    He was permitted to wash only rarely.

110.3.    His cell was not cleaned regularly.

110.4.    He was initially not allowed to leave his cell to use the toilet and was forced to relieve himself in his cell; later, when he was allowed out of his cell to use the toilet, he was made to do so with his hands tied and accompanied by 4 or 5 guards.

110.5.    During the first 7 months of his detention at Al Barirat, he was prevented from walking, exercise or seeing the sun. After refusing to eat for 5 days he was permitted to walk outside, albeit only for short periods and only a couple of times per week.

110.6.    He was repeatedly denied access to medical attention to treat conditions caused by the circumstances of his detention including constipation, back pain and skin conditions caused by lack of sun. After around 13 months in detention the skin on his legs began to rot and it was only after multiple requests were refused over a period of

several months that he was finally allowed medical attention. He was taken to hospital under a false identity and treated by a dermatologist who persuaded the authorities to allow him to spend one hour per day in the sun, which was then permitted to him.

111.   Conditions for Mr Al Sadeq in Al Barirat only improved meaningfully just before a human rights expert from Scotland, Dr Alan Mitchell, came to Al Barirat in around late 2015 or early 2016. Shortly before Dr Mitchell's visit, the Al Barirat authorities engaged *inter alia* in cleaning his cell. It is to be inferred from the fact that the conditions improved immediately before Dr Mitchell's visit that Dechert, who as set out at paragraph 112 had engaged him, and the Defendants exercised control over the conditions of Mr Al Sadeq's detention (as both Mr Gerrard and Mr Hughes implied to him on various occasions) and/or that they were aware of them.

112.   Dr Mitchell had been engaged by Dechert to produce a report stating that the conditions in the Al Barirat Camp were adequate and did not breach detainees' human rights. However, after reviewing the conditions in which Mr Al Sadeq was being kept, and after speaking to Mr Al Sadeq and informing him that conditions at Al Barirat were unsuitable, Dr Mitchell refused to write the report which Dechert had commissioned from him.

113.   At all material times Mr Al Sadeq was denied any visitation rights from his family, despite, as the Defendants knew, him going on hunger strike in an attempt to persuade those in charge of Al Barirat to allow him the right to see them following which he was promised that things would change soon, which they did not. Further as to this:

113.1.   Mr Al Sadeq's family were not told where he was being detained for the whole period of his detention in Al Barirat.

113.2.   It was not until 2 December 2014, when Mrs Al Sadeq and her mother in law were briefly allowed to see Mr Al Sadeq in the office of the Attorney General of RAK, Hassan Saeed Muhammed Al Habsi ("**Mr Al Habsi**"), that she was able to see him, and even then they were accompanied by several officials and told that the meeting would end immediately if Mr Al Sadeq said anything about the circumstances of his detention.

113.3.   Mr Al Habsi, who had known Mr Al Sadeq in a personal capacity when he worked at RAKIA, appeared (at that stage) sympathetic to Mr Al Sadeq's plight, made contact with Mrs Al Sadeq through his secretary, Saif, and was able to arrange for Mrs Al Sadeq to meet briefly with Mr Al Sadeq on a small number of occasions in his office, although Mr and Mrs Al Sadeq were never left alone together.   Mr Al Habsi told Mr and Mrs Al Sadeq on several occasions that Mr Al Sadeq's detention and

treatment were ultimately in the hands of the Ruler and Dechert outside the formal criminal justice system and were not under his control.

114.    Mr Gerrard, Mr Hughes and Ms. Black were fully aware of the atrocious and abusive conditions in which Mr Al Sadeq was being kept at Al Barirat. Furthermore, Mr Gerrard and Mr Hughes repeatedly made it apparent to Mr Al Sadeq during interrogation that they had the power to ensure that the conditions of his detention improved, if only he were to give them what they wanted. They would, for example, allow him to shower more frequently or change his clothes if they considered he had "cooperated", which was all part of their attempt to force him to confess to matters that were repeatedly put to him, and to implicate Dr. Massaad and his alleged co-conspirators in wrongdoing.

Mr Al Sadeq's lawyer denied access or information

115.    After her meeting at the Hilton with Mr Gerrard and others, on 11 September 2014  Mrs Al Sadeq engaged a lawyer on behalf of Mr Al Sadeq, Dr Ali Al Shamsi, although his brother and associate at the same firm, Dr Jamal Al Shamsi ("**Dr Al Shamsi**"), deputised for him in relation to Mr Al Sadeq's case. Dr Al Shamsi repeatedly tried to gain access to Mr Al Sadeq but was  refused. He was told by the Prosecutor that Mr Al Sadeq was being dealt with outside the criminal justice system in secret and in private sessions; that there were no formal criminal proceedings against him; and that he would not be entitled to any documents relating to the reason for Mr Al Sadeq's detention. Dr Al Shamsi told Mrs Al Sadeq that the manner in which her husband was being held and the process being followed was unlawful, and that he had been told the outcome of Mr Al Sadeq's case would be decided entirely by the influence of the advisers at Dechert and Al Tamimi (RAK's local lawyers who acted on the instructions of Dechert at all material times).

116.    Dr Al Shamsi was never allowed any proper access to Mr Al Sadeq at any stage during the period he was instructed from 11 September 2014 until around August 2015.  Although, after long and unnecessary delay he was finally given power of attorney over Mr Al Sadeq's affairs in April 2015, he was never allowed to receive any instructions from Mr Al Sadeq.

117.    The only time Dr Al Shamsi met Mr Al Sadeq was during his court appearances, and even then, he was prevented from talking to him alone, or in any effective or adequate manner as between a lawyer and his client. He was also not permitted to see any of the papers pertaining to any of the cases brought against Mr Al Sadeq at any time. He was therefore unable effectively to represent Mr Al Sadeq at any of the court hearings which he attended and ultimately ceased to act for this reason.

Interrogations while in Al Barirat from October 2014

118.    During the interrogations conducted in Al Barirat, Mr Gerrard, accompanied on most occasions by Ms. Black, made threats against Mr Al Sadeq, his wife and family about what would happen to them if Mr Al Sadeq did not give him the information he required to implicate Dr Massaad, Sheikh Faisal, Mr Quzmar, Mr Mikadze, Mr Azima and other alleged co-conspirators.  Mr Hughes on occasion deputised for Mr Gerrard and made similar threats.

119.    These threats included Mr Gerrard repeatedly telling Mr Al Sadeq that they were "*taking it easy*" on Mrs Al Sadeq but that they could ensure that his wife was arrested and imprisoned, which he claimed to have the power to procure, and their children left without parents.

120.    By way of further example, Mr Gerrard liked to project the image of being a hard, uncompromising, interrogator.  On one occasion he arrived to interrogate Mr Al Sadeq with his leg in a plaster cast.  Mr Al Sadeq remarked that Mr Gerrard's leg injury was karma for the way in which he had been mistreating him, to which Mr Gerrard replied that the reason his leg was in a cast was because he had "*shoved it up so many arses*".

121.    Mr Gerrard further told Mr Al Sadeq that he needed to "*wake up and smell the coffee*" because he was not American or Canadian so the only way he would ever be released would be if he "cooperated".

122.    As to Mr Hughes, he generally adopted an aggressive manner during his interrogations of Mr Al Sadeq and would habitually shout and swear at Mr Al Sadeq, for example regularly shouting "*fuck you*" at Mr Al Sadeq if he felt Mr Al Sadeq was not being "cooperative".

123.    Furthermore, when he was present Mr Hughes would closely control the notetaking process during the interrogations in order to try to maintain the charade that the interrogations were being conducted lawfully, and would direct the associate / assistant present in the room not to record certain things that Mr Al Sadeq said, or to record them in ways which did not accurately reflect what he and Mr Al Sadeq had said. For example, Mr Hughes would ask Mr Al Sadeq to confess to wrongdoing, and would tell him "*If you say this we will grant you bail*", but the associate present was not permitted to record the words used by Mr Hughes.  On various occasions the associate / assistant protested to Mr Hughes in front of Mr Al Sadeq about the way he was conducting the interrogation, saying that "*we have to stop this*", or words to that effect.

124.    Mr Gerrard and Mr Hughes would refer to Dr Massaad as the "Big Bastard", Mr Azima as the "Shark" and the Ruler as the "Boss".

125.    In relation to Mr Azima, Mr Gerrard asked Mr Al Sadeq to give false evidence that he was an international arms dealer which Mr Al Sadeq made clear was not true and that he had in fact met Mr Azima via the Ruler not via Dr Massaad. For example:

125.1.    Mr Al Sadeq was asked to give false evidence that Mr Azima was manipulating an aviation firm in RAK called RAK HeavyLift in order to use it a gun-running vehicle.

125.2.    Mr Gerrard asked Mr Al Sadeq to give false evidence stating that Dr Massaad, Mr Mikadze and Mr Azima had embezzled money from the Poti Port project and a shopping centre project in Georgia, as a cover to hide the fact that the embezzlement had been carried out by persons known to, and with the knowledge and approval of, the Ruler (and not  by Dr Massaad, Mr Mikadze and Mr Azima at all).

126.    Mr Gerrard and Mr Hughes consistently put pressure on Mr Al Sadeq to provide further "cooperation" during interrogations, even after he had made clear to them that he had truthfully told them everything he knew. Mr Al Sadeq understood this further "cooperation" to mean, and Mr Gerrard and Mr Hughes made clear that it did mean, that Mr Al Sadeq was to provide evidence against Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima, and other alleged co-conspirators which was not true in order to help them build their case against them, and in return for more favourable treatment and / or release from incarceration and / or for not carrying out threats to incarcerate Mrs Al Sadeq.

127.    In this regard, they would make it plain to Mr Al Sadeq that unless he provided such "cooperation" they would ensure he would remain in the inhumane conditions of Al Barirat.

128.    For example, on one occasion Mr Gerrard or Mr Hughes (who were together at the time) said to Mr Al Sadeq that his refusal to provide the necessary "cooperation" meant that "*Things will be prolonged for more years, now we have to go back* [to the UK] *for Christmas and New Year and this will only leave you in this shit place you are in for another two months, maybe you will be forbidden from taking a shower. Or maybe we will ask them to show you the sun for a bit.*" (or words to that effect) and thereby showed their complete control, subject to the Ruler, over Mr Al Sadeq's circumstances and treatment at Al Barirat amounting to torture. Mr Al Sadeq was not allowed to have any legal representation during these interrogations and was not allowed to contact or to be visited by a lawyer at any time during the period he was detained at Al Barirat, despite repeated requests to the Defendants.

129.    However, in order to conceal the fact that he was being denied any or adequate legal representation, Mr Al Sadeq was required to sign documents presented to him by Mr

Gerrard and Mr Hughes stating that he had waived his right to have a lawyer present during interrogations. When Mr Al Sadeq protested and said he wanted a lawyer Mr Gerrard and Mr Hughes on different occasions would respond with statements such as (by way of example) "*We don't have time for this. We have just come all the way from London, we are tired, we don't want these games of yours, just sign the fucking document so that we can finish our business and go back*" (or words to that effect) and threaten to withdraw what few rights he had at Al Barirat such as to shower on occasion.

130.    By contrast, when Mr Al Sadeq did cooperate with the Defendants he would be rewarded. By way of example, upon attending one interrogation with Mr Gerrard, Mr Al Sadeq was told "*see, you cooperated last time, so I allowed them to let you shower*" (or words to that effect).

131.    Dr Al Shamsi, made repeated attempts to obtain information from the office of the public prosecutor about Mr Al Sadeq's whereabouts. On each occasion and at all material times he was told until around mid-2015 (when criminal cases were finally brought against him) that there was no case registered against Mr Al Sadeq, and he was not under the responsibility of the public prosecutor but was being dealt with by the Ruler.

132.    It is to be inferred that Mr Al Sadeq's treatment in Al Barirat, where he was left in solitary confinement in appalling conditions, save for the interrogations to which he was subjected, was intended by the Defendants  on behalf of the Ruler to weaken his resolve to the point where he would agree to "cooperate" by saying, and putting his name to, anything the Defendants and the Ruler wanted him to say to assist them in building a case against Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and other alleged co-conspirators.

