UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x

In re Application of KARAM SALAH AL DIN
AWNI AL SADEQ for an Order                              Case No. _____
Under 28 U.S.C. § 1782 to
Conduct Discovery for Use in Foreign Proceedings.       **DECLARATION OF**
                                                        **HARALAMBOS TSIATTALOU**

---------------------------------------------------------------- x

      I, **HARALAMBOS TSIATTALOU**, do hereby declare under penalty of perjury pursuant to

28 U.S.C. § 1746 the following:

Introduction

      1.     I am admitted to practice before the Courts of England and Wales, and I am a partner

at the UK-based law firm of Stokoe Partnership Solicitors.  I am the Solicitor to the applicant

Karam Salah Al Din Awni Al Sadeq ("Mr. Al Sadeq" or "Applicant") in a civil proceeding pending

in the High Court of Justice of England and Wales, Queen's Bench Division captioned: <u>Karam</u>

<u>Salah Al Din Awni Al Sadeq v. Dechert, LLP, Neil Gerrard, David Hughes, and Caroline Black,</u>

Claim No. QB-2020-000322 (the "Foreign Proceeding").

      2.     I respectfully submit this Declaration in support of Mr. Al Sadeq's application for an

order under 28 U.S.C. § 1782 to conduct discovery for use in the Foreign Proceeding.  As detailed

below, the Foreign Proceeding is brought against the UK-based law firm of Dechert LLP ("Dechert

UK") and three of its current partners, who it is claimed committed various acts of wrongdoing in

breach of UAE civil and criminal laws.  The discovery sought here, information, documents, and

material gathered by the Policy Committee of the US-based firm Dechert LLP ("Dechert US") and

its constituent members, which is believed to have investigated these acts of misconduct, will shed

further light on the defendants' wrongful behavior as alleged by Mr. Al Sadeq in the Foreign

Proceeding.

Background to the Foreign Proceeding

3.      As set forth in the Claim attached to the accompanying Declaration of Tab K. Rosenfeld as Exhibit A, the Foreign Proceeding concerns misconduct and human rights abuses committed against Mr. Al Sadeq by Neil Gerrard ("Gerrard"), a solicitor and partner in Dechert UK, and the other defendants in connection with their investigation of fraud allegedly perpetrated against the RAK Investment Authority ("RAKIA").

4.      The nature of the allegations in the Foreign Proceeding  are detailed in paragraph 9 of the Claim.  In summary, Mr. Al Sadeq's claims include allegations that the defendants were implicated in:

   a.   The kidnap and extraordinary rendition of Mr. Al Sadeq from Dubai to RAK (see paragraphs 40 to 47 of the Claim);

   b.   Mr. Al Sadeq's unlawful detention without arrest or change, including a period of detention in solitary confinement, under a false name, with no access to legal representation (see paragraphs 105 to 109 of the Claim);

   c.   The interrogation of Mr. Al Sadeq.  In particular, Mr. Al Sadeq contends that during the first of his interrogations by Mr. Gerrard, he was blindfolded with his hands tied behind his back and had no lawyer present (see paragraph 64 of the Claim);

   d.   Threats and unlawful pressure made to Mr. Al Sadeq, his wife, and children, including a promise by Mr. Gerrard and Ms. Black that Mr. Al Sadeq's prison conditions could be improved if he "cooperated" with them (see, paragraphs 65 to 67, 89 to 98, and 120 to 130 of the Claim); and

   e.   The procurement of false confessions signed by Mr. Al Sadeq, but drafted by Mr. Gerrard and Mr. Hughes, in circumstances where Mr. Al Sadeq was detained in

the above conditions, did not have access to legal representation, and had made it

clear that the confessions were untrue (see, paragraphs 183 to 184 of the Claim).

5.      The allegations made by Mr. Al Sadeq are of an extremely serious nature.  That is all

the more so in circumstances where they are made against senior lawyers and a global law firm of

international repute.  As a consequence, the Foreign Proceeding has generated a significant degree

of publicity in the UK.

