On behalf of the Claimant
First Witness Statement
Exhibits HT1 and HT2
29th June 2020

**IN THE HIGH COURT OF JUSTICE**             **Claim No. QB-2020-002218**

**QUEEN'S BENCH DIVISION**

**B E T W E E N:**

### STOKOE PARTNERSHIP SOLICITORS

**Claimant**

**- and -**

### (1) PAUL ROBINSON
### (2) COMPANY DOCUMENTS LTD
### (3) OLIVER MOON

**Defendants**

---

## WITNESS STATEMENT OF HARALAMBOS TSIATTALOU

---

I, **HARALAMBOS TSIATTALOU**, of Stokoe Partnership Solicitors, Chancery House, 53/64 Chancery Lane, London, WC2A 1QU, **WILL SAY** as follows:

1.  I am a Solicitor of the Senior Courts of England and Wales and a partner in the law firm of Stokoe Partnership Solicitors. I am duly authorised to make this statement on behalf of the Claimant in support of its applications for an interim injunction restraining the First and Second Defendants from actual or threatened breaches of confidence and related disclosure orders; and *Norwich Pharmacal* disclosure orders from the First, Second and Third Defendants.

2.  The facts and matters set out in this witness statement are either derived from my own knowledge or have been supplied to me by others. In particular, my knowledge as to the Defendants' attempts to access the Claimant's confidential information was originally provided to me by Mr Alexander Sawyer of Quaestio Intelligence Services Ltd ("**Quaestio**"), who are enquiry agents acting for the Claimant. Where I refer to facts and matters below that

*1*

are within my own knowledge they are true. Where I refer to information supplied to me by others, its source is identified and it is true to the best of my knowledge and belief.

3.  Where in this statement I refer to the existence of legal advice, or to communications with third parties for the dominant purpose of these or other proceedings, this should not be regarded as a waiver of privilege either by the Claimant, or by any other individuals upon whose behalf the Claimant has been instructed.

4.  There is now produced and shown to me, marked "**HT-1**", an exhibit containing true copies of paginated documents to which I will refer in this statement. References below to page numbers are to the contents of that exhibit.

5.  There is also now produced and shown to me, marked "**HT-2**", an exhibit containing true copies of confidential documents to which I will refer in this statement. The present proceedings are intended to protect the confidentiality of these documents. Nothing in this statement should be taken as waiving confidentiality in this exhibit and the Court is requested to order that there be no access to those documents by third parties without permission from a High Court Judge.

6.  This witness statement has been prepared with the use of remote video conferencing software. It has been prepared on the basis of my own knowledge and records of the relevant events, a report produced by Quaestio at the Claimant's request, follow-up exchanges I have had with Mr Sawyer of Quaestio, and the assistance of counsel.

A.  **EXECUTIVE SUMMARY**

7.  In these proceedings, the Claimant applies for an injunction, disclosure orders and/or *Norwich Pharmacal* relief in relation to attempts by the First and/or Second Defendants to obtain confidential information from the Claimant. The application is made following instructions by the First and/or Second Defendants to obtain information, including confidential information relating

to the Claimant's bank accounts,  relating to the Claimant's conduct of High Court proceedings brought by its client, Mr Karam Al Sadeq against the law firm Dechert LLP and three of its current or former partners: Mr Neil Gerrard, Mr David Hughes, and Ms Caroline Black  in Claim No. QB-2020-000322 (the "**Al Sadeq Litigation**"). The attempts have come to light as the result of a 'whistle-blower' as I explain below.

8.     As explained further below, evidence has recently come to light that the Defendants have obtained, or have attempted to obtain, confidential information relating to the Al Sadeq Litigation.  This information has been sought by the First and/or Second Defendants from a number of different targets, including but not limited to the Claimant.  So far as the Claimant is concerned, the information sought by the First and/or Second Defendants includes banking records of the Claimant and details of my movements to and from the United Arab Emirates ("**UAE**") to take instructions from Mr Al Sadeq.

9.     So far as others are concerned, the information includes banking and telephone records from "Maltin PR", a legal public relations and litigation support firm, and from Radha Stirling who works for the London-based advocacy association "Detained in Dubai".  Both of these organisations are assisting Mr Al Sadeq.  It also appears that the First and/or Second Defendants have, in the past, attempted to obtain confidential information relating to the international law firm Hogan Lovells International LLP ("**Hogan Lovells**"). I have not contacted either Radha Stirling or Hogan Lovells directly.

10.     I say at the outset that I consider the attempts to access the Claimant's confidential information in connection with the Al Sadeq Litigation to be completely unacceptable and offensive to the interests of justice. Mr Al Sadeq brings his High Court litigation from a prison cell in the UAE and is only allowed limited contact with the Claimant. He is doing so to vindicate his rights in relation to serious allegations of human rights abuses, including his unlawful detention, his unlawful interrogation, and the imposition by the defendants in those proceedings of illegitimate pressure to obtain false confessions from Mr Al Sadeq.  Mr Al Sadeq has a legal right to instruct the

Claimant in connection with that litigation and the Claimant must be able to conduct that litigation consistent with the interests of justice and without having to investigate and fend off attempts by third parties to access its confidential information.

11.    At this stage, the Claimant does not know the full extent of the attempts to obtain confidential information, although, as explained below, there are a number of inferences which may reasonably be drawn from the background facts. The relief sought by the Claimant therefore includes orders requiring the Defendants to disclose what information has been obtained, by whom and for whom it has been sought, and to whom it has been provided. These orders are necessary so that the Claimant may obtain targeted relief against the relevant individuals.

12.    The Defendants to this action are persons who, in one way or another, are involved in the field of corporate intelligence (in broad terms). They are, therefore, unlikely to have been the ultimate instigators of the attempts to access confidential information and will likely be acting on behalf of others. Whilst I am not in a position to identify those persons at this time, the attempts to access the Claimant's confidential information coincided with my firm's involvement in the Al Sadeq Litigation.  I believe the evidence supports a strong inference that the Defendants' ultimate clients are one or more of the defendants in the Al Sadeq Litigation or persons otherwise connected to those proceedings.

13.    The requests for information which concern the Claimant all appear in some way to relate to the Al Sadeq Litigation.   Likewise, the timing of those requests corresponds to certain events in the Al Sadeq Litigation.   In particular, on the basis of the evidence that is currently available, it is my belief that the Defendants' attempts to obtain confidential banking information from the Claimant are likely to have been motivated, at least in part, by a desire to discover how Mr Al Sadeq is funding his litigation.

14.    I also believe that the First and/or Second Defendants' attempts to access the Claimant's confidential information have taken place against a background of

attempts by others to arrange surveillance of Mr Al Sadeq's UK legal team whilst in the UAE.   In particular, following the issue of proceedings in January 2020, I believe that I was the subject of various surveillance activities in Dubai in February and March 2020, including an apparent break-in to my hotel room,  the presence of surveillance agents at my hotel (where I attended privileged meetings in relation to the conduct of the Al Sadeq Litigation), and an attempt to follow me to a privileged meeting at a different location.   I believe these matters were also connected to the Al Sadeq litigation and that they were intended to disrupt the Claimant's ability to obtain instructions (as they in fact did).  I should make it clear, however, that the Claimant does not assert that the Defendants themselves were responsible for those acts of surveillance.

15.     The Defendants' attempts to obtain confidential information from my firm first came to my attention as a result of an approach by the Third Defendant as a whistle-blower.  I am informed by Mr Sawyer of Quaestio that the First and/or Second Defendants have instructed an individual whose identity I am not aware of but to whom I refer herein as "**Source A2**" to attempt to obtain confidential information.  I also understand that, in turn, Source A2 enlisted help of the Third Defendant.

16.     Since the end of March 2020, the Third Defendant has provided certain information and assistance to the Claimant and Quaestio to enable them to track the location of other persons who have sought and accessed confidential information.   These investigations have produced evidence that the First Defendant has indeed accessed the confidential documents using computers with public IP addresses close to both the First Defendant's residential property in West Sussex as well as the offices of the Second Defendant company, of which the First Defendant is a director.