Mr and Mrs Al Sadeq's meetings and Mrs Al Sadeq's initial meetings with the Ruler

133.    On 8 December 2014 Mrs Al Sadeq met the Ruler together with Mr Al Sadeq's mother. The Ruler was kind to Mrs Al Sadeq at this first meeting, which lasted for approximately 45 minutes, telling her that while he would not immediately be released she would be happy in the end and should not worry about Mr Al Sadeq. The Ruler further discussed how he had been chosen from amongst his brothers to rule and how Dr Massaad and Mr Quzmar had betrayed his trust but said that Karam was his son and he would keep him safe.

134.    When it was suggested by Mr Al Sadeq's mother that Mr Al Sadeq's continued detention was in the Ruler's power and that he could choose to release him, the Ruler replied that this would happen very soon. As a result, having believed the Ruler's promises,

Mrs Al Sadeq left the meeting overjoyed and optimistic that Mr Al Sadeq would soon be released.

135.    Thereafter, on 1 February 2015 Mr Al Habsi managed to arrange for Mr Al Sadeq to be brought from solitary confinement in Al Barirat to meet with Mrs Al Sadeq at his office. Mr Al Habsi was present at the meeting. The purpose of the meeting was to discuss how Mrs Al Sadeq should approach an audience she had been granted with the Ruler the following day to discuss her husband's case since both Mr Al Sadeq and Mr Al Habsi were very familiar with him whilst Mrs Al Sadeq had only met him once before.

136.    Mr Al Sadeq seemed tired and in a poor physical and psychological state to Mrs Al Sadeq.  However, he still appeared to have some hope about his situation, and said he believed that the Ruler would ensure his release and exoneration before long.

137.    Mr Al Habsi told Mrs Al Sadeq that she should make the Ruler aware of the very difficult position she and her children were in and hope that this would cause him to  be sympathetic.

138.    At this meeting Mr Al Sadeq told Mrs Al Sadeq to try to get the Ruler's side of the story; to ask the Ruler what he wanted from him; and to see whether the Ruler would be prepared to sanction a settlement or agreement leading to his release if he were to give in to the pressure which had been placed on him to make a false confession implicating Dr Massaad and his alleged co-conspirators. Mr Al Sadeq said to Mr Al Habsi in front of Mrs Al Sadeq about the suggestion that he and / or Dr Al Massaad had been involved in wrongdoing: "*Come on you know that he* [the Ruler] *knew about everything and gave his consent, he approved every move of it.*" (or words to that effect).

139.    On 2 February Mrs Al Sadeq met with the Ruler again at his palace and was accompanied by Mr Al Sadeq's mother again. The Ruler repeated to  Mrs Al Sadeq that his argument was not with Mr Al Sadeq, but with Dr Massaad and Mr Quzmar who he said had betrayed him. He asked Mrs Al Sadeq if Mr Al Sadeq had been involved in legal proceedings brought by Shahab Izadpanah against the Ruler in Abu Dhabi, and she confirmed that he had not been.  Regardless, he told her that Mr Al Sadeq had chosen the "wrong side" by being loyal to Dr Massaad, and promised Mrs Al Sadeq and her mother in law that as long as Mr Al Sadeq "cooperated" with his legal advisers, Dechert, in investigating and building a case against Dr Massaad, Mr Quzmar, and any other alleged co-conspirators, and in particular by providing written confessions, the case against Mr Al Sadeq would be settled.  The Ruler said that he would consult with his lawyers, by which Mrs Al Sadeq understood him to mean Dechert, about whether this could happen.

140.    On 3 February Mr Al Habsi facilitated a further meeting between Mr and Mrs Al Sadeq at his office, at which Mrs Al Sadeq updated Mr Al Sadeq about what the Ruler had said. Mr Al Habsi told Mr and Mrs Al Sadeq that unfortunately he had little or no influence on the situation since it was "*all in the hands of the foreigners*" (by whom he meant the Defendants, and Mr Gerrard in particular) or words to that effect. Mr Al Sadeq told Mr Al Habsi that he had already told them everything he knew in writing, and he did not have anything more to give unless he lied. Mr Al Habsi however indicated that Mr Al Sadeq needed to confess still more, which Mr and Mrs Al Sadeq understood to mean that Mr Al Sadeq would be required to give false confessions, untruthfully implicating others and himself in wrongdoing.

Mrs Al Sadeq's further appeals directly to the Ruler and Mrs Al Sadeq's contacts with the Guardian newspaper

141.    After her second meeting with the Ruler on 2 February 2015 until around July 2016 Mrs Al Sadeq made a number of further direct appeals to the Ruler to intervene in Mr Al Sadeq's case. In doing so, she had several face to face meetings with him, and also corresponded by email and letter. On one of those occasions Mr Al Sadeq's father also attended with her.

142.    Further as to this:

142.1.    On 24 February 2015 Mrs Al Sadeq emailed a letter to the Ruler (via his assistant, Jan) asking for his assistance, reminding him that her husband had been in solitary confinement for 6 months by that point, was in poor physical and mental health; had been cooperating with the requests made of him in the hope of securing his release; and referred to the Ruler's promise that the cases against her husband would be settled.

142.2.    On 4 March 2015 Mrs Al Sadeq emailed a letter to the Ruler, copying her email to Ms Black, confirming that she would not cooperate with a journalist from the Guardian newspaper, Simon Goodley by whom she had been contacted. She stated that "*I hope us continuing to help you will finally put an end to this situation we are living*". The background to this email is that the Ruler's assistant, Jan, and then subsequently Ms. Black, had called Mrs Al Sadeq shortly beforehand asking questions about her contacts with the press, and told her that the Ruler already knew that she had been assisting a journalist. It was apparent to Mrs Al Sadeq from her conversation with Ms. Black that Dechert and / or the Ruler might have had access to emails which had passed

between her and Mr Goodley, and she concluded that her email account had been hacked by or on behalf of the Defendants.

142.3.    On 5 March 2015 Ms. Black emailed Mrs Al Sadeq to arrange a meeting with the Ruler on 11 March 2015. She explained that she and Mr Gerrard would also be at that meeting and "*hope to be able to provide you with some positive information regarding the ongoing process in respect of*" Mr Al Sadeq. In the event, this meeting was cancelled because the Ruler came to learn that Mrs Al Sadeq had not in fact broken off all contact with Mr Goodley, a fact that Mrs Al Sadeq considered Dechert and the Ruler could only have known had they had access to her emails, confirming her suspicions. Instead, Mrs Al Sadeq and her father in law met with Khaled Yousef, an advisor to the Ruler, who told them that if Karam showed complete "cooperation" he would be released.

142.4.    On 6 April 2015 Mrs Al Sadeq again emailed a letter to the Ruler complaining *inter alia,* as Mr Al Sadeq had told her at a recent meeting which had taken place in the office of the Attorney General in around March 2015, that he was being pressured by Mr Gerrard to agree to pay the fees owing to Dechert by RAK, and to make a false confession, stating as follows:

> "*In the last meeting with Karam, my husband informed us of the suggested settlement by the law firm represented by "Neil", which suggested to my husband that he pay huge sums that he would not be able to pay even if he wanted to.*
>
> *The settlement stated a payment of 4 years of salary with interest **and paying all of the amounts due by the government of RAK to the law firm Dechert** and a forged confession of taking bribes, amongst a number of other conditions.*
>
> *Your Highness, **we are absolutely certain that you do not accept the above, and you would not be content with a defendant being pressured to offer false testimony. Considering that they threatened him by saying wake up and smell the coffee with the meaning that if he does not accept their requests he shall stay indefinitely.***
>
> *Considering that they threatened to imprison me for 25 years in my second meeting with them, saying "if he wanted, the Sheikh could imprison you for 25 years, he could, without anyone questioning it"*
>
> *Your Highness, after my meeting with you, I learned, full well, that these people do not represent you in what they say and you would not be pleased by this threat and intimidation of a wife who has done nothing wrong but try various ways to cooperate, and a husband who has expressed that he is completely prepared to consider any demand you deem appropriate and*

> *repeatedly reject the requests of his family to approach any other party. We*
> *hope for justice and mercy, which you are best able to perform.*
>  (emphasis supplied, literally translated from the original Arabic)

142.5.      On 15 April 2015 Mrs Al Sadeq emailed the Ruler to ask for the travel ban
against her to be lifted so that she could travel to visit her family in Palestine on 23
April 2015. That request was refused, it was not until July 2016 that Mrs Al Sadeq was
finally allowed to leave the UAE.

142.6.      On 15 May 2015 Mrs Al Sadeq emailed a letter to the Ruler pleading again for
his assistance in relation to Mr Al Sadeq.

142.7.      On 4 June 2015 Mrs Al Sadeq emailed a letter to the Ruler asking for his help,
having the previous day attended a court hearing in Mr Al Sadeq's criminal case which
by this point had formally been commenced. She referred back to the Ruler's promise
to her that Mr Al Sadeq would be released with a settlement:

> *I am still holding on to your promise to me, sir, that my husband will be*
> *released soon by a settlement. I did not want to attend the past court hearings*
> *because I was living on the promise and refused to believe [the situation], but*
> *yesterday was the first time I attended a hearing, and I cannot deny that I am*
> *gradually losing hope.*
>
> *We wanted to see you again with Karam's father, and we sat for hours in front*
> *of the doors of your palace to be able to see you, to remind you of your words*
> *that my husband was and still is cooperating to the fullest extent.*
>
> *My husband has not ceased his repeated willingness to use all possible means*
> *to cooperating with the demands of the investigators and lawyers, in terms of*
> *money, information and additional assistance upon his release. Sir, I ask you:*
> *What more can a person do?* (literally translated from the original Arabic).

142.8.      On 16 June 2015 Mrs Al Sadeq emailed a letter to the Ruler explaining the
plight she and her children were facing, and protesting that her husband had cooperated
fully:

> "*My youngest child is ill and I tried to take him to the national hospitals,*
> *however, to open a file I need a property rental contract which is one of the*
> *documents taken by the court upon their summoning of all of the documents.*
>
> *My youngest daughter needs to start school at the start of next year, i.e. in 2*
> *months, and I cannot register her without our money. Even if I was able to get*
> *the money I would not be able to conduct any official procedures without the*
> *sponsor (their father).*

*Our residency visa in the country will expire in a number of months and I have not been able to renew it under the present circumstances.*

*I expect at any moment to be evicted from our house due to the cases raised against Karam for failing to satisfy the house contract and many other issues arising from the cases related to his last work in Dubai.*

*Please help us, your Highness, for it is in your hands to change the circumstances or we cannot continue.*

*Is it possible that my husband has any other information with the full knowledge of the suffering that we are experiencing in our day to day lives, considering that he has not seen his children for more than 5 months and he has not changed his statements from the first day.*

*He has lost his life, his present and his future and I threatened him that he would lose me and the children if we found out that he is hiding something, but he is not concealing any other information.*

*Is it possible for him to be covering up for a person like Khater Massaad who let him and his family down and has not even contacted them to check up on them, considering that we knew Khater did not want to cooperate with the Authority's lawyers recently when they went to him and my husband knows this too.*

*Is it possible that a person like Khater would entrust with his secrets, a young man who had not even reached thirty years old.*

*Sir, you yourselves said that Karam has not stopped cooperating with you, please sir, just consider the possibility that my husband does not know more than what he said and that he is willing to atone for what he did with the money and time he spent in solitary confinement for up to nearly a year and two months from now.* (literally translated from the original Arabic)

142.9.    On 29 July 2015 Mrs Al Sadeq forwarded to the Ruler a letter from Mr Al Sadeq's father asking for a further meeting following one which had taken place on 24 July, prior to the expiry of his visa (which necessitated his return to Jordan). At this meeting with Mr Al Sadeq's father, the Ruler had adopted a noticeably more aggressive tone than in his meetings with Mrs Al Sadeq, accusing Mr Al Sadeq's father of not knowing how to raise him such that it was now "*their job*" and telling him that he could not believe that Mrs Al Sadeq had permitted Mr Al Sadeq to become "*such a thief*".