6.      Mr. Al Sadeq has also sought the assistance of the UN's Human Rights Council

through a petition submitted on his behalf on 13 November 2018.  Preparations are already being

made to submit petitions to the Arbitrary Detention Working Group and the Special Rapporteur on

Torture.  Through correspondence dated December 21, 2017, Mr. Al Sadeq has also sought the

assistance of the Minister of Justice in Abu Dhabi, the Crown Prince of Abu Dhabi, the Emir of

Dubai and the Ambassador of Switzerland to the UAE.

Events since the Foreign Proceeding was commenced

7.      Since the Foreign Proceeding was commenced in March 2020, I and Mr. Al Sadeq's

legal team have been subjected to a campaign intended to interfere with our ability to represent Mr.

Al Sadeq and progress the proceedings on his behalf.  This has included intrusive surveillance

carried out on Mr. Al Sadeq's legal team whilst seeking to visit him in the UAE, attempts to obtain

confidential information from Stokoe Partnership's bank account, and confidential information of

others connected with the Foreign Proceeding, as well as hacking attempts via "phishing" emails

and SMS messages.  These matters are relevant to this application for discovery, because they

demonstrate the extent to which persons connected with the defendants have sought to inhibit the

progress of the Foreign Proceeding via improper means, which in turn reduces the likelihood that

the ordinary process of discovery will yield all material information and documents.

8.    In order to advise and take instructions from our client, Mr. Al Sadeq, I attended the UAE with other members of the UK legal team.  We were not permitted to see Mr. Al Sadeq in prison, and whilst we stayed in Dubai, I believe that my hotel room was interfered with; I was independently informed that we were being kept under surveillance; I witnessed surveillance operatives following me and other members of the UK legal team; and I witnessed a Mr. Stuart Page inside the hotel that we were staying in whilst in Dubai.  As I explain further below, Mr. Page is a private investigator connected with Gerrard, who worked with him in relation to investigations in RAKIA, and who, with Gerrard, was alleged to have been involved in unlawful hacking in related proceedings.

9.    Even more significant was that on March 27, 2020, I was informed that a private investigator had been hired to investigate Stokoe Partnership Solicitors, Maltin Litigation Support (a litigation support team who are part of the Al Sadeq legal team), Detained in Dubai (a human rights advocacy organization which is helping to raise awareness of Mr. Al Sadeq's plight) and Hogan Lovells International LLP, a law firm which acts for ENRC, a company engaged in litigation with Gerrard.  The connection between each of these events is Mr. Al Sadeq and the Foreign Proceeding: it is fair to say that everybody connected with his case, or, in the case of Hogan Lovells, in different litigation involving Gerrard, has been subject to some sort of attack.[1]

10.    Stokoe Partnership Solicitors and members of the Al Sadeq UK legal team (including 4 Stone Buildings, Detained in Dubai, and Maltin Litigation Support) also became victims of hacking attempts and were sent phishing emails and SMS messages. Because of the connection between those hacking attempts (i.e. targeted at members of Mr. Al Sadeq's UK legal team) I have

---

[1] The information being sought included banking records, telephone records and details of my movements to and from the UAE to take instructions from Mr. Al Sadeq.  This is explained in detail in a witness statement I submitted to the High Court in London on June 29, 2020, a copy of which is annexed hereto as Exhibit A.

4

reason to believe that those ultimately behind those acts are connected to the defendants in the Al Sadeq proceedings.

11.   Due to these attempts to obtain confidential information from Stokoe Partnership Solicitors and other members of the Al Sadeq UK legal team, including Maltin Litigation Support, Stokoe Partnership Solicitors commenced legal proceedings in the High Court in England and Wales and obtained a court order in its favor.  Subsequently, Stokoe Partnership Solicitors issued proceedings on July 16, 2020 against two individuals and two companies, who I believe were also involved in attempts to obtain confidential information.  This included Mr. Stuart Page, the person I observed in my hotel in Dubai whilst travelling to the UAE to obtain instructions from Mr. Al Sadeq, and who I believe is likely to have been in charge of the surveillance operation carried out on me and my colleagues whilst staying there.