17.     I should also say at the outset that I understand that Mr Sawyer of Quaestio is aware of the identity of Source A2, but not his residential location or address for service.  Mr Sawyer has declined to provide this information to me or the Claimant.  The reason given by Mr Sawyer for not doing so is that he knows

that Source A2 has suffered with ill health recently and that, at this juncture, he is not prepared to divulge his name.

18.   In light of these events, the Claimant considers that they have causes of action against the First and/or Second Defendants for, amongst other things, breach of confidence and/or are entitled to injunctive relief on a *quia timet* basis. The Claimant may also have other causes of action against the Defendants or other parties implicated in the relevant events, although unless disclosure orders are made the Claimant is not presently able to identify all of its causes of action. In any event, I believe that unless restrained the First and Second Defendants, or those directing them, are likely to take further steps with a view to obtaining confidential information.

19.   The Claimant therefore applies for an interim injunction to prevent the First or Second Defendants taking any further steps to access confidential information. It also applies for disclosure orders to discover the full extent of the confidential information obtained so far and to identify the Defendants' ultimate clients to obtain further relief against those persons.

20.   In the alternative, if the Court were to consider that the Claimant's breach of confidence claims have not yet been established to the necessary standard based on the available evidence, the Claimant applies for disclosure orders pursuant to the *Norwich Pharmacal* principle to identify the ultimate wrongdoers. I believe there is compelling evidence that the Defendants are, at the very least, more than mere bystanders and are directly involved in that wrongdoing.

**B.   THE PARTIES**

**(1)   The Claimant**

21.   The Claimant is a firm of solicitors with offices in Central and East London and Manchester. It specialises in criminal defence work, civil litigation and arbitration, with a particular focus on cases involving allegations of fraud and complex crime. The Claimant is instructed to act on behalf of Mr Karam Al Sadeq in the Al Sadeq Litigation as described in **Section C** below.

**(2)**   **The Defendants**

22.     The First Defendant, Mr Paul Robinson, is resident in Haywards Heath, West Sussex.   According to information obtained from Companies House, Mr Robinson is a director and 50% shareholder of the Second Defendant, an English company whose principal activity is stated to be 'corporate research' **[HT1/10]**.

23.     I am informed by Quaestio that the First Defendant has used the encrypted email address 'duedilligence@hushmail.com' to give instructions to Source A2 to access the Claimant's confidential information.   Quaestio has been told this by the Third Defendant.   I am also informed that IP address evidence suggests that the First Defendant has received and accessed such information. These events are described at **Sections (6), D(7) and D(8)** below.

24.     The Second Defendant, Company Documents Ltd, is a company of which the First Defendant is a director and 50% shareholder. I understand from Quaestio that one of the confidential documents sought and obtained by Mr Robinson was accessed by an IP address close to offices used by Company Documents Ltd, at 28a Church Road, Burgess Hill, RH15 9AE.

25.     The Third Defendant is a private investigator and is resident in Copthorne, West Sussex.   I understand from Mr Sawyer of Quaestio that the Third Defendant had previously been instructed by Quaestio when undertaking investigations on behalf of the Claimant. I was unaware of this fact, or indeed of the Third Defendant's identity, until shortly before this action.   I also understand from Mr Sawyer that the Third Defendant is the 'whistle-blower' who, in March 2020, first alerted Quaestio to attempts by the Defendants' to gain access to the Claimant's confidential information.   The Third Defendant is referred to as **"Source A1"** in the Quaestio Report to which I refer in this statement.

**C.    THE 'AL SADEQ' LITIGATION**

**(1)    Mr Al Sadeq**

26.    Mr Karim Al Sadeq is a lawyer and Jordanian citizen who is a resident of the UAE.  For the past six years, Mr Al Sadeq has been incarcerated in Ras Al Khaimah ("**RAK**"), one of the constituent Emirates of the UAE, having been detained in September 2014 for his alleged involvement in fraudulent transactions committed against his former employer, the Ras Al Khaimah Investment Authority ("**RAKIA**").

27.    Mr Al Sadeq denies any involvement in wrongdoing and contends that he has been wrongfully convicted in the UAE on the basis of false confessions obtained under duress.   Since October 2019, the Claimant has legally represented Mr Al Sadeq in a legal action before the High Court of Justice in London, which I describe below.

**(2)    Mr Al Sadeq's High Court Proceedings**

28.    On 28 January 2020, Mr Al Sadeq commenced the Al Sadeq Litigation.  In those proceedings, Mr Al Sadeq brings claims against the law firm Dechert LLP and three of its current or former partners: Mr Neil Gerrard, Mr David Hughes, and Ms Caroline Black.  Mr Al Sadeq claims that those defendants committed various wrongs to him in breach of UAE civil and criminal law whilst conducting a purported investigation on behalf of RAKIA, RAK or its Ruler.

29.    The nature of the allegations in the Al Sadeq Litigation can be seen from paragraph 9 of the Particulars of Claim in those proceedings [**HT1/27-28**].  In outline, Mr Al Sadeq's claims include allegations that the defendants were implicated in:

29.1.    The kidnap and extraordinary rendition of Mr Al Sadeq from Dubai to RAK (see paragraphs 40 to 47 of the Particulars of Claim).

29.2.    Mr Al Sadeq's unlawful detention without arrest or change, including a period of detention in solitary confinement, under a false name, with

*8*

no access to legal representation (see paragraphs 105 to 109 of the Particulars of Claim).

29.3.   The interrogation of Mr Al Sadeq.   In particular, Mr Al Sadeq contends that during the first of his interrogations by Mr Gerrard, he was blindfolded with his hands tied behind his back and had no lawyer present (see paragraph 64 of the Particulars of Claim).

29.4.   Threats and unlawful pressure made to Mr Al Sadeq, his wife, and children, including a promise by Mr Gerrard and Ms Black that Mr Al Sadeq's prison conditions could be improved if he "cooperated" with them (see, paragraphs 65 to 67, 89 to 98, and 120 to 130 of the Particulars of Claim).

29.5.   The procurement of false confessions signed by Mr Al Sadeq, but drafted by Mr Gerrard and Mr Hughes, in circumstances where Mr Al Sadeq was detained in the above conditions, did not have access to legal representation, and had made it clear that the confessions were untrue (see, paragraphs 183 to 184 of the Particulars of Claim).

30.   The Al Sadeq Litigation has generated a significant amount of publicity, due to the serious nature of the allegations.   I refer, for example, to two recent articles that are exhibited at **[HT1/90]** and **[HT1/92]**.

## (3)   The Claimant's involvement in the Al Sadeq Litigation

31.   The Claimant was first instructed to act in the Al Sadeq Litigation in October 2019.   Since that time, there has been a correlation between the progress of the Al Sadeq Litigation and the Defendants' attempts to obtain confidential information from the Claimant and others in relation to those proceedings.

32.   The Claim Form in the Al Sadeq Litigation was issued on 28 January 2020 **[HT1/21]**.   Although it was not served at that time, the allegations were publicised in a press release published by Detained in Dubai on the date of issue **[HT1/98]**.   The Claim Form, which was made available online, was much more detailed than the amended version ultimately served with the Particulars of Claim **[HT1/23]**, and contained details of Mr Al Sadeq's claim

and the nature of the allegations made against the Defendants. It also, of course, stated that the Claimant was acting for Mr Al Sadeq.

33.     Mr Al Sadeq's Amended Claim Form and Particulars of Claim were served on 31 March and 1 April 2020.  As set out at paragraph 215 of the Particulars of Claim, my firm's ability to take instructions from Mr Al Sadeq has been impeded in various ways since the Al Sadeq Litigation was issued **[HT1/172]**.

34.     Between February and March 2020, I travelled to Dubai with other members of Mr Al Sadeq's UK legal team to meet with Dr Al Haddad, Mr Al Sadeq's local counsel, and to meet with Mr Al Sadeq in prison.   We were not, however, permitted to visit Mr Al Sadeq on those occasions. During these trips, my colleagues and I were the subject of surveillance activities which I describe at **Section E** below.