142.10.     Mrs Al Sadeq then met with the Ruler again on 4 August 2015. At this meeting, the Ruler repeated that Karam would be pardoned.

Introduction of Mrs Al Sadeq to Mr Buchanan

143.     On 20 May  2015 Mrs Al Sadeq went to the Ruler's palace with Mr Al Sadeq's sisters in an attempt to meet the Ruler. After waiting for several hours on the pavement outside the palace they were told that the Ruler would not see them.  However, one of the Ruler's courtiers gave them the telephone number of a Mr James Buchanan ("**Mr Buchanan**"). Mr Buchanan was the Chief Executive Officer of Ras Al Khaimah Development LLC, an adviser to the Ruler, a spokesman for the RAK Government, and is a close associate, and a neighbour in Sussex, of Mr Gerrard.

144.     Mrs Al Sadeq called Mr Buchanan and he invited her to meet with him at the Waldorf Hotel in RAK, which she did a few days later. At this meeting, at which a notetaker from Dechert or Al Tamimi was also present, Mrs Al Sadeq explained the history of her husband's kidnap and incarceration to Mr Buchanan who in turn told Mrs Al Sadeq that he was part of the investigation into RAKIA and claimed that wrongdoing had been found on the part of Dr Massaad but that Mr Al Sadeq's conduct was still under investigation.

145.     Mrs Al Sadeq told Mr Buchanan that even if Mr Al Sadeq was guilty then this did not justify his treatment. Mr Buchanan responded by telling Mrs Al Sadeq that her husband needed to "cooperate", and that he would attempt to use his influence with the Ruler to assist Mr Al Sadeq. He further stated that if Mr Al Sadeq "cooperated" he would be released within two months. If he did not, and refused to help develop a case against, and testify against, Dr Massaad and other alleged co-conspirators, he would be prosecuted through the RAK Courts.

146.     From that point Mrs Al Sadeq was in regular contact with Mr Buchanan by telephone and SMS, and met him on around ten occasions in person, sometimes with Mr Al Sadeq also present.

147.     During one of these meetings which took place at the courthouse in RAK, Mr Buchanan admitted to Mrs Al Sadeq that he hoped her husband would be released because he knew what was happening to him was wrong.

Pressure on Mrs Al Sadeq used to try to persuade Mr Al Sadeq to agree to sign confessions

148.     While Mr Al Sadeq was in Al Barirat, Mr Gerrard and Mr Hughes were also, in addition to Mr Buchanan after 20 May 2015, in regular contact with Mrs Al Sadeq in order to put

pressure on her to try persuade Mr Al Sadeq to confess that he had been involved in a fraud on RAKIA and to cooperate in building a case against Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and other alleged co-conspirators, in return for his release. While Mr Al Sadeq had given his assistance to Dechert in their investigation, he was refusing at this stage to sign a false confession that he had been involved in wrongdoing, and was refusing to give false evidence that Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima or any of their alleged co-conspirators had been involved in wrongdoing. He maintained (and continues to this day to maintain notwithstanding eventually being forced into signing the false confessions to this effect described at paragraph 183 below) that he was innocent of any wrongdoing. Everything Mr Al Sadeq did whilst working at RAKIA was on the instructions and/or with the knowledge of the Ruler via Dr Massaad.

149.    Mr Gerrard, assisted by Ms. Black, Mr Hughes and Mr Buchanan would each tell Mrs Al Sadeq that if she persuaded Mr Al Sadeq to tell them what they wanted, and to "cooperate" by signing a confession,  he would be released and pardoned, and they could get on with their lives; but that if no confession was forthcoming Mr Al Sadeq would remain in prison, and Mrs Al Sadeq was also at risk of being imprisoned and of losing her children as a result.

150.    This pressure was applied to Mrs Al Sadeq in circumstances where, as pleaded at paragraphs 110 to 114 above, and as apparent from the letter she sent to the Ruler referred to at paragraph 142.8  above, her husband was incarcerated in terrible conditions and his mental and physical health was deteriorating; she and her children were prevented from travelling outside the UAE; she was in dire financial circumstances as a result of her and Mr Al Sadeq's accounts being frozen; and she was not able to renew her or her children's residency, meaning that she was not able to work and they were not entitled to avail themselves of public services, such as healthcare or education, in Dubai.

151.    Against this background, on several occasions between 2015 and April 2016 Mrs Al Sadeq was asked by Mr Gerrard to attend the RAK court to where Mr Al Sadeq would be brought, and she would be allowed to spend a few minutes in a room with Mr Al Sadeq, generally in the presence of Mr Hughes but also, once he had become known to her, Mr Buchanan.

152.    During these meetings, Mrs Al Sadeq was instructed by them to persuade Mr Al Sadeq to sign false confessions (which the Defendants knew to be false) incriminating himself, Dr Massaad and his alleged co-conspirators as part of an overall settlement of the charges being made against him, so as to secure his release and pardon.

153.    By way of example of these meetings, on 15 June 2015, Mrs Al Sadeq met Mr Buchanan and Mr Gerrard who informed her that unless Mr Al Sadeq came up with new information to incriminate, *inter alios*, Dr Massaad and Mr Quzmar, which was to their liking, they would not recommend to the Ruler that Mr Al Sadeq be given a settlement and released, and instead he would be prosecuted through the RAK courts.

154.    Thereafter, the meetings continued and as a result of the treatment, threats and pressure being applied to him and Mrs Al Sadeq, and as a result of the promises he would be released and pardoned if he cooperated, Mr Al Sadeq had finally agreed in principle by about the third quarter of 2015 that he would "cooperate" by making a false confession and giving false evidence against Dr Massaad and his alleged co-conspirators including Mr Quzmar, Mr Mikadze and Mr Azima so long as he had sufficient binding assurances, in writing, that he would be released and pardoned, and that his family would be allowed to continue their lives as before if he did so.

155.    Mr Al Sadeq had at this time come to accept, as he had been repeatedly told by Mr Gerrard and Mr Hughes, that the only possibility for his release and the safety of his family was to provide them with the "cooperation" they sought by making false confessions and giving the evidence the Defendants wanted him to give.  It was his intention, once he was released, however, to reveal how he had been treated and forced to confess, and to clear his name.

156.    Once Mr Al Sadeq had indicated he would be prepared to sign false confessions the focus of discussions with Mr Gerrard, Mr Hughes, Ms Black, Mr Osama Daneshyar ("**Mr Daneshyar**") and Mr Khalid Al Hamrani ("**Mr Al Hamrani**") of Al Tamimi and (once he became involved) Mr Buchanan turned to the terms on which he would agree to sign false statements and give evidence against Dr. Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and other alleged co-conspirators. These discussions extended to Mrs Al Sadeq who was seen as key to persuading her husband to agree to "cooperate" in this way.

157.    On 10 August 2015 Ms. Black emailed Mrs Al Sadeq to try to organise a meeting between Mr Al Sadeq, Mrs Al Sadeq and Dr Al Shamsi, who was reluctant to attend. Ms. Black explained that Mr Gerrard would be happy to meet with Mrs Al Sadeq separately the following day.

158.    On 11 August 2015 Mr Gerrard emailed Mr Daneshyar from Al Tamimi saying that Mrs Al Sadeq had called him after speaking with her husband, and that Mr Al Sadeq had instructed, Dr Al Shamsi, to attend a settlement meeting with Mr Gerrard and Al Tamimi on 12 August 2015.

158.1.    In relation to the suggestion that Dr Al Shamsi was reluctant to attend the meeting, Dr Al Shamsi had been asked to attend several previous meetings which had been cancelled with no notice, causing him a number of wasted trips to RAK; he was frustrated by the lack of access to Mr Al Sadeq which meant he was not in a position properly to take instructions or to advise his client; he was concerned about the treatment of Mr Al Sadeq in general, and the impropriety of the pressure that was being applied to him to make a false confession with the promise of release and a pardon if he did so; and was concerned at the reluctance of Dechert and / or the Ruler to commit any settlement or proposed settlement to writing. Shortly afterwards, at a meeting with Mrs Al Sadeq and Mr Al Sadeq's father, Dr Al Shamsi informed Mrs Al Sadeq that it was impossible for him to assist or advise Mr Al Sadeq in the circumstances of his detention, lack of access to him or to information about the proceedings against him, and he therefore ceased to act for Mr Al Sadeq.

158.2.    Dr Al Shamsi did however attend the meeting on 12 August 2015 which took place at the Waldorf hotel in RAK where settlement terms were discussed for securing Mr Al Sadeq's release.

159.    On 13 August 2015, Mr Gerrard emailed Mrs Al Sadeq and asked her to call him as soon as possible. Mrs Al Sadeq called him as requested, and he told her that, as discussed at the meeting the previous day, Mr Al Sadeq would be  released within the following week prior to any judgements in the criminal cases already pending against him, and the settlement of current and future cases in return for: (i) his full "cooperation";  (ii) agreement that he, Mrs Al Sadeq and their children would surrender their passports and remain in the UAE for the period needed to complete Dechert's investigation so that he could continue to "cooperate".  In addition, Mr Al Sadeq had been told that he would be required to give a UAE 5 million guarantee that he would keep the terms of his release and pardon confidential (although this was not mentioned to Mrs Al Sadeq by Mr Gerrard).

160.    However, by 23 August Mr Al Sadeq had not been released. On that date Al Tamimi contacted Mr Al Sadeq's lawyer, Dr Al Shamsi, to say that the UAE 5 million Dirhams guarantee was not sufficient, because if someone (such as Dr Massaad) offered Mr Al Sadeq more than UAE 5 million Dirhams he would have no reason not to breach confidentiality.

161.    Mrs Al Sadeq emailed Mr Gerrard the same day, saying (*inter alia*):

"*...we can't envisage anything more than barring our family of leaving UAE and /or confiscating our passports, or a reasonable financial guarantee.*

> *And we are sure that once you receive all the necessary information from Karam under oath, the need for such extreme measures and guarantees shall cease its importance .*
>
> *I would like to remind you that Karam's cooperation was confirmed during my meetings by HRH, and by your good self, and this cooperation was for the purpose of not ending up with a conviction that will ruin Karam's career path and our family forever.*
>
> *I would appreciate your reply knowing that we are ready to accept any guarantee you see suitable to help end this situation helping you in your investigation and helping our family survive.*"

162.    On 30 August 2015,  three or four days prior to Mr Al Sadeq's next scheduled court hearing, Mrs Al Sadeq emailed Mr Gerrard again, having been contacted by Ms. Black a few days previously to say Mr Gerrard would be in contact but Mr Gerrard not having made contact:

> "*I was expecting your call, a few days back when Caroline informed me. Please feel free to call me at your convenience.*
>
> *Furthermore, I was informed that you would like to meet this Wednesday the 2nd of September, I would like to know if that is still on your schedule.*
>
> *I think you know that Karam's hearing is tomorrow, hoping that there won't be any sentence tomorrow which will effect Karams* [sic] *negotiated settlement.*"

163.    Following this email, Mr Gerrard called Mrs Al Sadeq to inform her that in fact Mr Al Sadeq would not be released. Contrary to the terms evidenced by Mrs Al Sadeq's emails to him on 23 and 30 August, in particular that Mr Al Sadeq would not be sentenced by the RAK court under the terms of the settlement agreed, or purportedly agreed with Mr Gerrard, Mr Gerrard now told Mrs Al Sadeq that Mr Al Sadeq would be convicted by the RAK Court and, for reasons of UAE law, only then could he be released and pardoned. He went on to  explain that Mr Buchanan would also need to meet with Mrs Al Sadeq in order to convey this news officially.

164.    On 31 August 2015, despite Mr Gerrard's promises in relation to Mr Al Sadeq's imminent release, Mrs Al Sadeq was denied permission to see Mr Al Sadeq.