Evidence given by Gerrard in the Azima Proceeding

12.   The Application for discovery arises from the evidence that Gerrard gave during the course of a separate proceeding in the UK before the High Court of Justice Business and Property Courts of England and Wales Business List (ChD), captioned: Ras Al Khaimah Investment Authority v. Farhad Azima, Case No. HC-2016-002798 ("the Azima Proceeding").  In that proceeding, the question of whether Gerrard and Dechert had been involved in human rights abuses in relation to Mr. Al Sadeq was considered by the Court, although Mr. Al Sadeq was not himself a party to those proceedings. The Court in that proceeding was asked to determine whether allegations of human rights abuses against, *inter alia*, Mr. Al Sadeq were false stories propagated as part of a negative media campaign.  Gerrard testified (on behalf of RAKIA) that those stories were indeed false.  It should also be noted that Mr. Azima was also the victim of a hacking attack and that his private and confidential emails were published on the Dark Web shortly after a meeting in which Gerrard threatened to make Mr. Azima "collateral damage" in his investigation for RAKIA. Mr. Azima

alleges that the publication of his emails online, and subsequent litigation brought by RAKIA, was as a result of Mr. Gerrard making good on this threat.

13.     The evidence given by Gerrard in the Azima Proceeding is relevant to this application for three main reasons.  First, the reliability of Gerrard as a source of evidence in the Foreign Proceeding has been seriously called into question as a result of the evidence he gave in the Azima Proceeding.  Second, that evidence demonstrates that Gerrard has been willing to engage in practices likely to result in the destruction, or non-availability, of relevant documentary evidence.  Third, and most significantly, Gerrard's evidence specifically identified Dechert US as a likely repository of material documents germane to the allegations in the Foreign Proceeding.

14.     In the Azima Proceeding, Gerrard testified and gave evidence on a number of matters material to the Foreign Proceeding.  However, after the judge in the Azima Proceeding delivered his judgment on May 22, 2020, Gerrard took the extraordinary step of filing a "corrective" witness statement, seeking to amend aspects of his evidence.  This would be a very unusual step for any witness to take in English litigation, let alone one who is a senior lawyer, as it involved an explicit acceptance that the evidence he had given to the High Court was untrue, in a number of material respects. Gerrard's professed reason for doing so was in order to comply with his professional obligations, which itself constitutes an admission that the evidence he gave had the effect of misleading the Court.

15.     The matters Gerrard sought to correct relate to his involvement with Mr. Al Sadeq. Gerrard now accepts (having previously denied these matters in forthright terms in his evidence to the High Court) that (i) he interviewed Mr. Al Sadeq during an extended period of detention without charge in RAK, (ii) that the location of at least some of those interviews was a camp of the Ruler of RAK's private militia, (iii) that the interviews were conducted not in accordance with PACE (the "Police and Criminal Evidence Act", the UK statute governing fair procedure in criminal

6

interviews), (iv) that he also interviewed Mr. Al Sadeq's wife, and (v) that the interviews were conducted without Mr. Al Sadeq's lawyer being present.  Each of these matters is material to the allegations of the Foreign Proceeding, and it appears that Gerrard was content to give false evidence about them in the Azima Proceeding, and only correct that evidence when it became clear that he would have to respond to these matters more directly in the Foreign Proceeding.

16.     On June 30, 2020, the learned Judge in the Azima Proceeding provided an Addendum to his judgment addressing the corrections that Gerrard wished to make to his evidence. A copy of that Addendum is annexed hereto as Exhibit B.  The learned Judge summarized the nature of the corrections as follows:

a.  **Number of meetings/interviews with Mr Al Sadeq** (at [9.1]): Gerrard accepted that, contrary to his evidence in the High Court that he had only interviewed Mr. Al Sadeq once, Gerrard had in fact interviewed Mr. Al Sadeq at least six times, and on an unspecified number of further occasions which he described as "meetings" rather than "interviews" (notwithstanding that Mr. Al Sadeq was in custody on those occasions): see [9.1].