35.     By a letter dated 16 April 2020, the solicitors acting for the defendants in the Al Sadeq Litigation wrote to the Claimant to ask about Mr Al Sadeq's funding arrangements for the litigation **[HT1/102]**.  In particular, they requested:

> "9.     *Please confirm whether the Claimant is funding his claim or whether it is being funded by a third party/parties.   In this regard, please identify the third party/third parties and the arrangements in place.*
>
> 10.     *We note that, if the Claimant is being funded, this may provide the basis for a security for costs application...   We note the commentary in The White Book §25.14.6 which makes it clear that the court also has an implied power to order disclosure of details of third party funders.*"

36.     I now understand from Mr Sawyer that, shortly before this letter was sent, the Third Defendant had received instructions to obtain confidential banking information from the Claimant in early April 2020.  In the event, the Claimant responded on behalf of Mr Al Sadeq by a letter dated 22 May 2020, in which it confirmed that Mr Al Sadeq was prepared to provide the sum of £232,833 by way of security for costs up to 30 June 2020 **[HT1/105]**.  As security was being provided, Mr Al Sadeq declined to answer the questions raised by the defendants' solicitors **[HT1/104]**.

37.    As at the date of this statement, the defendants in the Al Sadeq Litigation have yet to file a Defence.  Mr Al Sadeq has already agreed various extensions of time, such that the current date for service of a Defence is 30 June 2020. Since then, however, the defendants have applied for additional time until 31 July 2020.

**(4)    The 'Azima' Litigation**

38.    I should also briefly mention a piece of related litigation in *Ras Al Khaimah Investment Authority v Azima*, in which judgment was recently handed down by Andrew Lenon QC on 22 May 2020 [2020] EWHC 1327 (Ch) **[HT1/107]**. I will refer to those proceedings as the "**Azima Litigation**".

39.    The Azima Litigation concerned claims brought by RAKIA against Mr Farhad Azima, a US businessman involved in the aviation industry who had been party to a number of business ventures with RAKIA and other RAK entities between 2007 and 2016.

40.    As recorded at paragraphs 2 and 30 of the judgment in the Azima Litigation, part of the factual background to that case involved an investigation conducted by RAKIA from around late 2014 into RAKIA's former Chief Executive Officer, Dr Massaad.  This background overlaps with the investigations that are in issue in the Al Sadeq Litigation.  In particular, the question of whether human rights abuses had been committed against Mr Al Sadeq also became an issue in the Azima Litigation (see, paragraphs 201 and 202 of the judgment).

41.    In the course of the Azima Litigation, it became clear that in January 2015 the Ruler of RAK had engaged a private investigator, Mr Stuart Page, to investigate the activities of Dr Massaad (see, paragraph 31 of the judgment). So far as I am aware, Mr Page has a strong presence in Dubai and also has connections to companies incorporated in the UK.

42.    On 6 March 2020 I personally witnessed Mr Page whilst staying at the 'One and Only on the Palm' Hotel in Dubai.  I believe that this encounter was connected to acts of surveillance that I describe at **Section E(2)** below.

43.     RAKIA's position in the Azima Litigation was that the allegations about Mr
        Al Sadeq's mistreatment were untrue (see, paragraph 29 of the judgment).  On
        this issue, the learned Judge found, at paragraph 202 of the judgment, that:

> "In order to make good its case that Mr Azima procured and promoted
> false stories in the media, it was incumbent on RAKIA to establish that
> the stories which it was intended to publish about human rights
> violations were untrue. It has not done so. It appears that Project Clay
> intended to draw attention to actual cases of detention and illegality,
> not fabricated cases. The 2014 Amnesty International Report indicates
> that there were real grounds for concern about detention procedures in
> RAK. None of RAKIA's witnesses were in a position to refute the
> findings in that report".

44.     A further issue that arose in the Azima Litigation was whether RAKIA's case
        against Mr Azima was based on evidence obtained as a result of hacking Mr
        Azima's email account, including by the device of a 'spear-phishing' email
        (see, for instance, paragraphs 35-36 and 251 of the judgment).  In particular,
        Mr Azima invited the Court to find that RAKIA was responsible for that
        hacking, and that RAKIA's claim should therefore be struck out as an abuse of
        process (see, paragraphs 251 to 255 of the judgment).

45.     The Judge did not accept Mr Azima's submission that RAKIA was
        responsible for the hacking of his emails.  Nor did the Judge make any finding
        of wrongdoing on the part of Mr Page, although he did make findings as to the
        world in which Mr Page operated.  I draw the Court's attention to the findings
        made at paragraphs 251, 260, 265, 269 to 271, 348 to 349, 355, 368 to 369,
        and 380 of the judgment.

46.     In particular, I note the learned Judge found that "*These cases highlight the
        fact that Mr Page operates in a world of covert surveillance in which agents
        acquire confidential information unlawfully and that Mr Page has dealings
        with such agents. It would be a reasonable inference to draw from these
        incidents that Mr Page has access to agents with the capacity to hack emails…
        these other incidents do not establish that Mr Page ever personally carried
        out or authorised the unlawful obtaining of confidential information and
        therefore do not affect my assessment of the likelihood of Mr Page acting
        unlawfully in this case*" (at paragraph 369 of the judgment).

47.   I briefly refer at **Section F** below to phishing emails that I have personally received and continue to receive since the Claimant was instructed in the Al Sadeq proceedings.

## D.   THE DEFENDANTS' ATTEMPTS TO ACCESS CONFIDENTIAL INFORMATION

### (1)   The Quaestio Report

48.   My account below of the Defendants' attempts to obtain confidential information is based on a report produced by Quaestio dated 27 June 2020, my own personal involvement in the relevant events and my subsequent exchanges and discussions with Mr Sawyer.  A copy of Quaestio's report is exhibited at **[HT2/41]**.

49.   The Quaestio report was produced following an approach by the Third Defendant to Mr Sawyer as a whistle-blower.  In particular Mr Sawyer has informed me that, on 27 March 2020, he was contacted by the Third Defendant who told him that he wanted to discuss a 'job' he was involved in. I understand that the Third Defendant approached Mr Sawyer because the new 'job' related to the Claimant and the Third Defendant had previously worked on behalf of former clients of the Claimant, although I was not aware of this at the time.  Mr Sawyer also informed me that the Third Defendant was not aware of the full background to the requests involving the Claimant and that he has only ever received instructions from Source A2.  The Third Defendant also mentioned to Mr Sawyer that he had received an earlier request to obtain confidential banking records from Maltin PR and others. So far as I am aware, Source A2 does not know that the Claimant is aware of his involvement in these events.

50.   After this discussion, I agreed with Mr Sawyer that Quaestio should work with the Third Defendant to assist us in tracking the individuals standing behind Source A2 who were trying to access the Claimant's confidential information. The detail of these matters is set out below.  Prior to 27 March 2020, however, neither the Claimant nor Quaestio were aware of any activities by the Defendants to access confidential information.

51.     The account I set out below is the best evidence that the Claimant currently has with regard to the attempts to access their confidential information. It is, however, quite possible that it does not represent the full picture. This could be either because the Third Defendant has not yet disclosed the entirety of his involvement to Quaestio, or because there are matters about which the Third Defendant is unaware. At the date this statement is signed, the Third Defendant has refused to provide information to the Claimant on oath.

**(2)    Encrypted Communications**

52.     According to Mr Sawyer, the Third Defendant has explained that most of his communications with Source A2 were conducted via an encrypted messaging application called "Threema" or via encrypted emails. I also understand that the same is true of the communications between Source A2 and Mr Robinson.

53.     In particular, Mr Sawyer has explained to me that emails were sent using the encrypted email address: "fairydust1998@protonmail.ch". This account was set up for the Third Defendant and Source A2 and both had access to it, although I am told that it was only Source A2 who ever sent messages from it. Whenever the Third Defendant received information, he would save it as a draft email so that it was available on the account. I will refer to this email address as the "**Fairy Dust Account**".