165.    Mr Buchanan then contacted Mrs Al Sadeq and told her that the Ruler had agreed that Mr Al Sadeq would be released and pardoned, subject to Mr Al Sadeq agreeing to "cooperate". He told her, however, that the agreement would only be available orally and could not be put in writing. In an effort to reassure her, he informed her that she and Mr Al Sadeq could trust the Ruler and that in any event Mr Buchanan was "*a man of his word*" and if the Ruler broke his word then they could sue Mr Buchanan, wherever he was.

166.    With regard to the lack of a written agreement, Mr and Mrs Al Sadeq had made repeated requests for any settlement agreement to be committed to writing (which had also been made by Dr Al Shamsi when he was still instructed). This request was refused because, they were told on various occasions by Mr Buchanan and Mr Gerrard that the Ruler and Dechert were concerned that Mr Al Sadeq could subsequently use any written agreement against the Ruler, including to demonstrate that his confessions were false and had been improperly obtained. Mr Al Sadeq had agreed various solutions to those concerns, such as that he give a financial guarantee (as pleaded at paragraph 159 above) and had proposed that the written confirmation of any agreement could be kept in escrow and used only if the Ruler did not keep to his side of the agreement. These solutions had all ultimately been rejected.

Discussions about settlement in return for a false confession

167.    Thereafter, on 2 September 2015 Mrs Al Sadeq met Mr Al Sadeq with Mr Buchanan also present (the "**2 September 2015 Meeting**"). Mr Al Sadeq was brought to this meeting at the court house in handcuffs and shackled, looking broken, and unable even to look at Mrs Al Sadeq. Upon seeing this, Mr Gerrard, who was waiting with Mrs Al Sadeq and Mr Buchanan by the reception turned to Mrs Al Sadeq immediately after Mr Al Sadeq had been brought past and, laughing, remarked to Mrs Al Sadeq in a tone which suggested both amusement and menace "*this is how they do things here*" or words to that effect. He also told Mrs Al Sadeq that it was up to her to convince Mr Al Sadeq to agree to the offer that was to be conveyed from the Ruler by Mr Buchanan.  He then remained outside the small room in which the 2 September 2015 Meeting took place whilst Mr Al Sadeq, Mrs Al Sadeq and Mr Buchanan went in, telling Mrs Al Sadeq that it would not be appropriate for him to witness what Mr Buchanan was going to say.

168.    At this meeting, Mr Buchanan, appearing to read from a piece of paper which neither Mr nor Mrs Al Sadeq were permitted to see, set out the terms for settlement which he said came from the Ruler. These were that if Mr Al Sadeq "cooperated" in whatever ways Dechert required to their satisfaction and signed confession statements, he would be released from prison on bail to a house in RAK in due course, his family being obliged to surrender their passports, although he would not be permitted to leave the country until after he had finished assisting with trials at which point he would be granted a pardon and permitted to leave RAK.

169.   Mr Buchanan informed Mr and Mrs Al Sadeq that all these terms, including the Ruler's promise that Mr Al Sadeq would be released and pardoned, had been authorised by the Ruler himself at a meeting attended by Mr Buchanan, the Attorney General Mr Al Habsi, and Dechert.

170.   As a result of the refusal to put any settlement agreement in writing, Mr and Mrs Al Sadeq were concerned that even if Mr Al Sadeq agreed to the terms put forward by the Defendants, they would not be honoured.

171.   Following the 2 September Meeting and as a result of these concerns on the part of Mr and Mrs Al Sadeq, on 4 September Mr Buchanan called Mrs Al Sadeq to encourage her to convince Mr Al Sadeq to agree to the proposed oral settlement agreement as soon as possible because it was "*the best you can get*". This echoed the previous statement made by the Defendants and Mr Buchanan in relation to Mr Al Sadeq's concerns about the lack of a written agreement, telling him that he was the one in solitary confinement and was only wasting time.

172.   As a result of her and Mr Al Sadeq's continuing reservations about entering into a purely oral settlement agreement, on 21 September 2015, Mrs Al Sadeq wrote directly to the Ruler, appealing to him to grant them written assurances if Mr Al Sadeq would cooperate stating, *inter alia*:

> "...[W]e have tried to reach a settlement with the RAK Investment Authority's lawyer and other concerned parties, but in the end the lawyers withdrew from submitting a written settlement and offered my husband an oral settlement which did not guarantee anything such as releasing him on bail, dropping the charges, a written pardon or a non-conviction certificate to save his professional future and therefore his children's future neither of which are older than four years old.
>
> My husband, Karam Al Sadeq, agreed to cooperate in every way possible, from giving information in his possession to giving up any money requested and remaining in RAK until you find it appropriate, and he did not fail to provide solutions to any obstacle for his conditional release.
>
> We seek empathy from Your Highness by directing the lawyers, if it pleases you, to grant my husband some guarantees as he has shown his full willingness to cooperate, and to reconsider the possibility of granting him a settlement or a written promise guaranteeing what was promised in the settlement discussions. (literally translated from the original Arabic)

173.   Over the following weeks however, Mr Al Sadeq began to "cooperate" with the Defendants, even in the absence of anything in writing, in the (ultimately vain) hope that

he would be released if he did so. Mr Al Sadeq, considering that his life was in danger if he remained at Al Barirat, felt that he had been left with no other choice and was no longer able to endure the torments and torture heaped upon him, directly or indirectly, by or on the instructions of the Defendants, and Mr Gerrard in particular.  In substance, he therefore agreed to the proposal made by Mr Buchanan at the 2 September 2015 Meeting, thereby concluding an agreement on those terms (the "**False Confession Agreement**") with the Ruler via Mr Buchanan. In doing so Mr Al Sadeq relied upon the promise made by the Ruler and the Defendants  and Mr Buchanan *inter alia* that he would be released and pardoned.

174.    Despite his "cooperation" with the Defendants in producing false confessions, criminal court proceedings against Mr Al Sadeq continued, as Mr Gerrard had said they would. On around 12 October, around two weeks prior to a sentencing hearing, Mr Hughes told Mrs Al Sadeq while she was at the RAK court trying to prepare a bail application for her husband, that Mr Al Sadeq's sentence would be 8 years.  When she asked him how he knew this he responded: "*Because I know*", or words to that effect.  He separately told Mr Al Sadeq a similar thing.

175.    On 28 October 2015 the RAK Court of First Instance passed of a sentence of 8 years imprisonment against Mr Al Sadeq. In the same case, Dr Massaad received a sentence of 30 years *in absentia*, and Mr Quzmar was also sentenced to 30 years in prison.

176.     The fact that the RAK Court of First Instance handed down this sentence as had been correctly foretold by Mr Hughes some two weeks earlier, as pleaded at paragraph 174 above, appeared to Mr Al Sadeq and Mrs Al Sadeq to confirm the Ruler's and Dechert's control over the sentences which had been passed and the proceedings, just as they were seemingly in control of all other parts of the justice system in RAK. It further confirmed that they controlled Mr Al Sadeq's fate, thereby necessitating his continued cooperation in providing the Defendants with false confessions implicating Dr Massaad, Mr Mikadze and other alleged co-conspirators.

177.    The announcement of the RAK Court's sentences several weeks before they were delivered was not Mrs Al Sadeq's only direct interaction with Mr Hughes whether alone, or together with Mr Al Sadeq. As to this:

177.1.    At the same meeting on 12 October 2015 in a room in the Court in RAK at which Mr Hughes told Mrs Al Sadeq what Mr Al Sadeq's sentence would be, he also told them that the result of Mr Al Sadeq's agreement to make a false confession and to implicate Dr Massaad and others, he (Mr Hughes) had the Ruler's agreement to

release Mr Al Sadeq on bail, but that in order to guarantee that he did not try to leave the UAE Mrs Al Sadeq would be required to give her and her children's passports to Mr Hughes.  Mrs Al Sadeq met with Mr Hughes a few days later at the RAK court and gave him the passports as requested, but he then told her that bail would not be granted at that point, but he was still working on it.

177.2.      In about November 2015 Mr Hughes called Mrs Al Sadeq late one evening and told her to come to the Ritz Carlton in the Dubai International Financial Centre immediately.  Mrs Al Sadeq did as she had been instructed, and found Mr Hughes there having dinner and drinking wine, he told her to join him at his table. She did not eat or drink, although Mr Hughes insisted on pouring her a glass of wine despite her having refused it, which Mrs Al Sadeq perceived as Mr Hughes being disrespectful towards her, given the circumstances. Mr Hughes told Mrs Al Sadeq, adopting a triumphal manner, that what was happening to her husband was political, but told her that so long as he "cooperated" he would be released by December 2015 provided that Mrs Al Sadeq did not involve the press or take steps through lawyers to challenge her travel ban. He also threatened her again with imprisonment leading to the loss of her children. He told her "*this is how things work in the modern world*" and made disparaging comments about the position and role of women in Middle Eastern society.

The failure to honour the False Confession Agreement

178.    As pleaded above Mr Al Sadeq had at all times during his detention done his best truthfully to assist Dechert with their investigation and had initially resisted the pressure being put upon him to make a false confession as to any criminality on his own part,  and to implicate Dr Massaad and / or his alleged co-conspirators falsely.

179.    Pursuant to the False Confession Agreement, Mr Al Sadeq was however required to assist Dechert with their enquiries on an ongoing basis, in particular by giving false evidence, which evidence the Defendants knew to be false, against Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and alleged co-conspirators and wrongly distancing the Ruler from any knowledge about RAKIA's offshore investment activities, which had always been done with his knowledge or on his instructions, and ultimately for his personal benefit in the years before and after his accession.

180.    Under the terms of the False Confession Agreement, and as was made clear at all material times by the Defendants and Mr Buchanan, Mr Al Sadeq's bail was contingent upon Dechert being satisfied with the assistance he was giving them. Consequently, for

some time after the False Confession Agreement, Mr Al Sadeq continued to be held at Al Barirat in appalling conditions and interrogated by the Defendants much as before.

181.   In the light of this lack of change in Mr Al Sadeq's circumstances despite his agreement to the False Confession Agreement and the sentence passed against him on 28 October 2015 together with a subsequent application made by the prosecutor for it to be increased, Mrs Al Sadeq made a further plea to the Ruler, sending a letter by email on 16 November 2015 to which she attached photographs of Mr Al Sadeq's children and father. She explained as follows:

> "*Today, after a year and three months of our attempts in various ways to contain the crisis and reunite my family, we learned that the battle continues strongly, and that my husband will appear again before the judges at the request of the Public Prosecution on an appeal to increase the severity of his punishment.*
>
> *We have no more hope left, after the continuous promises and Karam's continued cooperation, we have only been left worse off.*
>
> *Karam was sentenced in the first case to 8 years with deportation, and now he is forced to appeal without a lawyer due to us not being able to pay for a lawyer.*
>
> *Karam will stand before the judges representing himself against the army of lawyers and investigators.*
>
> *We have many times and repeatedly pleaded for you to be compassionate with us and my husband after what has happened until now. We no longer have the energy for this war, knowing that its main parties are hiding behind the largest law firms in Switzerland and elsewhere, and my simple husband is the one who suffers the blows.*
>
> *My husband is nothing to you but a number, and the months and years are merely numbers, for us Karam has broken our backs, every day for me away from my husband is a new survival battle to secure my children financially, and a psychological battle to find solutions to the endless problems from residency visas to setting up health insurance to being forbidden from visiting my sick father in Palestine who hasn't seen his grandchildren in two years.*
>
> *I was forbidden from travelling for reasons I do not know, I was forbidden from working, mine and my children's residency visas are about to expire in January 2016. We have been suffering mentally continuously since 2014, we are living on sedatives, we have tried in various ways to make you end the tragedy on our family, and you have all of the information you wanted, but we have seen no avail.*

> *In the end, we were all offered to go to prison with Karam, and live in a prison composed of one floor with soldiers and police officers living in the same house.*
>
> *Your Royal Highness, my pleadings are not to be united with Karam in a large prison but rather to release him to raise his children so that he can try to save their and his future.* (literally translated from the original Arabic).

182.    Despite this appeal, and as described at paragraphs 185 to 190 below, Mr Al Sadeq remained incarcerated at Al Barirat until 20 April 2016.