b.  **Compliance with PACE/manner in which the interviews were conducted** (at [9.2]): Gerrard now accepts that, contrary to his evidence in the High Court, none of the interviews he conducted with Mr. Al Sadeq were compliant with PACE. At [9.2], the Judge set out key extracts from Gerrard's evidence, which he now accepts were untrue. This includes unambiguous statements such as that he "*followed PACE to the letter and indeed cautioned him [*Mr. Al Sadeq*] at the start of it*" (at [9.2(b)]).

c.  **Presence and approval of Mr. Al Sadeq's lawyer** (at [9.4]): Gerrard now accepts, contrary to his unambiguous evidence in the High Court, that Mr. Al

Sadeq's lawyer did not agree to the interviews he conducted in 2014, and that Mr.

Al Sadeq was not legally represented at the time.

d. **Attendance of lawyers from Al Tamimi** (at [9.5]): Gerrard now accepts that

evidence he gave in the High Court about lawyers from a firm called Al Tamimi

attending interviews in 2014 on behalf of Mr. Al Sadeq was untrue.

e. **Mrs. Al Sadeq** (at [9.6]): Gerrard now accepts, contrary to his evidence in the

High Court that he did not think had had ever met Mrs. Al Sadeq, that in fact he

met her on a number of occasions, and conducted meetings with her that could be

classed as interviews.

f. **Location of the interviews** (at [9.7]): Gerrard now accepts, contrary to his

evidence in the High Court that he only conducted interviews in RAK in the

prison on the outskirts of the main town in RAK, that he interviewed Mr. Al

Sadeq in (i) the RAK general police headquarters, (ii) the "Al Barirat" military

prison, and (iii) the RAK central courthouse.

g. **Interview before charge** (at [9.8]): Gerrard now accepts, contrary to his evidence

in the High Court that he only interviewed Mr. Al Sadeq after he had been

charged, that he did in fact interview Mr. Al Sadeq before he had been charged.

17.    Significantly, the Judge in the Azima proceeding make the following observations

regarding Gerrard's corrective statement:

a. That it was not correct to describe the errors made by Gerrard as "minor

inaccuracies", and that the corrected evidence "*cumulatively creates a materially*

*different impression of the extent and nature of Mr Gerrard's dealings with Mr Al*

*Sadeq*" (at [14]).

      b.   That Gerrard had failed to give an entirely satisfactory explanation for "*either the inaccuracies in his evidence in cross-examination or for the delay in providing corrective evidence*"(at [16]).

      c.   That Gerrard gave his untrue evidence on the matters involving Mr. Al Sadeq "*with bluster, volunteering additional details about his dealings with Mr Al Sadeq – which now turn out to be wrong – often in unambiguous terms and emphatic tone, with no suggestion that his memory could be faulty or that he had not prepared himself to answer such questions*"; the learned Judge then gave several examples of clear and unambiguous evidence given by Gerrard that he now accepts was untrue (at [17]).

See Exhibit B.

18.     At paragraphs [18]-[19] of the Addendum, the Judge specifically referred to the professional conduct implications of Gerrard's incorrect evidence, stating:

> "*Given the extent of the discrepancies between his original, somewhat slapdash evidence on these matters and the corrected evidence, it ought to have occurred to Mr Gerrard once he was able to reflect calmly after leaving the witness box, and at the latest when he read the Claim Form or the Particulars of Claim in the Al Sadeq Proceedings, that he had given, or might have given, inaccurate evidence about his dealings with Mr Al Sadeq at which point he should have checked the available records and not waited until much later on when material was made available for the purposes of the Al Sadeq Proceedings.*"

See Exhibit B.

19.     Gerrard is currently being investigated by the Solicitors Regulation Authority (SRA), the governing body that regulates Solicitors in England and Wales.  The investigation concerns Mr.