54.     In turn, emails were sent by Source A2 from the Fairy Dust Account to Mr Robinson, who used the email address: "duediligence@hushmail.com". This email account is also encrypted. I will refer to this email address as the "**Hush Mail Account**".

**(3)    Instructions to access Radha Stirling information**

55.     Radha Stirling is the founder and CEO of an organisation called "Detained in Dubai". According to its website, Detained in Dubai was founded by Radha Stirling in 2008 as an advocacy group to assist foreign victims of injustice in the UAE and the Gulf States **[HT1/232]**. Radha Stirling and Detained in Dubai have published articles about the Al Sadeq Litigation and have assisted Mr Al Sadeq at various times to raise the awareness of his case among human rights activists and non-governmental organisations.

*14*

56.   I understand from Mr Sawyer that the Third Defendant has explained to him that, since July 2019, Source A2 has asked the Third Defendant to obtain confidential information about persons connected with the Al Sadeq Litigation.  In turn, I am informed by Quaestio that the Third Defendant has stated that Source A2's instructions originated from Mr Robinson.

57.   Among other things, between October 2019 and December 2019 Source A2 was asked to obtain information about Radha Stirling's whereabouts, her telephone numbers, and banking information.   So far as I am aware, no information was sent back to Mr Robinson.

**(4)     Instructions to access Maltin PR banking and telephone information**

58.   Mr Sawyer informs me that, in February 2020, Mr Robinson requested Source A2 to obtain financial records and monthly transactional data from Maltin PR's bank account.  Source A2 in turn involved the Third Defendant in these activities.   I understand that the Third Defendant and Source A2 were subsequently able to obtain such information and that Source A2 delivered this by email to Mr Robinson for onward transmission to an unknown person.  I refer the Court the Quaestio Report at **[HT2/48]**.

59.   I am also informed that Mr Robinson requested Mr Tim Maltin's mobile phone records.  I understand, however, that it was not possible for the Third Defendant or Source A2 to access these.

60.   On 8 March 2020 a request was made by Mr Robinson for specific transactional information relating to the Maltin PR account.  The specific transactions related to payments in relation to Radha Stirling and Mr Azima. The communication also requested that banking co-ordinates be identified for these two individuals.  I am informed that this request was, once again, forwarded to the Third Defendant.  I am also informed by Quaestio that no information was provided by the Third Defendant in relation to these specific requests.

61.   On 11 March 2020 Mr Robinson sent a further request via Threema that the Maltin PR bank account be accessed in relation to transactions pertaining to

Hogan Lovells and that banking co-ordinates for this firm of solicitors be provided. I also understand from Quaestio that on 6 April 2020 Source A2 instructed the Third Defendant to investigate Hogan Lovells and 'pull' three months of corporate banking records. As I explain below, the 11 March 2020 request was subsequently used as an opportunity for Quaestio to use a tracking device to trace the public IP addresses of persons sending and receiving the requested information. I am informed that the specific confidential information sought in these particular requests was not provided by the Third Defendant.

**(5)**  **Instructions to access the Claimant's banking information**

62.    Quaestio informs me that, on 2 April 2020, Mr Robinson requested Source A2 to obtain the Claimant's banking co-ordinates. I refer in particular the Quaestio Report at **[IIT2/53]**. The timing of this request was shortly before certain questions asked by the solicitors for the defendants in the Al Sadeq Litigation as to how Mr Al Sadeq was funding those proceedings. The request was also made at around the same time that Mr Al Sadeq's Amended Claim Form and Particulars of Claim were served on 31 March and 1 April 2020 **[HT1/23]**, **[HT1/26]**.

63.    Mr Sawyer later informed me that this request had been made. As a response, I agreed that Quaestio should carry out a tracing exercise to track the persons giving and receiving the information, with the aim of identifying the persons who were ultimately requesting it. The process involved transcribing the Claimant's bank account information into a document format that would be recognisable to Mr Robinson, but into which a covert tracking facility could be inserted to track the public IP addresses of persons accessing the information.

64.    I understand from my discussions with Mr Sawyer of Quaestio that this tracking process was undertaken as follows.

65.    First, I took a genuine bank statement for the Claimant's Manchester office bank account and provided it to Quaestio. This bank account is used by the Claimant for everyday business transactions and not client money. We chose

this account as it contained fewer transactions and would likely lead to a further request for the London office account.

66.    The information from the bank statement was transcribed into a format that Quaestio considered would be recognisable as a transcribed bank statement. I understand from Mr Sawyer that client reference numbers were removed. The copy of this document exhibited to this statement has been partially redacted and has been placed in a confidential exhibit.

67.    A geolocation tracing device was then inserted into the document by Quaestio's cyber security specialists. This device enabled Quaestio to trace the location of the public internet protocol ("**IP**") address for any computer that accessed the document whilst connected to the internet. The end result was a document which I refer to as the "**Stokoe Manchester Office Account Document**" **[HT2/2]**. This was provided to the Third Defendant, who in turn provided it to Source A2 as an attachment to a draft email message in the Fairy Dust Account.

68.    On 8 April 2020, the Stokoe Manchester Office Account Document was sent to Mr Robinson by Source A2 from the Fairy Dust Account to the Hush Mail Account. I refer the Court to the Quaestio Report at **[HT2/54]** which contains an image of that email within the Fairy Dust Account. The document is visible in that image with the attachment name "The Stokoe Partnership – March 2020".

**(6)    IP Address Tracing #1: Stokoe banking information**

69.    The Quaestio Report includes a table setting out the information obtained from the tracing exercise conducted in relation to the Stokoe Manchester Office Account Document. I refer the Court in particular to that report at **[HT2/56]**. It appears that the Stokoe Manchester Office Account Document was accessed on a different computer at 17:38 on 8 April 2020 using the IP address 86.152.6.157 ("**Reader 1**"). It was then accessed again by Reader 1 at 20:13 on 8 April 2020 using the same IP address. A second user accessed the document twice at 11:51 and 12:05 on 9 April 2020 from a computer with IP address 31.48.65.176 ("**Reader 2**").

70.    I am informed by Mr Sawyer that the IP address used by Reader 1 is that of Source A2.    Quaestio know this because they are aware of Source A2's identity and because the Third Defendant has stated this from his knowledge of Source A2's residential address.

71.    Quaestio then carried out searches to identify the geolocation of the IP address from which Reader 2 accessed the Stokoe Manchester Office Account Document. I refer the Court in particular to page the Quaestio Report at **[HT2/58]**. It was revealed that the document had been opened in the Burgess Hill area of West Sussex, with post code RH15. The IP address is located approximately 482 metres from 28a Church Road, Burgess Hill, RH15 9AE, which is an office used by the Second Defendant.

72.    I should make it clear that Mr Sawyer has informed me that it is not possible to obtain the precise location of an individual computer that has accessed the document without risking an infringement of data protection legislation. I also understand that to do so may also increase the risk of detection. The approach taken was therefore to trace the "public" IP address of the local internet service provider that accessed the document, rather than  the "private" IP address of an individual user that sits behind it.

73.    For this reason, I understand that the fact that the IP address was geolocated 482 metres away from the offices of Company Documents Ltd is not evidence of imprecision. It is, instead, the consequence of tracing the public IP address which has a broader geolocation than a private IP address. In other words, a public IP address contains within it a range of private IP addresses, located in the vicinity of each other.  In any event, I believe that this evidence supports a strong inference that it was Mr Robinson, or somebody else at Company Documents Ltd, who accessed the Stokoe Manchester Office Account Document.  It is, in particular, very unlikely that another unconnected individual in Burgess Hill would have accessed the document.