The False Confession Statements

183.    Pursuant to the False Confession Agreement, and following several further months of being pressurised by the Defendants for false testimony and without the benefit of legal advice, Mr Al Sadeq eventually signed statements confessing to his involvement in alleged fraud concerning Pioneer Cement Industries LLC, a company part-owned by RAKIA, and Poti Port in Georgia (respectively the "**False Confession Statements**"), and incriminating, *inter alios*, Dr Massaad and Mr Mikadze. Those statements had been drafted by Mr Hughes and approved by Mr Gerrard. Mr Al Sadeq was not given, or allowed to read, the statements in their entirety at any point, but parts of the statement were read out to him by Mr Hughes. Additionally, he was asked to sign at least ten blank sheets of paper which, it is to be inferred, was so that those unique signatures could be falsely applied to additional statements and / or documents.

184.    Mr Al Sadeq signed the False Confession Statements under duress, despite them being untrue in important respects which incriminate himself, Dr Massaad and Mr Mikadze.  Mr Al Sadeq had also made clear to, *inter alios*, Mr Gerrard, Ms. Black, Mr Hughes and Mr Buchanan that the contents of those statements were substantially untrue. As to this, for example, each of the Confession Statements states:

184.1.    that Mr Al Sadeq had had the benefit of legal advice in relation to the statement. That was untrue and the Defendants knew it to be untrue because they had refused to allow Mr Al Sadeq's lawyer, Dr Al Shamsi, to read the False Confession Statements and had refused him any access to Mr Al Sadeq in relation to the False Confession Statements; and they had also at various times forced Mr Al Sadeq against his will to sign statements waiving the right to legal representation at interrogations as described at paragraph 129 above; and on one occasion had forced Mr Al Sadeq to call Dr Al Shamsi and tell him that he did not require him to attend court or represent him, even

though by that stage Dr Al Shamsi had ceased to act, or in reality to attempt to act, for Mr Al Sadeq.

184.2.    that the Ruler was unaware of the arrangements and transactions said to constitute wrongdoing on the part of Dr Massaad and Mr Al Sadeq.  This was untrue, as Mr Al Sadeq had told Mr Gerrard, Ms Black, Mr Hughes and Mr Buchanan repeatedly.  The Ruler had had contemporaneous knowledge of all the relevant aspects of the transactions about which complaint was made and had approved and/or directed them. That fact would have provided Mr Al Sadeq (and Dr Massaad) with a defence to the claims brought against them which, it is to be inferred, is why it was important to the Ruler and the Defendants that Mr Al Sadeq give false evidence in this respect.

Mr Al Sadeq's continued detention at Al Barirat

185.    During the period between agreeing to the False Confession Agreement and signing the False Confession Statements, Mr Al Sadeq remained incarcerated at Al Barirat.

186.    On 30 December 2015 however, Mrs Al Sadeq was allowed to see Mr Al Sadeq, taking with her their two children. This was due to be the first time that Mr Al Sadeq had been allowed to see his children since March 2015 when Mr Al Habsi had allowed them to meet in his office. However, Mr Al Sadeq was not produced, and the meeting did not take place.

187.    On 28 January 2016 Mrs Al Sadeq emailed the Ruler, explaining about the cancelled meeting with their children on 30 December, and the three hearings at which Mr Al Sadeq was not in attendance and, in any event, unable to afford legal representation.

188.    On around 13 January 2016 an appeal hearing took place in the RAK court  to consider Mr Al Sadeq's appeal.  This appeal had been adjourned on two previous occasions, 19 December and 30 December 2015, because Mr Al Sadeq had not been informed of the hearings and had not been produced.

189.    In or around February 2016, Mrs Al Sadeq met with the Ruler, Sheikh Ahmed (the Ruler's son), and Mr Buchanan to discuss Mr Al Sadeq's release now that he had complied with his side of the False Confession Agreement.  The Ruler asked if a satisfactory house had been found, and Mrs Al Sadeq explained that she did not care about the house, she just wanted her husband to be released now that he had provided the requested "cooperation". The Ruler confirmed to Mrs Al Sadeq that he would abide by the False Confession Agreement and that as soon as the house to which he was to be moved was ready, Mr Al Sadeq would be granted bail and released from Al Barirat. The Ruler then told Mr

Buchanan to take Mrs Al Sadeq to see the house so that she would believe what she was being told, although in the event Mrs Al Sadeq said this was not necessary.

190.   At this meeting, the Ruler also raised Dr Massaad's and Mr Quzmar's disloyalty in plotting with Sheikh Faisal against him.

Transfer from Al Barirat to the Villa Prison in Al Hamrah

191.   By around mid-March 2016 Mr Al Sadeq was still in Al Barirat in solitary confinement. Mrs Al Sadeq had been told by Mr Buchanan and Commander Al Awadhi that the reason for this delay in releasing Mr Al Sadeq to the house was only because the security at the house was not ready.

192.   Nevertheless, in early April 2016 Mr Al Sadeq was still being held in Al Barirat in solitary confinement. As a protest against the fact that in breach of the False Confession Agreement he had not been released on bail to a house as promised, despite signing the False Confession Statements, Mr Al Sadeq commenced a hunger strike on or around 4 April 2016.

193.   On 10 April 2016, as a result of this, his second hunger strike whilst detained at Al Barirat, he was taken before Mr Al Habsi, the Attorney General of RAK, who told him that a case had been filed against him for attempted suicide and that they would continue with the prosecution if he did not desist.  He also told Mr Al Sadeq that the house to which he was to be released on bail was almost ready. However, he claimed not to be aware of the promise which had been relayed to Mr Al Sadeq by Mr Buchanan on 2 September 2015 that he would be pardoned if he signed the False Confession Statements: Mr Al Sadeq believed this claim to be false because Mr Buchanan had told him that the Attorney General had been present when the Ruler had made the said promise.  This caused Mr Al Sadeq concern that the Ruler no longer intended to abide by the False Confession Agreement.

194.   The Attorney General told Mr Al Sadeq that if he was not satisfied then he would be moved to the RAK Central Prison, and described the terrible conditions there, telling Mr Al Sadeq that there were no beds, no food, and that prisoners were raped there.

195.   Mr Al Sadeq was returned to Al Barirat after this meeting.  A few days thereafter Mr Al Sadeq was transferred to the RAK Central Prison. His records were backdated so that it appeared he had been held in the RAK Central Prison since the date of his kidnap in September 2014 in order to hide the fact that he had actually been held, unlawfully, in solitary confinement at Al Barirat from October 2014 to around mid-April 2016.

196.    On 10 April 2016, Mrs Al Sadeq sent an SMS to Mr Buchanan complaining at the way Mr Al Sadeq was being treated, as follows:

> "*Dear James, hope this finds you well. Karam went on a hunger strike and he* [sic] *taken to the prosecutor today to meet Hassan and Khalid. He called to tell me the deal we agree on with you is not on the table anymore and he will suffer more if he doesn't obey. It's shocking how they treat ppl who cooperate. How do you expect others to cooperate when they see and hear about what's happening to Karam.*"

197.    Mr Buchanan was in New York but agreed to meet Mrs Al Sadeq in order to try to assist upon his return, and they met on 17 April 2016, together with Mr Al Sadeq's mother, at the Waldorf Hotel in RAK.  Mr Buchanan said he would do what he could to help Mr Al Sadeq. Mr Buchanan also promised to help Mrs Al Sadeq travel outside the UAE (which she had been prevented from doing since September 2014), including procuring a visa for her.

198.    On 19 April 2016 Mr Buchanan messaged Mrs Al Sadeq to confirm that Mr Al Sadeq would be moved to a house the following day, Wednesday, 20 April.

199.    As Mr Buchanan had informed Mrs Al Sadeq, on 20 April 2016 Mr Al Sadeq was transferred to the second floor of a two-storey villa in Al Hamrah village in RAK (the "**Villa Prison**"), where he was detained until around August 2016. The Villa Prison was secured with bars on the windows and a security door, and Mr Al Sadeq was not allowed to leave the Prison Villa.

200.    During his time in the Villa Prison Mr Al Sadeq was allowed the use of the upstairs, and four guards were constantly present downstairs.  Mrs Al Sadeq was allowed to stay for weekends and her children to visit. However, the circumstances of those visits were degrading and humiliating. On each occasion Mrs Al Sadeq was subjected to a strip search and body search in front of her children; and her children were subjected to intrusive searches which included searches inside their underwear by the guards.  Any toys they brought with them were also searched, and on at least one occasion one of the children's cuddly toys was torn open in front of them and the stuffing pulled out as part of a purported search.

201.    Despite the previous delay in implementing the False Confession Agreement, and the doubts raised by what Mr Al Sadeq had been told by the prosecutor, Mr and Mrs Al Sadeq were initially hoping that the move to the Villa Prison would be a precursor to the release of Mr Al Sadeq, as agreed in the False Confession Agreement.

<u>Mrs Al Sadeq and her children allowed to leave the UAE</u>

202.    Mrs Al Sadeq and her children did not visit or stay with Mr Al Sadeq in the Prison Villa after 16 June 2016.  On the last occasion she was with Mr Al Sadeq in the Prison Villa Mrs Al Sadeq suffered an injury to her finger which ultimately required an operation. Despite requesting help while bleeding heavily she was denied any medical assistance and had to drive one handed from RAK to Dubai, with her two children in the car, to seek help.  After that incident she was too fearful to return to RAK again.

203.    On 10 July 2016, with the assistance of Mr Buchanan and after a last direct appeal to the Ruler, Mrs Al Sadeq's UAE-wide travel ban was finally revoked (after previous broken promises which had seen her and her children turned back on attempting to leave the UAE), and she left the UAE to travel to Jordan with her two children, where she has remained ever since. She has not seen Mr Al Sadeq, and he has not seen his young children, since June 2016 because she is afraid for them to return to the UAE.

<u>Publication of the False Confession Statements</u>

204.     On around 29 July 2016 the False Confession Statements were published on the internet on a website with the URL www.khatermassaad.com (the "**Anti-Massaad Website**"). The Anti-Massaad website contained serious allegations made against Dr Massaad, which it claimed were corroborated by the False Confession Statements.

205.    The Anti-Massaad Website had been created by a UK company, Digitalis Reputation Limited, at the direction of the Ruler and Dechert through Mr Buchanan and the now-disgraced public relations firm Bell Pottinger, as propaganda supporting the Ruler's continuing vendetta against Dr Massaad and efforts to distance himself from the investment activities of RAKIA in the years during which Dr Massaad was its CEO despite his own intimate involvement in these.

206.    The Anti-Massaad Website ceased to be accessible on the internet on around 11 August 2016.

<u>August 2016 meeting – Mr Buchanan's denial that the Ruler made any promise to release Mr Al Sadeq</u>

207.    When Mr Al Sadeq discovered that the False Confession Statements had been published on the Anti-Massaad Website he called Mr Buchanan and asked him why the False Confession Statements had been publicised and to assist in making the Ruler comply with his promise to release Mr Al Sadeq.  Mr Buchanan told Mr Al Sadeq that he was only the

messenger of the Ruler, and that he was not the one who had lied to him (implying, thereby, that the Ruler had lied to Mr Al Sadeq).

208.    In response to this unsatisfactory response Mr Al Sadeq requested a meeting between himself, his recently instructed lawyer Mr Ali Sultan Al Haddad ("**Mr Al Haddad**"), Mr Buchanan and Mr Gerrard.  That meeting took place on or around 16 August 2016 in a basement room at the Court jail in RAK. Mr Al Sadeq had not been allowed to meet with Mr Al Haddad prior to the meeting, and Mr Al Haddad had been denied access to the papers concerning any of the cases brought against his client.

209.    Mr Al Sadeq complained repeatedly to Mr Buchanan about the fact that he had not been released from the Prison Villa and pardoned, saying "*You said sign the papers, I'll take you out, sign the papers, no harm will come to your wife or to your friends.*" (or words to that effect).

210.    Mr Buchanan responded, saying "*Yes we promised you, but this is not in my hands, this is in the Ruler's hands.*" (or words to that effect).