Al Sadeq's allegations generally, and the SRA has also now been invited to consider further issues of professional misconduct arising from the inaccurate evidence Gerrard gave to the High Court in the Azima Proceeding.  Gerrard is an officer of the court in England and Wales, and therefore his evidence before the High Court must be scrupulously accurate.  Solicitors in England and Wales owe far-reaching duties of integrity and honesty, and owe a specific professional obligation not to mislead the Court, whether carelessly or dishonestly.  In light of this, Gerrard's false evidence before the High Court is of great concern from a professional ethics standpoint, which in turn casts doubt on the likelihood of obtaining full and accurate discovery in the Foreign Proceeding.

20.     Moreover, in the Azima Proceeding, the Court faced significant difficulties in obtaining documentary evidence about the conduct of RAKIA's investigation, in which Gerrard and Dechert UK participated.  In particular, reports made by Mr. Page in connection with that investigation were apparently provided under an agreed protocol whereby copies of the reports would be returned to Mr. Page after two weeks, such that they no longer remained in the hands of the persons for whom they were prepared.  Gerrard received at least one such report ("the Project Update"), yet failed to refer to this in his witness statement and was criticized by the Judge for failing to do so (see [271] of Exhibit B). The only possible explanation for such a protocol, is a desire to avoid retaining documents so as to prevent them from being subject to discovery in legal proceedings.  That provides a further reason why it is necessary for relevant documentary evidence to be obtained from alternative sources where possible.

Documents held by Dechert US

21.     In the course of giving evidence in the Azima Proceeding, Gerrard testified that he reported to the "main board" of Dechert US about his concerns about a negative media campaign (i.e. involving allegations of human rights abuses) against him and Dechert UK, among others, concerning their investigation of fraud allegedly perpetrated against RAKIA.  See Rosenfeld Decl.

Ex. B. The substance of any report made by Gerrard on these matters, and any related documents, are therefore likely to be material to the Foreign Proceeding.

22.     Those documents are likely to include the following:

    a.   Any report(s) made by Gerrard to the "main board";

    b.   Any notes of meetings with or about Gerrard concerning these matters;

    c.   Any internal documents generated as a result of those reports or meetings, including any summaries, notes, policy statements, action plans, agendas or similar.

    d.   Any documents evidencing any internal investigation conducted by Dechert US into these matters.

    e.   Any documents evidencing any report by Dechert US to any external authorities about these matters.

    f.    Any emails and other communications by and among the Policy Committee and/any other person regarding Gerard and the other Dechert attorneys who are party to the Foreign Proceeding

23.     Given the circumstances, what Gerrard reported to the "main board" of Dechert US, and any documents generated as a result of that, is likely to be germane to the Foreign Proceeding.

24.     Upon information and belief, the "main board" to which Gerrard reported is Dechert US' Policy Committee, which is Dechert US' elected board of directors (the "Policy Committee").[2]

---

[2] See https://www.forbes.com/sites/davidparnell/2016/11/08/henry-nassau-dechert-we-have-set-our-sail/#49d7a4811960.

25.     Upon information and belief, among other things, the Policy Committee, was, at all relevant times, responsible for risk management within Dechert LLP's global network of firms, and would be responsible for investigating alleged misconduct of its attorneys.

26.     It is believed that the Policy Committee has information concerning Gerrard's report(s) to it, and it is further believed that the Policy Committee conducted an inquiry and/or investigation into allegations of misconduct by Gerrard and the other defendants.

27.     Accordingly, upon information and belief, Dechert US has information, documents, and material, which would shed further light on the defendants' misconduct in connection with their investigation of, *inter alia*, Mr. Al Sadeq, and which would provide evidence germane to Mr. Al Sadeq's Claim in the Foreign Proceeding.

28.     Mr. Al Sadeq should also be permitted to take the testimony of the members of the Policy Committee regarding their inquiry and investigation into Gerrard's conduct and that of the other Dechert UK attorneys who are named defendants in the Foreign Proceeding

29.     For these reasons, it is respectfully requested that this Court grant the Application in its entirety.

Dated:  July 31, 2020

_____
Haralambos Tsiattalou