74.    The Stokoe Manchester Office Account Document was then accessed on two further occasions by a third user ("**Reader 3**"), as shown in the table of the Quaestio Report at **[HT2/60]**.  This occurred at 13:06 and 13:22 on 9 April

2020, on each occasion using (public) IP address 81.92.206.  According to subsequent research by Quaestio, this IP address is owned by a business hosting company: M247 Ltd.  I refer the Court in this respect to the Quaestio Report at **[HT2/61].**

75.    According to research by Quaestio, the IP address of Reader 3 was geolocated to an address at 2 Adelaide Street, Charing Cross, London WC2N 4HZ.  This is within 800 metres of the UK offices of Page Corporate Investigations, a company connected to Mr Stuart Page based at 5-8 The Sanctuary, Westminster London SW1P 3JS.  I accept, of course, that that this is a busy area of Central London and that many companies have offices based in and around that area.  I refer the Court in this respect to the Quaestio Report at **[HT2/61-63]**.

**(7)    IP Address Tracing #2: further banking information**

76.    On 9 April 2020, Mr Robinson sent a request to Source A2 by the Threema platform that the Claimant's main banking account should be accessed.  The request asked for transactional data for the business bank account for the last three months.  I understand that Source A2 then called the Third Defendant to relay this request.

77.    This request provided a second opportunity for a tracing exercise. In this instance, Quaestio transcribed the transactional data from the Claimant's London office bank account.  I understand that Quaestio took steps to protect sensitive information by anonymising certain information recorded on the document, for example referring to certain barristers chambers simply as "*Chambers*". The result was to produce a second tracing document, which I will refer to as the "**Stokoe London Office Account Document**".  This document is also included in the confidential exhibit with certain redactions **[HT2/4]**

78.    I note here that the Stokoe London Office Account Document included a reference to another of the Claimant's bank accounts. This further account is the Claimant's client account (the "**Client Account**"). This reference was left in the Stokoe London Office Account Document in case it triggered a further

request for information. In the event, as I describe below, that is exactly what happened.

79.   Quaestio has informed me that, by an email timed at 17:49 on 17 April 2020, the Stokoe London Office Account Document was sent from the Fairy Dust Account to the Hush Mail Account. I refer the Court in particular to the Quaestio Report at **[HT2/64]**. However, on this occasion Quaestio was unable to trace the IP addresses used to access this document. It is apparent, however, from a later request made using the Hush Mail Account that Mr Robinson did receive the information contained in the Stokoe London Office Account Document.

80.   I am also informed that, on 21 April 2020, an email was sent from the Hush Mail Account to the Fairy Dust Account with the subject line "*UAE – Ins and outs*". In that email my name, its variants, and my date of birth were provided. The accompanying instruction was that: "*[w]e want to know the movements in and out of Dubai – for Feb 2020*". This instruction appears at the Quaestio Report at **[HT2/65]** As I explain at **Section E(1)** below, in February 2020 I visited Dubai for the purposes of the Al Sadeq Litigation. I believe that I was the subject of surveillance during this trip.

81.   Quaestio inform me that, on 22 April 2020, Mr Robinson requested further information from Source A2 via Threema, which was relayed to the Third Defendant. In particular, Mr Robinson asked for information relating to the Client Account given that the information he sought was not contained in the Stokoe London Office Account Document.

82.   The Stokoe London Office Account Document contained significant transactions being paid into that account from the Client Account. It is my belief, therefore, that the request for information about that account once again supports the inference that the purpose of these enquiries was to identify information about the Al Sadeq Litigation and the funding of that litigation.

83.   Quaestio also inform me that, by the same request, Mr Robinson asked for transactional information for the Client Account for the month of March 2020. He indicated that, subject to those findings, he was also likely to want

information for the period between November 2019 to February 2020.  This period coincides almost exactly with the first few months of the Claimant's instructions in the Al Sadeq Litigation.

84.   Quaestio tell me that, in response to this request, the Third Defendant informed Source A2 that it was not possible to obtain this information as the Claimant now had heightened security.  This response was given on Quaestio's instructions, as it was felt that the tracing exercise had yielded sufficient information to identify the First Defendant as one of the individuals who had accessed confidential information.  It was also done in an attempt to stop further requests to access the Claimant's confidential information.

85.   I am also informed by Quaestio that, on 23 April 2020, Mr Robinson asked Source A2 certain questions about an entry in the Stokoe London Office Account Document using the letters "SFB".  I am told by Quaestio that these questions were asked on a Threema call.  For the Court's information, I can clarify that "SFB" refers to "Speciality Flat Breads Ltd", a company which manufactures pitta breads and other food products and of which I am a shareholder and director.  I am informed that the Third Defendant asked Source A2 whether this entry had been abbreviated or shortened. I believe that these questions support an inference that Mr Robinson has  read the Stokoe London Office Account Document.

**(8)    IP Address Tracing #2: Hogan Lovells information**

86.   Hogan Lovells is an international firm of solicitors.  Hogan Lovells are not involved in any way involved in the Al Sadeq Litigation.  However, I understand from speaking with Maltin PR and from reading articles in the legal press that Hogan Lovells has acted for a company called Eurasian Natural Resources Corporation ("**ENRC**") in High Court litigation **[HT1/237]**.  I also understand that ENRC has commenced claims against Mr Neil Gerrard who is a defendant in the Al Sadeq litigation.  Mr Gerrard has also brought separate proceedings against ENRC in which he alleges, among other things, that ENRC placed him under surveillance.

87.  Quaestio have informed me that, on 11 March 2020, Mr Robinson asked Source A2 to identify transactional information from the Maltin PR bank account relating to transactions involving Hogan Lovells.  This request was in turn communicated to the Third Defendant.

88.  I also understand that, on 6 April 2020, Source A2 instructed the Third Defendant via Threema to investigate Hogan Lovells and 'pull' three months of corporate banking transactions.  I refer the Court, in this respect, to the Quaestio Report at **[HT2/68]**.  I understand, however, that the Third Defendant did not in fact carry out these instructions.

89.  I am also informed that, on 23 April 2020, the Third Defendant prepared a report for Mr Robinson which stated that it was not possible to obtain information concerning transactions involving Hogan Lovells (the "**Hogan Lovells Report Document**") **[HT2/69]**. This document was prepared in conjunction with Quaestio's cyber security experts so as to contain a tracing device.  It was sent from the Fairy Dust Account to the Hush Mail Account by an email dated 23 April 2020 and timed at 17:50.  I refer the Court, in this respect, to the Quaestio Report **[HT2/69]**.

90.  Quaestio then conducted a further tracing exercise using the Hogan Lovells Report Document.  This exercise yielded the information set out in the table in the Quaestio Report at **[HT2/70]**.  In outline, the Hogan Lovells Report Document was accessed by one user on 24 April 2020 at 17:40 using the IP address 5.81.45.198.  The same reader accessed the document again on 24 April 2020 at 18:07 using the same IP address.

91.  The geolocation of the IP address that accessed the Hogan Lovells Report Document was also identified.  The result is shown in the geolocation table in the Quaestio Report at **[HT2/71]**.  It indicates that IP address 5.81.45.198 was located at Ansty, Haywards Heath, West Sussex, with post code RH17.  According to research by Quaestio, this geolocation is approximately 1,500 metres away from the residential address of Mr Robinson in a rural area in West Sussex: 6 Belvedere Walk, Haywards Heath, RH16 4TD.  Once again, this is a reference to the public IP address of the local internet service provider

and not the private IP address of the individual computer used to access the document. I refer the Court to the Quaestio Report at **[HT2/72]**.

92. Taking all the above matters together, the Claimant believes that from October 2019 to at least April 2020 the First and Second Defendants have made several requests to obtain confidential information from the Claimant and (through Source A2) have given the Third Defendant instructions to obtain that information. The confidential information sought includes banking information relating to the Claimant and other persons as described above and in the Quaestio report. There is, in my view, a strong inference that the Defendants have sought to obtain unauthorised confidential information relating to the Al Sadeq Litigation.

## E.   SURVEILLANCE IN THE UAE

93. The First and/or Second Defendants' attempts to obtain confidential information from the Claimant have been made against the background of other suspicious activities that the Claimant has encountered in pursing the Al Sadeq Litigation. In particular, for the reasons outlined below, I believe that both I and my colleagues have been the subject of surveillance in the UAE as a result of our having conduct of that litigation.