211.    At this, Mr Gerrard abruptly halted the meeting, and told Mr Buchanan to follow him outside.  Mr Al Haddad and Mr Al Sadeq heard Mr Gerrard shouting aggressively at Mr Buchanan. When Mr Gerrard and Mr Buchanan returned to the room Mr Buchanan was red-faced and denied that he knew anything about any promise to release Mr Al Sadeq by the Ruler and said that the Ruler had merely said he would consider it. The meeting, which lasted about 15 minutes, then concluded.

<u>Mr Al Sadeq removed from the Prison Villa and returned to RAK Central Prison</u>

212.    On his return to the Prison Villa after this meeting Mr Al Sadeq sent a letter to the Ruler in which he accused the Ruler of lying to him in relation to the False Confession Agreement.

213.    Within around an hour of sending this letter to the Ruler Mr Al Sadeq was returned to RAK Central Prison, where he has remained ever since.  Shortly before being removed from the Prison Villa he was able to call Mrs Al Sadeq in a state of panic, saying "*those bastards they are coming to take me to jail, I do not know where they are taking me.*"

214.    Since August 2016 Mr Al Sadeq's access to legal representation has been severely restricted, and he has only been allowed to meet with Mr Al Haddad on a handful of occasions. He remains in the RAK Central Prison as of the date of these Particulars of Claim.

Attempts to hamper the preparation of these legal proceedings

215.    The RAK authorities have attempted to prevent the taking of instructions by Mr Al Sadeq's UK legal team in relation to these proceedings. As to this:

215.1.    The Claim Form was issued on 28 January 2020. The following day, Mr Al Sadeq's papers were confiscated and he was placed in solitary confinement in RAK Central Prison.

215.2.    Mr Al Haddad's attempts in February and March 2020 to be appointed as Mr Al Sadeq's legal guardian were impeded as was his access to court documents; and he was prevented from meeting Mr Al Sadeq in prison.

215.3.    Mr Al Sadeq's UK solicitor, Mr Tsiattalou, was present in Dubai on several occasions between January and March 2020 in order to try to visit Mr Sadeq in the RAK Central Prison. All requests to the RAK authorities for permission to visit Mr Al Sadeq (which were made via Mr Al Haddad) were refused.

215.4.    During a stay in Dubai between 18 and 22 February 2020, Mr Tsiattalou returned to his hotel room in Dubai to find that the balcony doors (which had been locked from the inside when he left the room) were open; and it appeared to Mr Tsiattalou that papers relating to these proceedings, and his laptop computer, had been disturbed.

215.5.    During the first week of March 2020 Mr Al Sadeq's UK-based legal team were present in Dubai. During this time, they were denied access to Mr Al Sadeq in RAK Central Prison, despite attempts to obtain visitation rights.

215.6.    In the course of their stay in Dubai Mr Al Sadeq's UK legal team became aware that they were under surveillance by a number of intimidating individuals from RAK security and by the UAE-based surveillance firm, Page Security, run by a Mr Stuart Page. Mr Page's involvement is telling, because he admitted under cross examination in High Court proceedings in London between Mr Azima and RAKIA on 29 January 2020 that he had been engaged by the Ruler in January 2015 to investigate possible cooperation between Dr Massaad and members of the Ruler's own family: in his oral evidence to the court he stated that the reason for this investigation was that the Ruler believed that they were "*working together for the purposes of destabilising or causing harm to His Highness to the detriment of the Ruler*".

215.7.    The threatening manner in which this surveillance was conducted, including cars following Mr Al Sadeq's legal team and the fact that Mr Page personally attended

Mr Al Sadeq's UK-based legal team's hotel and made his presence obvious to them, can only have been an attempt to intimidate those representing Mr Al Sadeq in these proceedings, presumably made at the behest of the Defendants and the Ruler.

215.8.     In the circumstances pleaded above, it is to be inferred that Mr Tsiattalou's room was entered and searched during the week of 18 to 22 February 2020 by RAK security and / or Page Security in order to obtain information on behalf of the Ruler and / or the Defendants about the preparation of these proceedings.

215.9.     After a telephone conference call, on 12 March 2020 which Mr Al Sadeq had been allowed to make to his UAE and UK legal team his telephone privileges were revoked with no, or no adequate, explanation.

215.10.    On 25 March 2020 Mr Al Sadeq managed to get a message to his lawyers from prison saying that: (a) the prison management had removed the telephone number of Mr Al Sadeq's UK solicitor, Mr Tsiattalou,  from the list of the authorized numbers to be contacted on the orders of RAK State Security; and (b) in the event of any further conference calls made to his UK lawyers Mr Al Sadeq would be sentenced to solitary confinement and prevented from using the phone for a month.

216.    It is apparent that all of the steps taken against Mr Al Sadeq as pleaded at paragraph 215 were taken in order to impede the preparation of this claim against, and (it is to be inferred) with the knowledge and / or at the request of the Defendants.

Effect on Mr Al Sadeq's personal and business assets

217.    After his kidnap from Dubai to RAK Mr Al Sadeq's bank accounts were (and remain) frozen.

218.    In relation his other assets and business interests:

218.1.     Mr Al Sadeq's businesses, Tamad Properties, LS Holdings and Maya 4 in the RAK Free Zone (the "**Property Businesses**") owned properties in the Marina and Emaar Boulevard. The Property Businesses owned 14 two/three bedroom apartments in the Marina, and one apartment on Emaar Boulevard. There is an average yearly service charge of approximately AED 25,000 on each apartment, as well as a total annual rent for all properties of at least AED 3,000,000. After Mr Al Sadeq's detention he was refused permission to appoint anybody to manage the Property Businesses in his stead. As a result, no rent has been received for any of the properties which form part of the Property Business. Over the six years of Mr Al Sade's detention he estimates that the total income of which Mr Al Sadeq has been deprived via the Property

Businesses is approximately AED 25 million. Further, the Property Businesses have also been fined for delays in payments, licence renewals and other business expenses while his assets have been frozen. These costs are estimated to be approximately AED 3,000,000.

218.2.    Mr Al Sadeq owns a further business, Elegant Businessman Services (the "**Investment Business**"), which owns offices at 404 in Emaar Square, which is the investment business he established in around 2012 once he had relocated from RAK to Dubai. As a result of Mr Al Sadeq's detention since September 2014 this business has failed. Had it not been for Mr Al Sadeq's detention and / or the loss of reputation, this would not have occurred, and it would now be a successful business.

218.3.    Mr Al Sadeq also individually owns a villa in Arabian Ranches in Alvorada 4 (the "**Villa**"). He has been deprived of the use of the Villa.

219.    The total value of Mr Al Sadeq's assets was in excess of AED 75,000,000 when he was detained. He has been deprived of the use and the benefit of these assets since September 2014.

Causes of action under UAE law

220.    Section 282 of the Federal Civil Transactions Law No. (5) of 1985 (as amended) (the "**Civil Code**") ("**Section 282**") provides that: "*Any harm done to another shall render the doer thereof, even though not a person of full capacity, liable to make good the damage.*"

*Breaches of Article 282*

221.    Under Article 282 the Defendants and each of them owed a duty to Mr Al Sadeq not to cause him harm; and if they did cause him harm to make good any damage caused thereby.

222.    In the premises pleaded herein, the Defendants and each of them have caused harm to Mr Al Sadeq.

223.    The harm done to Mr Al Sadeq as pleaded herein, which arises from the conduct and / or unlawful and / or criminal acts of the Defendants and each of them, includes (*inter alia*):

223.1.    Abduction from Dubai and extraordinary rendition to RAK;

223.2.    Detention in degrading and inhumane conditions in solitary confinement in Al Barirat;

223.3.    Forcing Mr Al Sadeq to make false confessions in return for broken promises of release and pardon;

223.4.    Deprivation of contact with his family.

224.    The Defendants and each of them have committed and / or orchestrated and / or led and / or acquiesced in all of the wrongdoing generally and / or the criminal acts under the Penal Code committed against Mr Al Sadeq which are pleaded herein.

225.    The Defendants and each of them are liable to make good the harm caused to Mr Al Sadeq as a result of the wrongs committed against him as pleaded herein.

*Abuse of right*

226.    Article 106 of the Civil Code, provides as follows:

> *"(1) A person shall be held liable for an unlawful exercise of his rights.*
> *(2) The exercise of a right shall be unlawful :*
>> *(a) if there is an intentional trespass [infringement of another's right]*
>> *(b) if the interests which such exercise of right is designed to bring about are contrary to the rules of the Islamic Shari'a, the law, public order or morals;*
>> *(c) if the interests desired are disproportionate to the herm that will be suffered by others; or*
>> *(d) if it exceeds the bounds of custom and practice"* .

227.    In all the premises pleaded herein, the Defendants and each of them have used the rights accorded to them by RAKIA and / or the government of RAK and / or the RAK public prosecution service and / or the Ruler unlawfully within the meaning of Article 106 in order to commit the harms complained of by Mr Al Sadeq herein.

228.    As a result of the aforesaid unlawful use of rights Mr Al Sadeq has suffered loss and damage for which the Defendants and each of them are required to compensate Mr Al Sadeq pursuant to Article 106(1) of the Civil Code.

229.    The provisions of UAE law and the UAE constitution and the breaches thereof pleaded at paragraphs 230 to 293 below are material to the consideration of the liability of the Defendants and each of them pursuant to Articles 282 and 106 of the Civil Code.

Relevant breaches of the UAE Constitution and UAE law

230.    In all the circumstances set out above, the treatment of Mr Al Sadeq and the manner in which he was kidnapped, detained, threatened, mistreated and forced to confess as a consequence of that treatment since September 2014 is in breach of the law applicable in the UAE and the Defendants themselves have committed crimes and unlawful acts under the laws of the UAE.

*The UAE's international human rights obligations*

231.    The UAE has ratified the Convention against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment (the "**Convention against Torture**") and the Arab Charter on Human Rights (the "**Arab HR Charter**"), the latter of which prohibits arbitrary detention as well as inhuman and degrading treatment.

232.    As a matter of customary international law, the 1948 Universal Declaration of Human Rights (the "**UDHR**") is binding on the UAE and provides additional rights and protections to persons in the UAE which are enforceable as a matter of international law. These include the right not to be subjected to inhuman treatment, arbitrary detention, and the right to have a fair trial (which includes the right not to be forced into a confession).

233.    In all of the circumstances pleaded herein the treatment of Mr Al Sadeq since his kidnap on 5 September 2014 has amounted *inter alia* to illegal rendition, arbitrary detention, subjection to torture and inhuman treatment, and denial of the right to a fair trial contrary to international law. Further, all these denials of his fundamental rights are contrary to his rights and / or the UAE's obligations under the Convention against Torture, the Arab HR Charter and the UDHR, each of which forms part of domestic UAE law.

234.    Insofar as the Defendants have acted as agents of the RAK state, they have participated in the UAE's denial of Mr Al Sadeq's fundamental rights under the aforesaid conventions.

*Breaches of the UAE Constitution*

235.    The UAE Constitution of 1971 (as amended)  (the "**Constitution**") prohibits torture and degrading treatment of detainees and protects a person's rights to legal due process when accused of a crime.  As pleaded at paragraphs 236 to 241 below, Mr Al Sadeq's rights under Articles 26, 28 and 40 of the Constitution have been violated by the treatment of him by RAK since 5 September 2014 which treatment has been orchestrated and / or led by and / or acquiesced in by the Defendants and each of them.

236.    Article 26 of the Constitution provides that "*Personal liberty is guaranteed to all citizens. A person may not be arrested, searched, detained or imprisoned except in accordance with the provisions of the law. A person may not be subjected to torture or to degrading treatment.*"

237.    In the circumstances pleaded herein, Mr Al Sadeq's rights under Article 26 have been violated: he has been deprived of his liberty unlawfully; he has been detained and imprisoned outside the RAK criminal justice system at the whim of the Defendants and the

Ruler; and he has been subjected to torture and degrading treatment including (without prejudice to all of the relevant matters pleaded herein):

237.1.    Kidnap from Dubai and rendition to RAK, without arrest as pleaded at paragraphs 40 to 70  hereof;

237.2.    Detention without charge, as pleaded at paragraphs 48 to 70 hereof;

237.3.    Detention in solitary confinement in inhumane and degrading conditions under an assumed name, as pleaded at paragraphs 48 to 201 hereof;

237.4.    Threats and pressure applied against him and his family to force him to "cooperate" and to give false evidence as pleaded at paragraphs 40 to 214 hereof.