94. For the avoidance of doubt, the Claimant does not allege that the Defendants are involved in these suspected surveillance activities. There are, however, certain points of context of which the Court should be aware when considering the present applications.

### (1)   Dubai Trip, 18-24 February 2020

95. On 18 February 2020, I travelled to Dubai with Mr Arthur Maltin who is an Associate Director of Maltin PR, a legal public relations and litigation support firm. Maltin PR is engaged to provide litigation support services in relation to the Al Sadeq Litigation.

96. On one of the days I was staying at the One & Only Hotel between 18 and 22 February, I returned to my hotel room at the One & Only Hotel, The Palm, Dubai at around 4:00pm and found that the balcony door was open. This was

unexpected, as I had not left the door open when leaving my room in the morning.  Nor had it been left open on previous days.  I therefore became suspicious that somebody may have entered my room.

97.    In response to this event, I questioned the hotel cleaner forcefully about whether he had left the balcony door open.  He was very clear that he had not done so.  I therefore immediately went to the reception manager and asked whether I could review the CCTV footage.  I was told that I could not, but that the reception manager would do so.  In the event, I was informed by the reception manager that he had reviewed the footage personally but that he did not believe that there were any security issues.  As I explain below, however, this was not the only security incident I have experienced at this hotel.

98.    Since then, both Dr Al-Haddad and Stokoe have written to the hotel on several occasions asking to review the CCTV footage **[HT1/245]**.  No response has been received.

**(2)    Dubai Trip, 1-8 March 2020: Surveillance**

99.    On 1 March 2020, I travelled again to Dubai and stayed at the same hotel. This time, I was accompanied by Mr Arthur Maltin, Mr Alastair Tomson, a barrister instructed in the Al Sadeq Litigation, and Mr Joseph Thomas, a paralegal at Stokoe. I became concerned at an early stage of this trip that we had been placed under surveillance.  In particular, as from shortly after our arrival on 1 March 2020 there appeared to be a constant presence of surveillance operatives sitting in the lobby of the hotel.

100.   Each day a team of at least two and sometimes four or six men were seated in the lobby and the bar and lounge area. The men were Arabic in appearance, wore casual clothes and always sat in the same positions.  In particular, in the lobby of the hotel  there is a fountain in the middle of the atrium with two tables.  One man would always sit at a table opposite where I tended to sit whilst working early in the morning.  I exhibit a photo of the men at **[HT1/249]**.  There would also be another man, or two men sitting together, at a table in the bar area. They would simply sit there all day, not interacting with the staff or anyone else.

101.    It is absolutely clear to me that these men were there to observe us and, very
        likely, to intimidate us.  They made no effort to conceal their presence.  As I
        explain further below, I was later told by a member of the hotel staff that we
        were indeed under surveillance.

102.    On the evening of 6 March 2020, we had dinner on the upper terrace of the
        hotel. The terrace was quiet, there might have been one or two other people
        sitting there but no more than that.

103.    In the course of the evening, a man walked onto the upper terrace
        accompanied by two women.  I did not see the man enter the terrace, although
        I understand that Mr Maltin did, and that he saw them walk out of the bar,
        across the upper terrace, down onto the lower terrace, and then back up to the
        upper terrace to sit about two tables away from us.  After the man had passed
        us and sat down at his table, Mr Maltin told me that he believed it was Stuart
        Page. We were all shocked by this.

104.    At the time of this incident, I was aware that Mr Page was a security specialist
        based in Dubai and had been carrying out an investigation for the Ruler of
        RAK.  However, I did not personally know what he looked like so would not
        have recognised him if Mr Maltin had not done so.   I understand from
        discussions with Mr Maltin, however, that he was able to recognise Mr Page
        because he had previously seen him being cross-examined in the Azima
        Litigation a few weeks beforehand.  I believe that Mr Page may also have
        recognised Mr Maltin.

105.    Mr Page stayed for between 15 to 20 minutes before they got up and left.  As
        Mr Page was leaving, and whilst his back was turned to us, we took a
        photograph of him in the hotel which is included in the Quaestio Report at
        **[HT2/51]**.  The time stamp of that photo indicates that it was taken at 22:07 on
        6 March 2020.

106.    I note that the One & Only Hotel, The Palm, is situated in a somewhat out of
        the way location in Dubai **[HT1/247]**.  It would probably take around 30
        minutes to get there from central Dubai, and you would have to pass a number
        of more popular drinking spots along the way.  I believe it is most unlikely to

be a coincidence that Mr Page happened to come for a drink at the hotel where we were staying.

107.    The following morning, I rose early at about 6:00am and went down to the lobby to work.  While sitting there, a member of staff approached me and handed me a menu which had a sheet of paper inside of it, on which someone, I assume him, had written in English.  I can't remember the exact words, but the gist of them was: "You're being followed/watched by security services. They are very serious people. Nobody can stand in their way."  The member of staff told me not to look at the note or say anything and then walked away.

108.    When he came back, the member of staff took the menu and the note back from me.  He said that he didn't know why he was telling me this, but he felt that I needed to know. I got the sense that he had been planning to tell me this, rather than that this was something he spontaneously decided to do.  I asked him to check whether Mr Page was staying at the hotel, and he went away, checked, and then said "no".  Although I know this member of staff's name, I would prefer not to name him as I am concerned that he may face reprisals if his conduct becomes known.

109.    Later that morning I decided to wait for the two surveillance operatives in the chairs where they normally sat.  I therefore moved to their usual location in the hotel bar and lounge area and waited for them to arrive. At their normal time, they came in, took one look at me sitting in their position, and immediately turned around and left.

110.    That same morning of 7 March 2020 I also spoke to Mr Sawyer of Quaestio.  I asked him to try to obtain a recent photograph of Mr Page so that we could compare this to the person we had seen at the hotel. Mr Sawyer provided us with the photograph in the Quaestio Report at [HT2/51], from which we were able to confirm that the person we had seen the previous evening was indeed Mr Page.

111.    Later that day, my team and I were due to meet Mr Al Sadeq's UAE lawyer at the hotel.  However, in light of what the night manager had told me, we decided to meet Dr Al Haddad at his offices instead.  When we were about to

go to our meeting, I noticed that the surveillance operatives were sitting outside the conference room in the hotel that we had planned to use for our meeting. This concerned me, as they may have known that we were planning to meet Dr Al-Haddad to discuss the case there.

112.   In the event, we left the hotel and travelled to Dr Al-Haddad's offices at the Fairmont Hotel (about a 40 minute drive away). I noticed that there was a white car sitting outside. This car followed us the entire way. The car pulled up behind us in the courtyard of the Fairmont Hotel and I noticed one man follow us into the lobby before heading quickly into a flower shop after seeing us. I am informed by Mr Maltin that he saw two other men waiting at the back entrance of the hotel with ear pieces, who quickly dispersed when they saw him. Mr Maltin took a photograph of one of them, which I exhibit at **[HT1/248]**.

113.   After the meeting, Dr Al-Haddad drove us back to our hotel. On the way back, we were followed again by another white car. Two of the surveillance operatives were sitting in the reception of the One and Only Hotel. Mr Maltin took photographs of them which are exhibited at **[HT1/249]**. In view of these events, I contacted our UK travel agent and changed our flights to return to the UK in the early hours of the very next day on 8 March 2020 **[HT1/250]**.

**F.    RECEIPT OF PHISHING EMAILS**

114.   Since the issue of proceedings in the Al Sadeq Litigation, I, along with others involved in the Al Sadeq Litigation, have received numerous emails and text messages which appear to be targeted attempts to access personal data. I believe that these attempts amount to phishing or spear-phishing; i.e. communications which seek to trick the recipient into clicking on a link to a website which itself contains malicious software which is downloaded onto the recipient's device. Spear-phishing is a more sophisticated form of phishing where the communication contains specific information, targeted at the recipient, which makes it more likely that the recipient will click on the link.