238.    Article 28 of the Constitution provides that:

"*Penalty is personal. An accused is presumed innocent until proved guilty in a legal and fair trial. An accused person has the right to appoint as his/her attorney at law anyone who is capable to defend him/her in trial.  The law specifies the cases where a counsel for defense must represent an accused person. An accused person may not be physically or morally harmed.*"

239.    In the circumstances pleaded herein, Article 28 of the Constitution has been violated in that, as pleaded at paragraphs 40 to 214 above, at all material times Mr Al Sadeq:

239.1.    was presumed guilty;

239.2.    was not permitted a legal or fair trial in respect of the charges against him;

239.3.    was deprived of the right, in any substantive sense, to appoint a lawyer capable of defending him at trial;

239.4.    was caused physical harm as a result of the circumstances of his detention in Al Barirat necessitating hospital treatment;

239.5.    has suffered moral harm from the conditions of his detention.

240.    Pursuant to Article 40 of the Constitution "*Foreigners in the UAE enjoy the rights and freedoms stipulated in the applicable international instruments or in the treaties and conventions to which the UAE is a party, and have to perform the duties which correspond to those rights and freedoms.*"

241.    In the circumstances pleaded herein Article 40 of the Constitution has been breached in that Mr Al Sadeq has not been permitted to enjoy the rights and freedoms stipulated in the Convention against Torture, the Arab HR Charter and the UDHR.

*Breaches of the UAE Criminal Procedure Law*

242.    The UAE Criminal Procedural Law 1992 (as amended) sets out the procedures which must be applied in relation to persons accused of committing criminal acts in the UAE. Mr Al Sadeq's treatment by RAK since 5 September 2014 as pleaded herein amounts to multiple breaches of the Criminal Procedure Law, which breaches have been orchestrated and / or led by and / or acquiesced in by the Defendants and each of them.

243.    Article 2 of the Criminal Procedure Law provides as follows:

"*No criminal sanction may be adjudicated against any person unless he is proved guilty according to this Law.*
*No person may, as well, be arrested, searched, detained or imprisoned except in the cases and under the conditions provided for in this Law. Detention and imprisonment may not occur except in the places specially reserved for each and for the period specified in the order issued by the competent authority.*
*It is forbidden to cause bodily or moral harm to the accused or subject any person to torture or degrading treatment.*"

244.    In breach of Article 2 of the Criminal Procedure Law Mr Al Sadeq:

244.1.    was detained and imprisoned other than under the conditions provided for in the Criminal Procedure Law in the respects pleaded at paragraphs 245 to 270 below.

244.2.    was detained and imprisoned at Al Barirat, Al Barirat not being a place specially reserved for detention or imprisonment in RAK but rather being a camp for the Ruler's personal militia; and his detention and imprisonment were not the subject of any (or any proper) order issued by any competent authority given that (at least) he was held under an assumed name and not his real name. Further in this regard, requests by Mr Al Sadeq's lawyers for documents including orders relating to his detention have at all material times been refused.

244.3.    has been caused bodily and / or moral harm and / or has been subjected to torture and / or degrading and inhumane treatment.

245.    Article 47 of the Criminal Procedure Law provides as follows:

"*The judicial police officer must hear the deposition of the accused immediately upon his arrest, apprehension and arraignment and if he does not submit proof of his innocence, he shall be sent, within forty-eight hours to the competent public prosecution.*
*The public prosecution shall interrogate the accused within twenty-four hours then it shall order either his arrest or his release.*"

246.    Contrary to Article 47 of the Criminal Procedure Law:

246.1.    No judicial police officer heard Mr Al Sadeq's deposition immediately upon his apprehension and kidnap from Dubai to RAK on 5 September 2014 (Mr Al Sadeq not

having been arrested or arraigned); and he was not sent within 48 hours to the competent public prosecution.

246.2.　　Mr Al Sadeq was not interrogated by the public prosecution within 24 hours of being abducted from Dubai as pleaded at paragraphs 48 to 70 hereof.

246.3.　　It was only in fact on 10 September 2014 that Mr Al Sadeq was arrested, although charges were not brought against him until around mid-2015.

247.　　Article 55 of the Criminal Procedure Law provides as follows:

*'The dwelling of the accused may not be inspected except for the search of the things related to the crime, for which evidence is collected, or constitute the object of investigation. Nevertheless, if during the inspection, some objects are incidentally discovered which possession constitutes per se a crime or which may lead to revealing the truth in another crime, the judicial police officer shall proceed with their seizure.''*

248.　　In breach of Article 55 of the Criminal Procedure Law, as pleaded at paragraph 82 to 88 above the searches conducted at Mr Al Sadeq's home and office in September 2014, in respect of which Ms. Black was in charge, were indiscriminate, and led to the removal of property which could not possibly have been relevant to any crime by Mr Al Sadeq, even were there any *bona fide* suspicions or accusations against him.

249.　　Article 65 of the Criminal Procedure Law provides as follows:

"*The public prosecution shall by itself proceed with the investigation in felonies and in misdemeanours, where deemed necessary.*"

250.　　In breach of Article 65 of the Criminal Procedure Law, at all material times the Defendants, at the behest of the Ruler, were permitted to and did pursue the investigation in the stead of the public prosecution.

251.　　Article 68 of the Criminal Procedure Law provides as follows:

 "*The member of the public prosecution may assign to one of the judicial police officers one or more task of the investigation, except the interrogation of the accused. He may also, if required to take any of the measures outside his jurisdiction, to delegate for its performance a member of the public prosecution or a judicial police officer within this area of performance and, in all cases, the delegated person shall, for the investigation, all powers that the principal may have in order to carry out, in his jurisdiction, the investigation.*"

252.　　In breach of Article 68 of the Criminal Procedure Law, as pleaded at paragraphs 61 to 214 Mr Gerrard, Ms. Black, and Mr Hughes carried out extensive and repeated interrogations of Mr Al Sadeq despite neither of them being a member of the public prosecution or judicial police officers (albeit that as pleaded at paragraphs 271 to 274 hereof they were Public Servants within the meaning of Article 5 of the Penal Code).

253.   Article 72 of the Criminal Procedure Law provides as follows:

"*The member of the public prosecution shall search the dwelling of the accused upon a charge imputed to him of perpetrating a crime or by acting as an accomplice in it. He may, in this respect search any place and seize any papers, arms and all what may likely be used in the perpetration of the crime or resulting therefrom, as well as anything that may help in revealing the truth.*"

254.   In breach of Article 72 of the Criminal Procedure Law, as pleaded at paragraphs 82 and 88 hereof, Ms. Black was permitted to direct the search of Mr Al Sadeq's home and office, and exceeding the power provided in the Article, seized property which was not likely to have been used in the perpetration of any crime by Mr Al Sadeq, and which did not result therefrom.

255.   Article 80 of the Criminal Procedure Law provides as follows:

"*Objects seized in the course of the investigation, even before the judgment, may be restituted unless they are necessary for the action process or under confiscation.*"

256.   In breach of Article 80 of the Criminal Procedure Law, as pleaded at paragraphs 83 and 87 hereof, none of the items seized from Mr Al Sadeq's home or office have ever been returned.

257.   Article 100 of the Criminal Procedure Law provides as follows:

"*The attorney for the accused must be enabled to attend the investigation with him and take knowledge of the investigation papers, unless otherwise decided by the member of the public prosecution in the interest of the investigation.*"

258.   In breach of Article 100 of the Criminal Procedure Law Mr Al Sadeq's lawyers have, at the instigation and /or with the involvement of the Defendants, continuously and consistently been denied the right to attend the investigation carried out against him and have been denied access to or knowledge of the relevant investigation papers, without any proper justification.

259.   Article 104 of the Criminal Procedure Law provides as follows:

"*The public prosecution member must immediately interrogate the arrested person or, if this be impossible, he should be put in one of the specialized places of detention until his interrogation. The period of detention must not exceed twenty-four hours after which the administrator of this place has to send the detained person to the public prosecution which must instantly interrogate him, otherwise order his release.*"

260.   In breach of Article 104 of the Criminal Procedure Law Mr Al Sadeq was detained for more than 24 hours in the GHQ without interrogation by the public prosecution; and he was then detained at Al Barirat outside the criminal justice system entirely.

261.   Article 105 of the Criminal Procedure Law provides as follows:

"*With due observance of the provisions of the Federal Law No. (11) of 1973, Organizing the Relations between the Emirates Members of the Federation, if the accused is arrested outside the scope of jurisdiction of the court where the interrogation takes place, he shall immediately be sent to the public prosecution of the place of his arrest which shall verify all information concerning the identity of this person, then refer him to the public prosecution of the court where he is interrogated through the public authority which has to deliver him there as quickly as possible.*
*In case the accused objects to his moving or if his condition does not allow his transport, the public prosecution member shall inform the investigator of this matter who shall forthwith order what should be followed.*"

262.   In the premises pleaded at paragraphs 40 to 70 above, Article 105 of the Criminal Procedure Law was not observed in relation Mr Al Sadeq's kidnap from Dubai and rendition to RAK, and Federal Law No. 11 was not complied with.

263.   Article 106 of the Criminal Procedure Law provides as follows:

"*With due observance of the provisions provided in the Law on Juvenile Delinquents and Homeless Persons, the public prosecution member may, after interrogating the accused, order his provisional detention if there is enough evidence and if the act constitutes a felony or a misdemeanour sanctioned by other than the fine penalty.*"

264.   Mr Al Sadeq's transfer to and detention in Al Barirat was not pursuant to Article 106 because he was dealt without outside the criminal justice system, Al Barirat not being an official detention centre, but a camp controlled by the Ruler's private militia.

265.   Article 107 of the Criminal Procedure Law provides as follows:

"*In addition to the information stated in clause 2 of Article (101), the order of detention must include an instruction to the person in charge of the administration of the place of detention to accept the accused and place him therein. The order should mention the law provision applicable to the case and shall be governed by the law provisions provide for by the last paragraph of Article (108).*"

266.   Article 108 of the Criminal Procedure Law provides as follows:

"*When confining the accused in the place of detention, a copy of the order of detention must be delivered to the person in charge of the administration of the place after securing his signature on the original stating that he received the copy thereof.*
*The administrator of the place of detention may not allow any member of the public authority to have any contact with the person under provisional detention inside the place except by a written authorization from the public prosecution and, if this be the case, he must write down in the book kept for the purpose, the name of the person giving the authorization, the time of the visit and the date and contents of the authorization.*"

267.   As pleaded at paragraph 115, during Mr Al Sadeq's detention in GHQ the lawyer engaged by Mrs Al Sadeq, Dr Al Shamsi, was told that he was being detained outside the criminal justice system, so it necessarily follows that Articles 107 and 108 of the Criminal

Procedure Law were not complied with in Mr Al Sadeq's case while he was detained in GHQ.

268.   Further, given that Al Barirat was not an official detention centre but a camp for the Ruler's private militia, it necessarily follows that Articles 107 and 108 of the Criminal Procedure Law were not complied with in Mr Al Sadeq's case whilst he was detained  in Al Barirat.

269.   Article 109 of the Criminal Procedure Law provides as follows:

"*Should the investigation procedures so necessitate, the public prosecution member shall issue an order forbidding any contact between the provisionally detained accused and the other detained and any visits by any person whatsoever, without prejudice to the right of the accused to permanently contact in private his attorney.*"

270.   In any event, in breach of Article 109 of the Criminal Procedure Law Mr Al Sadeq was deprived of the right to permanent contact (or any adequate contact) with his attorney at any stage whilst detained in GHQ, Al Barirat or the Prison Villa.