115.   The Claimant's and Quaestio's investigations into these phishing and spear-phishing attempts are at an early stage and I am not currently aware whether any of the attempts have been successful.

116.   These attempts are summarised in the Quaestio Report at **[HT2/73]**. They include:

116.1.   Numerous emails sent to me containing various links. The emails do not appear to originate from known or genuine sources.

116.2.   On 16 June at 15:32, I received an SMS containing a link. Just one minute before I received this SMS, two representatives of Maltin PR received exactly the same link by SMS.

116.3.   I am further informed by the Claimant's outsourced IT specialist company that over the April 2020 bank holiday weekend there was a very high level of suspicious activity on the Claimant's servers.

116.4.   Other professionals (including Radha Stirling and the barristers instructed by Mr Al Sadeq) involved in the Al Sadeq litigation have also been targeted by similarly structured phishing emails.

117.   Again, for the avoidance of doubt, the Claimant does not allege that the Defendants have been involved in these phishing attempts. However, as with the surveillance, I consider that they are important and relevant points of context. I note, in particular, that phishing attempts were also raised in the Azima Proceedings (albeit, to be clear, Andrew Lenon QC did not find that RAKIA was responsible for the phishing: see e.g. paragraphs 35, 36 and 295 of the judgment **[HT1/114] [HT1/200]**).

## G.   THE APPLICATIONS

### (1)   Interim Injunction and Disclosure Orders

118.   The Claimant's first application is for an interim injunction and ancillary disclosure orders. This application is brought against the First and Second Defendants.

**(2)**      **Serious Issue to be Tried**

119.    In light of the matters set out above, I believe that there is, at the very least, a serious issue to be tried in respect of breach of confidence and unlawful means conspiracy.

(a)      Breach of Confidence

120.    Confidentiality.  First, I consider that the information which the First and Second Defendants: (i) have acquired, (ii) attempted to acquire, and/or (iii) are attempting to acquire, is confidential to the Claimant.  In particular, the relevant information includes banking co-ordinates for the Claimant and bank transaction data for the Claimant.  Those Defendants have also sought information as to my movements as a solicitor instructed in the Al Sadeq Litigation.  None of this information is in the public domain.  Nor has it been disclosed in the Al Sadeq Litigation.  Neither of the First or Second, Defendants, nor any persons connected to the defendants in the Al Sadeq Litigation, have any legal right or entitlement to this information.  It is of its very nature private and confidential information.

121.    Acquired in Confidence.  Secondly, the Claimant believes that the First and Second Defendants have acquired, or have attempted to acquire, this information in circumstances that import an equitable duty of confidence.  In particular, the evidence indicates that: (i) the First and Second  Defendants have made improper and surreptitious investigations to obtain confidential information without the Claimant's knowledge or consent; and (ii) there are no obvious legitimate means by which the Defendants could have obtained the information requested without the consent of the Claimant.

122.    I also believe that each of the First and Second Defendants separately owned obligations of confidence as third parties with knowledge, or notice, that the information they had received had been supplied in breach of duties of confidence owed to the Claimant.  There was, in particular, no reasonable basis for the First or Second Defendants to think that the Claimant had authorised the disclosure of the confidential information to them.

123.   Unauthorised use.   Thirdly, it is the Claimant's position that it did not authorise the First and Second Defendants to disclose the confidential information.   It would appear, however, from the IP tracing evidence that the information has indeed been sent to several recipients, all some of whom have not yet been identified.   None of these recipients have been authorised by the Claimant.

124.   It may be suggested by the First and Second Defendants that the Claimant expressly or implicitly authorised their receipt of confidential information. Such a suggestion would be wrong.   The confidential information came to the knowledge of the First, and Second Defendants in circumstances where they had notice that the information was confidential to the Claimant. The Claimant has a reasonable expectation of confidentiality in its banking records. To the extent that the Claimant voluntarily passed confidential information to the Third Defendant, it did so on the basis that it was confidential and at no point did the Claimant authorise its use by the First or Second Defendants.   Nor did the Claimant authorise the First or Second Defendants to send the confidential information on to other persons, whether known or unknown. The Defendants have no legal entitlement to use or pass on the Claimant's confidential information to any other person.   By doing so, the First and Second Defendants acted in breach of confidence.

125.   In any event, in view of the circumstances of this case the I consider that there is, at the very least, a strong basis to infer from the First and Second Defendants' conduct that they have threatened to misuse the Claimant's confidential information by passing it on to one or more other persons.

126.   The Claimant believes that it has a clear interest in maintaining the confidentiality of their financial information.   The Claimant is also concerned that the First and/or Second Defendants may seek to use the information as a springboard for further investigations into the Claimant's affairs; whether through the intermediary of Source A2 or otherwise

(b)   Unlawful means conspiracy

127.   As to unlawful means conspiracy, the Claimant accepts that at this stage it
       does not have all of the pieces of the jigsaw. That is one of the reasons that
       disclosure orders are sought. However, it appears that there was a common
       design as between at least some of the Defendants to obtain the Claimant's
       confidential information. Such a plan would inevitably damage the interests of
       the Claimant which has a reasonable expectation of confidentiality in its
       financial records. Given that there is no apparent lawful route to obtain the
       Claimant's confidential banking records without consent, it reasonable to infer
       that the use of unlawful means was part of the common design. The First and
       Second Defendants must have known that they could not lawfully have
       accessed the confidential information which they sought (or at the very least
       turned a blind eye).

**(3)   *Quia Timet* relief**

128.   Further and in any event, there appears to have been a concerted attempt by
       the First and/or Second Defendants to obtain the Claimant's confidential
       information.  The full extent of those Defendants' wrongful conduct remains
       obscure I therefore believe that *quia timet* relief would be appropriate. For the
       reasons I have set out above, I consider that there are good grounds to infer
       that further attempts may be made by the First and/or Second Defendants, or
       those directing them: (i) to access the Claimant's confidential information;
       and/or (ii) to make further use of the information already obtained.   In
       addition, pending the provision of the relief sought in the terms of the
       Claimant's draft Order, the Claimant is not yet in a position to know whether
       further (successful or unsuccessful) attempts to access their confidential
       information have already been made by the Defendants or those instructing
       them.

129.   In particular, I note that the Third Defendant was not successful in obtaining
       all the information that he, or those instructing him, were apparently seeking.
       There are, accordingly, grounds to infer that further or other attempts to access
       the Claimant's confidential information have already been made or may be
       made in the future; whether through the agency of the Third Defendant and/or

Source A2 or otherwise. It is, in this respect, pure chance that due to the Third Defendant's prior instruction by Quaestio on behalf of Stokoe he has come forward as a whistle-blower.

**(4)** *__Norwich Pharmacal__* **relief**

130. The Claimant's second application is for disclosure orders pursuant to the Court's *Norwich Pharmacal* jurisdiction. This application is made against all of the Defendants.

131. As I have explained above, the Third Defendant has come forward as a 'whistle-blower' and has given information to the Claimant. However, the Claimant does not presently know whether that information is full and complete as to the circumstances as to the Third Defendant's involvement in the relevant events. The Third Defendant should provide this evidence on oath; but has so far declined to do so. The Claimant therefore includes the Third Defendant within the *Norwich Pharmacal* application, even though it does not apply for an interim injunction against the Third Defendant.

132. Separately, as regards the First and Second Defendants, even if, contrary to the Claimant's position, there were no serious issue to be tried against these Defendants for breach of confidence, the Claimant is entitled to and applies for disclosure orders against all of the Defendants pursuant to the *Norwich Pharmacal* jurisdiction.

133. In particular, the evidence I have set out suggests that each of the Defendants are, at the very least, caught up in attempts made by others (i.e. those instructing them) to gain access to confidential information belonging to Stokoe and others. I believe that, in those circumstances, *Norwich Pharmacal* relief would be appropriate to enable the Claimant to identify the real wrongdoers and seek appropriate relief against them. I understand that these matters are to be elaborated upon further in legal submissions.

**(5)** **Damages would be an Inadequate Remedy**

134. In the present case, I do not believe that damages would be an adequate remedy for the Claimant. This is so for two reasons.