*Crimes committed under the UAE Penal Code*

271.   Under Article 5(5) of the UAE Penal Code 1987 (as amended) (the "**Penal Code**") a Public Servant is defined as including "*Any person assigned to a certain task by a public authority, to the extent of the delegated task.*"

272.   Mr Gerrard, Mr Hughes and Ms. Black, and each of them, were engaged by RAKIA and / or the government of RAK and / or the RAK public prosecution service and / or the Ruler and assigned to a certain task by a public authority for the purposes of the Penal Code. They therefore fall within the definition of Public Servants

273.   Further or in the alternative, the final paragraph of Article 5 of the Penal Code provides that:

"*Shall be deemed the same as a public servant in the present Law, any person who is not included within the categories set forth in preceding Clauses, and who is engaged in a work of public service as assigned to him by a public servant in charge under laws or regulations with respect to the assigned task.*"

274.   Mr Gerrard, Mr Hughes and Ms. Black, and each of them, were engaged by RAKIA and / or the government of RAK and / or the RAK public prosecution service and / or the Ruler (each falling with the definition of Public Servant in Article 5), in a work of Public Service (being the carrying out of an investigation in relation to purported allegations of a criminal nature against Mr Al Sadeq, Dr Massaad, Mr Quzmar, Mr Mikadze, Mr Azima and other alleged co-conspirators), and are therefore to be deemed to be Public Servants

for the purposes of the Penal Code under the said final paragraph of Article 5 of the Penal Code.

275.   Article 240 of the Penal Code provides as follows:

"*Shall be sentenced to detention, every public servant or person in charge of a public service arresting a person, detaining or confining a person in cases other than those provided for by Law.*"

276.   In the premises pleaded at paragraphs 40 to 214 above, Mr Gerrard, Ms. Black and Mr Hughes orchestrated and / or acquiesced in the unlawful detention and / or confinement of Mr Al Sadeq in GHQ and / or in Al Barirat. Accordingly, as Public Servants for the purposes of the Criminal Procedure Law, Mr Gerrard, Ms. Black and Mr Hughes committed a crime in relation to the treatment of Mr Al Sadeq pursuant to article 240 of the Penal Code.

277.   Article 241 of the Penal Code provides as follows:

278.   "*Any public servant or person entrusted with a public service who searches a person, a house or establishment in other than the cases prescribed by Law or contrary to the rules indicated in such Law, with his knowledge of such fact, shall be subject to a jail sentence*".

279.   In the premises pleaded at paragraphs 82 to 88, 248 and 254  above, Ms. Black led the search of Mr Al Sadeq's home and office, and that search was unlawful. Accordingly, as a Public Servant for the purposes of the Criminal Procedure Law, Ms. Black committed a crime in relation to the search of Mr Al Sadeq's home and office pursuant to article 241 of the Penal Code.

280.   Article 242 of the Penal Code provides as follows:

"*Shall be sentenced to term imprisonment, every public servant using, in person or through others, torture, force or threat with the accused, a witness or an expert in order to have him confess a crime, make a statement or give information concerning it to withhold any relevant matter*."

281.   In the premises pleaded at paragraphs 40 to 214 above, Mr Gerrard, Ms. Black and Mr Hughes used in person, and or through others, and or acquiesced in and / or orchestrated the use of, torture and / or force and / or threats to Mr Al Sadeq in order to cause him to confess to crimes and / or to make statements and / or to give information in relation to crimes of which Mr Al Sadeq and / or Dr Massaad and / or Mr Quzmar and / or Mr Mikadze and / or Mr Azima and / or other alleged co-conspirators were accused. Accordingly, as Public Servants for the purposes of the Penal Code, Mr Gerrard, Ms. Black and Mr Hughes committed a crime in relation to the treatment of Mr Al Sadeq pursuant to article 242 of the Penal Code.

282.    Article 245 of the Penal Code provides as follows:

"*Shall be sentenced to detention for a minimum term of one year and/or to a minimum fine of ten thousands dirham, every public servant, or person in charge of a public service, using force on a person, basing himself in the power granted to him by virtue of his office, dishonouring or causing him bodily pain.*"

283.    In the premises pleaded at paragraphs 40 to 214 above, Mr Gerrard, Ms. Black, and Mr Hughes used, and or acquiesced in and / or orchestrated the use of, force on Mr Al Sadeq which dishonoured Mr Al Sadeq and / or caused him bodily pain. Accordingly, as Public Servants for the purposes of the Penal Code, Mr Gerrard, Ms. Black and Mr Hughes committed a crime in relation to the treatment of Mr Al Sadeq pursuant to article 245 of the Penal Code.

284.    Article 259 of the Penal Code provides as follows:

"*Without prejudice to the provision of Article 242 of the present Law, any person who uses torture, force or threat against another person, or who offers a gift or a benefit of any kind, or makes a promise of the same to induce another person to conceal a matter or to declare false statements or information or to hide away evidence from a judicial authority, shall be punished by jail sentence and a fine*".

285.    In the premises pleaded at paragraphs 40 to 214 above, Mr Gerrard, Ms. Black and Mr Hughes used, and or acquiesced in and / or orchestrated the use of, torture and / or force and / or threats to Mr Al Sadeq in order to cause him to give untrue statements or information before the RAK court in relation to crimes of which Mr Al Sadeq and / or Dr Massaad and / or Mr Quzmar and / or Mr Mikadze and / or Mr Azima and / or other alleged co-conspirators were accused. Accordingly, as Public Servants for the purposes of the Penal Code, Mr Gerrard, Ms. Black and Mr Hughes committed a crime in relation to the treatment of Mr Al Sadeq pursuant to article 259 of the Penal Code.

286.    Article 344 of the Penal Code provides as follows:

"*Shall be sentenced to imprisonment, whoever illegally kidnaps, arrests, detains or deprives from freedom, a person by any means whatsoever and whether by himself or through the intermediary of others. The penalty shall be life imprisonment in the following instances:*
*1. If the act takes place by impersonating a public capacity, pretending the performance or assignment of a public service or to contact under a false representation.*
*2. In case the act is performed by use of subterfuge or accompanied by use of force, threat of killing, inflicting severe body harm or by acts of physical or psychological torture.*
*3. If the act is perpetrated by two or more armed persons.*
*4. If the period of kidnapping, arresting, detaining or depriving from freedom exceeds one month.*

> *5. In case the victim is of female sex, a juvenile, an insane or imbecile person.*
> *6. In case the purpose of the act is to draw profit, revenge, rape of the victim, disgrace him, injure him or have him perpetrate a crime.*
> *7. If the act is perpetrated against a public servant during, or because of, the discharge of his duties.*
> *Should the act lead to the death of the victim, the sanction shall be the death penalty or life imprisonment. Shall be sanctioned to the same penalty prescribed for the principal perpetrator, any of the intermediaries in the perpetration of any of the crimes provided for in this Article (as well as whoever knowingly hides a kidnapped person.*"

287.   In the premises pleaded at paragraphs 40 to 214  above Mr Gerrard and Mr Hughes and Ms Black orchestrated and / or acquiesced in the illegal kidnap and / or detention and / or deprivation from freedom of and / or hiding of Mr Al Sadeq and therefore committed a crime in relation to the treatment of Mr Al Sadeq pursuant to Article 344 of the Penal Code.

288.   Article 348 of the Penal Code provides as follows:

> "*Shall be sentenced to detention and/or to a fine, whoever deliberately perpetrates an act that exposes the life, health, security or freedom of human beings to danger. Without prejudice to a prejudice any more severe penalty prescribed by law, the penalty shall be detention in case the act results in a prejudice of any kind.*"

289.   In the premises pleaded at paragraphs 40 to 214  above Mr Gerrard, Ms .Black and Mr Hughes orchestrated and / or acquiesced in the perpetration of acts which exposed the life and / or health and / or security and / or freedom of Mr Al Sadeq to danger, and therefore committed a crime in relation to the treatment of Mr Al Sadeq pursuant to Article 344 of the Penal Code.

290.   Article 351 of the Penal Code provides as follows:

> "*Shall be sentenced to imprisonment for term not exceeding seven years, whoever threats another person, in writing or verbally, to perpetrate a felony against his person or property or against the person or property of others, or by attributing or divulging dishonouring matters, where all these are accompanied by a demand, instructions to do or abstain from doing something or if so intended.*"

291.   Article 352 of the Penal Code provides as follows:

> "*Shall be sentenced to detention, whoever threatens another to perpetrate a felony on his person or property or on the person or property of others, by attributing or divulging dishonouring or disrespectful matters a instances other than those stated in the preceding article.*"

292.   Article 353 of the Penal Code provides as follows:

> "*Whoever threatens another by words, acts or signs, in writing or verbally or through another person and in instances other than those stated in the two preceding articles, shall be sentenced to detention for a term not exceeding one year or to a fine not in excess of ten thousands dirham.*"

293.    In the premises pleaded at paragraphs 40 to 214 above, Mr Gerrard and Mr Hughes, in the presence of and with the involvement and acquiescence of Ms. Black, made threats towards Mr Al Sadeq to perpetrate felonies against Mr Al Sadeq and / or Mrs Al Sadeq accompanied by demands and / or instructions to give information and / or evidence and / or false testimony, and Mr Gerrard, Mr Hughes and Ms. Black therefore committed a crime in relation to the treatment of Mr Al Sadeq pursuant to Articles 351 and / or 352 and / or 353 of the Penal Code.

Loss and damage

294.    As a result of the aforementioned harms and / or breaches and / or torts by the Defendants and each of them Mr Al Sadeq has suffered loss and damage.

*Physical and psychological harm*

295.    Mr Al Sadeq has suffered severe psychological and physical harm, pain and suffering as a result of his incarceration and the circumstances thereof and seeks and is entitled to compensation in respect thereof.

*Financial loss*

296.    Mr Al Sadeq intends to provide fuller particulars of financial loss and expert evidence in respect of the quantum thereof in due course. However, his losses include (at least):

296.1.    Loss of profits and / or value in relation to the Property Businesses which, but for Mr Al Sadeq's abduction and incarceration since September 2014, would have generated aggregate profits of in excess of AED 25 million had he been able to continue to manage them.  Furthermore, this profit would have been reinvested over time thus increasing the value of the Property Businesses and Mr Al Sadeq's ongoing return therefrom.

296.2.    Loss of profits and / or value in relation to the Investment Business which but for Mr Al Sadeq's abduction and incarceration since September 2014 would have generated very significant profits had he been able to continue to manage and grow the business; and his interest therein would have been significantly valuable.

296.3.    Loss of assets including the Villa.

297.    The net value of assets lost for which Mr Al Sadeq seeks compensation is in excess of AED 75 million.

*Moral damage*

298.    Furthermore, Mr Al Sadeq  has suffered moral damage as a result of the wrongs committed against him, including (*inter alia*) damage to his reputation (*inter alia*, by the fact of his detention and prosecution, and as a result of the publication of the False Confession Statements on the Anti-Massaad Website) for which he also seeks and is entitled to compensation.

Interest

299.    Mr Al Sadeq also seeks interest pursuant to section 35A of the Senior Courts Act 1981 at such rate and for such period as the court shall see fit.


**AND THE CLAIMANT CLAIMS:**

   i.      Damages for breach of Article 282 of the UAE Civil Code;

   ii.     Damages for abuse of right under Article 106 of the UAE Civil Code;

  iii.    Such accounts or enquiries as the Court may see fit;

  iv.     Further or other relief;

   v.      Interest;

  vi.     Costs.

**EDWARD FITZGERALD QC**

**JOHN BRISBY QC**

**ALASTAIR TOMSON**

**NICHOLAS WRIGHT**

**31 March 2020**

**STATEMENT OF TRUTH**

The Claimant believes the facts stated in this Particulars of Claim are true. I am duly authorised by the Claimant to sign this statement.

**Full name:**    Bambos Tsiattalou

**Signed:**        ……………………………….

                  Claimant's legal representative

**Dated:**        31 March 2020