135. The first reason is that the confidential information that has already been obtained from the Claimant is sensitive in nature. It includes the banking information of a firm of solicitors. It is not, at present, known by the Claimant which persons have access to this information or what their intended use of the information might be. In any event, however, the Claimant has a legitimate interest in ensuring that their banking coordinates and transactional information is not disseminated widely to unknown persons by any of the Defendants.

136. The second reason is that, at present, the Claimant does not know the full extent to which the Defendants and/or their ultimate clients have taken steps to obtain confidential information from the Claimant (successfully or otherwise). Likewise, the Claimant is concerned that, in light of the sophisticated attempts to obtain information so far, further attempts may be made to obtain confidential information. It is, for this reason, that *quia timet* relief is sought. In these circumstances, an award of damages against the known Defendants would not be an adequate remedy given it can only relate to the breaches of confidence known to have occurred. On the contrary, one of the purposes for bringing the present application is to obtain the ancillary disclosure orders to uncover the full extent to which attempts have been made to access confidential information from the Claimant.

**(6)   Balance of Convenience**

137. In all the circumstance set out above, the Claimant believes that the balance of convenience favours the granting of an interim injunction. The Claimant has a legitimate interest in recovering any and all confidential information that has been surreptitiously obtained by the Defendants and to prohibit future attempts by the Defendants or their ultimate clients to obtain additional information or otherwise seek to disrupt the Al Sadeq Litigation. If further or other breaches of confidentiality were to occur, the Claimant fears that this may adversely impact their representation of Mr Al Sadeq in the Al Sadeq Litigation.

138. By contrast, the Claimant sees no material hardship on the Defendants if the Court were to order them to cease taking steps to obtain confidential information from the Claimant without consent. There is, in particular, no

obvious or compelling reason why the Defendants should be entitled to receive or retain the confidential information that has been requested by Mr Robinson.

**(7)      Cross-Undertaking in Damages**

139.    I understand that a party applying for an interim injunction will be required by the Court to give a cross-undertaking in damage.  In this respect, I confirm on behalf of the Claimant that it is willing to give such a cross-undertaking in damages in the usual terms.

**H.      FULL & FRANK DISCLOSURE**

140.    The Claimant is bringing the present applications 'on notice' to the Defendants, such that the duty to provide full and frank disclosure does not arise.  Out of an abundance of caution, however, I wish to bring the following matters to the Court's attention in case an argument is made at a later date that the applications should have been treated as being made 'without notice'.

141.    First, the First and Second Defendants may contend that they have been wrongly identified as having taken steps to obtain the Claimant's confidential information, or that the IP address tracing exercise has produced an incorrect result.  In this respect, I have set out above the evidence in support of my belief that each of the Defendants is implicated in the attempts to obtain the Claimant's confidential information.  In particular, there is evidence to suggest that confidential documents have been viewed at locations very close to the First Defendant's residential address and the Second Defendant's office address.   Further, I am told by Mr Sawyer of Quaestio that the Third Defendant informed Mr Sawyer that Source A2 had been instructed by Mr Robinson. Whilst I accept that I must rely, in part, on the hearsay account of the Third Defendant, it is my belief that overall there is sufficient evidence from which this Court may conclude that the Claimant is entitled to the interim relief sought.

142.    Secondly, the Defendants may contend that some or all of the requirements of the Claimant's cause of action for breach of confidence have not been

satisfied. These points are considered at paragraphs 120 to 126 above.  For the purposes of this application, I believe that there is a serious issue to be tried on the merits of the Claimant's claims.  In the alternative, I believe that there is at the very least sufficient material from which this Court may conclude that the Defendants are "caught up" in wrongdoing and should be ordered to respond to a *Norwich Pharmacal* order.

143.   Thirdly, the Defendants may contend either that they were not aware that the information was confidential, or that they believed that the Claimant was willing to provide it through the Third Defendant.  If so, however, I would respond that:

143.1.  the surreptitious circumstances in which the information was obtained are not consistent with a genuine belief that the information was not confidential;

143.2.  those circumstances appear to include attempts by the Defendants to access other confidential information from other persons;

143.3.  the Claimant has not consented to the dissemination of any of its confidential information by the First or Second Defendants; and

143.4.  the nature of the information, i.e. the bank records of a solicitors firm, plainly put the Defendants on notice as to a reasonable expectation of confidentiality.

144.   The Third Defendant is a respondent to the *Norwich Pharmacal* application only.  It is brought on the basis that the full extent of his involvement has not yet been ascertained and he has not agreed to provide evidence on oath.  In any event, I believe that the Third Defendant is "caught up" in the wrongdoing of the other Defendants for the purposes of a *Norwich Pharmacal* order.

145.   Fourthly, it is possible that the First and/or Second Defendants may argue that the Claimant's evidence-gathering amounts to entrapment such that the present application should not succeed.  The Claimant considers, however, that any such suggestion would be misconceived, since: (i) the Claimant is not

an agent of the state; (ii) the attempts to trace the identities of the First and Second Defendants were responsive to their own wrongdoing and did not involve gross misconduct or commercial lawlessness on the Claimant's part; and (iii) the Claimant has not induced any of the Defendants to commit a criminal act.

146.   Fifthly, it might be suggested that the Claimant has delayed in bringing this application. If so, however, such a suggestion would be unfounded. The Claimant has worked expeditiously in response to the findings of Quaestio's investigations and has brought the present applications as soon as reasonably practicable. The full details and implications of Quaestio's investigations have only become apparent shortly before the applications were made.

147.   Finally, and conversely, the Defendants might suggest that the Claimant ought to have given them additional notice that the applications would be brought. In this respect: (i) the Claimant intends to serve the applications and evidence in support by hand at least three clear days before the hearing in accordance with rules for injunctions at CPR PD 25A para. 2.2; and (ii) the Claimant intends to request undertakings from the Defendants at the time of service in an attempt to avoid the need for a hearing. The Claimant considers that, given the risk that the Defendants or those instructing them might make further or other attempts to access its confidential information, it is not appropriate for any longer period of notice to be given before interim injunctive relief is sought. Given that the *Norwich Pharmacal* relief overlaps materially, the Claimant considers the appropriate notice period to be the same as in relation to the injunctive relief.

## I.   RELIEF SOUGHT

### (1)   Interim Injunction

148.   In the circumstances set out above, the Claimant invites the Court to grant an interim injunction: (i) to restrain the First and Second Defendants from taking any further steps to access the Claimant's confidential information without consent; and (ii) to require the Defendants to return any and all confidential information that they have received from the Claimant.

149.   In addition, the Claimant invites the Court to make ancillary disclosure orders to the injunction requiring the First and Second Defendants to identify, in a sworn affidavit: (i) the full extent of the confidential information that has been obtained in relation to the Claimant and the Al Sadeq Litigation; (ii) the identity of any and all persons giving direct or indirect instructions to the Defendants to access the Claimant's confidential information; and (iii) any and all methods by which they have obtained, or have sought to obtain, confidential information in relation to the Claimant and the Al Sadeq Litigation.

**(2)**   ***Norwich Pharmacal* Order**

150.   The Claimant also invites the Court to make a *Norwich Pharmacal* disclosure order requiring each of the Defendants to provide full information as to the circumstances in which they have been "caught up" in the wrongdoing of other persons.

151.   In particular, the Court is invited to order that the Defendants identify, in a sworn affidavit: (i) the full extent of the confidential information that has been obtained in relation to the Claimant and the Al Sadeq Litigation; (ii) the identity of any and all persons giving direct or indirect instructions to the Defendants to access the Claimant's confidential information; and (iii) any and all methods by which they have obtained, or have sought to obtain, confidential information in relation to the Claimant and the Al Sadeq Litigation.

152.   The Court is invited to make such orders in the terms of the draft appended to the Claim Form and Application Notice.

**STATEMENT OF TRUTH**

**I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.**

Signed:

HARALAMBOS TSIATTALOU

Dated:   29/6/20.