Neutral citation number: [2020] EWHC 1686 (Ch)

**IN THE HIGH COURT OF JUSTICE**                    **Case No. HC-2016-002798**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

Royal Courts of Justice
Rolls Building, Fetter Lane, London EC4A 1NL

Date: 30 June 2020

**Before**:

**ANDREW LENON Q.C. (sitting as a Deputy Judge of the Chancery Division)**

BETWEEN:-

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Claimant**

- and -

**FARHAD AZIMA**

**Defendant**

───────────────────────────────────────

**APPROVED ADDENDUM TO JUDGMENT**
───────────────────────────────────────

**Hugh Tomlinson Q.C. and Edward Craven (instructed by Stewarts Law LLP) for the Claimant**
**Tim Lord Q.C. and Hugo Leith (instructed by Burlingtons LLP) for the Defendant**

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

Covid-19 Protocol: This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and released to Bailii. The date and time for hand-down is deemed to be 14.00 on 30 June 2020.

1

**Introduction**

1.  On 22 May 2020 I handed down judgment ("the Judgment") following the trial in these proceedings, which took place on dates between 22 January and 14 February 2020, and gave directions for an exchange of submissions on costs and interest. On 29 May 2020, before making a final order to give effect to the Judgment, I received a letter from Enyo Law LLP ("Enyo Law") acting on behalf of Mr Neil Gerrard stating that Mr Gerrard wished to file a corrective witness statement.  As noted in the Judgment (paragraph 62), Mr Gerrard is a partner in the firm of Dechert LLP ("Dechert") who has been retained by RAKIA to work on various matters from 2014 onwards. He was directly involved in certain of the events in issue in the proceedings. He provided two witness statements, was called as a witness by RAKIA at the trial and cross-examined by Counsel for Mr Azima for slightly over one day.

2.  One of the matters about which Mr Gerrard was cross-examined was his dealings with Mr Karam Al Sadeq who has been held prisoner in Ras al Khaimah ("RAK") since 2014. Those dealings were material to these proceedings: one of RAKIA's claims in the proceedings was that Mr Azima had orchestrated a malicious campaign to damage the reputation, standing and internal stability of the Government of RAK by procuring the publication in the media of false stories that individuals were being unlawfully detained in a dungeon operated by the Ruler of RAK and Dechert and that the Ruler of RAK had improperly abdicated judicial, prosecutorial and governmental functions to unlicensed UK lawyers, who were overseeing the operation of a secret prison in RAK.  In the Judgment (paragraph 202) I held that RAKIA failed to establish that the stories intended to be published about human rights violations in RAK were untrue and so this claim failed. A 2014 Amnesty International Report indicated that there were real grounds for concern about detention procedures in RAK and none of RAKIA's witnesses were in a position to refute the findings in that report.

3.  Mr Gerrard is now the second defendant to proceedings commenced by Mr Al Sadeq in the English High Court ("the Al Sadeq Proceedings"). Mr Al Sadeq alleges that Mr Gerrard together with one current partner of Dechert (Caroline Black) and one former partner (David Hughes) violated Mr Al Sadeq's rights by using threats and/or

mistreatment and/or unlawful methods to force Mr Al Sadeq to give evidence and/or false evidence in an attempt to build a case, at the behest of the Ruler of RAK, against Dr Khater Massaad, a former senior government official. As noted in paragraphs 13 – 15 of the Judgment, RAKIA alleges that Dr Massaad was guilty of large-scale embezzlement. Whilst the defendants have yet to file a defence in the Al Sadeq Proceedings, Mr Gerrard confirms that they strongly deny all of the claims.

4.  The letter from Enyo Law stated that it had recently become apparent during the course of investigations for the purposes of the Al Sadeq Proceedings that Mr Gerrard's memory regarding the investigation relating to Mr Al Sadeq was "not right" and that Mr Gerrard wished to correct the position by filing a corrective third witness statement.

5.  Following receipt of the letter, I revoked the directions I had made and directed an exchange of submissions concerning the issues raised by the new evidence. Following an exchange of submissions and the filing of Mr Gerrard's third witness statement on 5 June 2020, I notified the parties that I intended to issue an addendum to the Judgment and invited the parties, if so advised, to file any responsive submissions which they did. On 23 June 2020 I received a further memorandum from Mr Azima's Counsel concerning evidence given in yet other proceedings by Mr Hughes, the former Dechert partner and defendant in the Al Sadeq Proceedings. This additional material was of no assistance in resolving the issues raised by Mr Gerrard's third witness statement.

6.  Mr Azima has invited me to re-open the Judgment and to recall Mr Gerrard for further cross-examination. The purpose of this Addendum to the Judgment is to set out the reasons for my decision not to do so.

**Mr Gerrard's account of events between the trial and the third witness statement**

7.  In his third witness statement, Mr Gerrard says that he did not prepare for trial on the basis that he would be cross-examined in detail in relation to matters regarding his

interviews with Mr and Mrs Al Sadeq and had not refreshed his memory beforehand of the interviews he had conducted; during his cross-examination, he believed that he recollected the relevant details but it has recently become apparent that he was mistaken in some aspects of his recollections; as a result, and inadvertently, the answers he gave to some questions were not completely accurate; the reason that this has come to his attention is because he has had to focus upon these issues in the context of the Al Sadeq Proceedings.

8. Mr Gerrard's account of the sequence of events between the trial and third witness statement is as follows:

8.1 The Claim Form in the Al Sadeq Proceedings was issued on 28 January 2020 (coincidentally, the second day of his cross-examination). The Claim Form included brief details of claim but not the Particulars of Claim. The Claim Form was not served on any of the defendants at that stage, but was published online by www.mynewsdesk.com. In addition to the Claim Form, a copy of a complaint against Mr Gerrard to the Solicitors Regulation Authority was also published online. Mr Gerrard was not aware of the claim or SRA complaint prior to being cross-examined though both were drawn to his attention immediately afterwards as a result of the online publication.

8.2 Enyo Law wrote on Dechert's and Mr Gerrard's behalf to Mr Al Sadeq's lawyers on 19 March 2020 stating that, in light of the working restrictions caused by COVID-19, they were authorised to accept service of pleadings from the Al Sadeq Proceedings by email.

8.3 The Claim Form and the 64-page Particulars of Claim in the Al Sadeq Proceedings were served on Mr Gerrard by email to Enyo Law on 31 March 2020. The Particulars alleged that his evidence under cross-examination in these proceedings had been *"perjurious"* in three respects, namely where he had stated that:

(a)   he had only conducted one interview with Mr Al Sadeq (§62);

(b)   he had only interviewed him with the agreement of Mr Al Sadeq and his lawyer (§62); and

(c)   he did not interview Mrs Al Sadeq (§104).

8.4   During this time, Mr Gerrard contracted COVID-19 as did the rest of his household. He first developed symptoms and started to become seriously unwell on approximately 19 March 2020. He was advised by his doctors on two occasions that it was thought that he might require treatment in hospital. Whilst that has not been necessary, he suffered severely from the illness for some 16 days and during this time lost a stone and a half in weight. It has taken him some time subsequently to recover from the illness.

8.5   The contemporaneous material relating to the Al Sadeq Proceedings forms part of Dechert's client files and engages questions of privilege. Material was made available to Enyo Law and Mr Gerrard from these client files from 1 May 2020 onwards for the purposes of the Al Sadeq Proceedings.

8.6   Members of the Enyo Law team were first able to discuss details relating to the Al Sadeq Proceedings with Mr Gerrard on 11 May 2020 and with the other individual defendants on 14 and 18 May 2020, respectively.

8.7   In the light of these discussions, and a subsequent review by Enyo Law on 25 May 2020 of the answers he gave under cross-examination in these proceedings, it became apparent to Mr Gerrard on 26 May 2020 during discussions with Enyo Law that he needed to correct some of those answers in order to comply with his professional duties. This realisation precipitated the letter from Enyo Law of 29 May 2020 and the production of the third witness statement.

**The corrections**

9. The corrections which Mr Gerrard wishes to make to his evidence on the basis of his third witness statement are as follows.

9.1 **Number of meetings/interviews with Mr Al Sadeq** Mr Gerrard had said in cross-examination that he interviewed Mr Al Sadeq only once: "I only did one of the interviews myself".  In his corrective witness statement he says that he interviewed Mr Al Sadeq at least four times in September and October 2014 and on at least two further occasions, on 25 August 2015 and 25 April 2016.  Mr Gerrard therefore accepts that he interviewed Mr Al Sadeq at least six times.  He also accepts that he met with Mr Al Sadeq on further occasions when Mr Al Sadeq was in custody but suggests that these were meetings rather than interviews. Mr Gerrard says that the distinction between meetings and interviews is not always clear-cut but that he understands an interview to be a question-and-answer session designed to elicit information relevant to Dechert's investigations.

9.2 **Manner in which interviews were conducted / PACE**   Mr Gerrard rebutted allegations of his abuse of Mr Al Sadeq by assuring the Court repeatedly that he had his team adhere to due process safeguards during all interviews.  Specifically, he claimed that in interviewing Mr Al Sadeq he had followed the safeguards in the Police and Criminal Evidence Act 1984 ("PACE").  He said:

   a. that he had followed PACE, and that "we insisted on" doing so (Day 5, p.39, lines 7-9);

   b. that, "I followed PACE to the letter and indeed cautioned him at the start of it" (Day 5, p.39, lines 20-21);

   c. that the form of the interviewing, "was as good as PACE as we could make it" (Day 5, p.39, lines 24-25);

   d. that, "We followed the process of PACE when we met him" (Day 5, p.45, lines 20-22); and

    e.   when it was put to Mr Gerrard in cross-examination that he had interviewed Mr Al Sadeq using aggressive and inappropriate tactics rather than in accordance with PACE, he denied this (Day 5, p.176, line 5).

9.3  Mr Gerrard now says that it was only in October 2015 (i.e. after the four initial interviews that he carried out with Mr Al Sadeq) that Dechert established a process for interviews with Mr Al Sadeq where he was being asked to provide evidence, in which Mr Al Sadeq was to be asked to agree, *inter alia*, that:

    (1)   He was not obliged to provide any statement or information to Dechert or, the UAE law firm, Al Tamimi & Company ("Al Tamimi").

    (2)   Any information was provided of his own free will and followed receipt of his own independent advice.

    (3)   Anything he said might be used in evidence against him, or other relevant individuals, in criminal or civil proceedings, and he should not say anything which he did not want to be disclosed to others.

    (4)   He could stop the interview at any time for any reason, including to consult with his legal adviser.

    (5)   Following the conclusion of the interview, a draft written statement would be prepared in English and Arabic, and that he would be given an opportunity to comment upon and make amendments to it, in conjunction with his legal adviser.

    (6)   Anything he said could be disclosed to third parties and used against him in court proceedings even if it did not appear in the witness statement which he signed.

(7)   Confirming the identity of his legal advisers and stating either that he wished to continue the interview in their absence, or wait for them to attend.

Mr Gerrard says that during the course of cross-examination and, indeed, up to 26 May 2020, he mistakenly believed that this process for the conduct of interviews had been in place at the time of his early interviews with Mr Al Sadeq in 2014. He now accepts that the interviews conducted in 2014 did not follow PACE or a PACE-like process and that the subsequent interviews did not fully conform to PACE either. In the Judgment, I noted that, from Mr Gerrard's own evidence in cross-examination, the interview with Mr Al Sadeq to which he referred had not been conducted strictly pursuant to the standards in PACE (paragraphs 201.7 and 201.8).

9.4  **Presence and approval of Mr Al Sadeq's lawyer**  Mr Gerrard gave evidence:

a.   that Mr Al Sadeq's lawyer was "present" when Mr Al Sadeq was interviewed (Day 5, p.39, line 14; p.45, line 21);

b.   that he interviewed Mr Al Sadeq with "the agreement" of his lawyer (Day 5: p.36, lines 23-24; p.37, lines 11-13); and

c.   that, "We refused to continue with the interview until the lawyer signed [a document], saying 'It's okay for you to interview him'" (Day 5, p.39, lines 16-18).

Mr Gerrard now accepts that Mr Al Sadeq's lawyer did not agree to the 2014 interviews taking place as Mr Gerrard did not believe that he was legally represented at that time. He also says that Mr Al Sadeq informed him that, as a lawyer, he was able to represent himself and that, for the avoidance of doubt, Mr Al Sadeq consented to all meetings and interviews which Mr Gerrard attended with him. Mr Gerrard also says that, according to the Particulars of Claim in the Al Sadeq Proceedings, Mrs Al Sadeq appointed Dr Ali Al Shamsi to represent her husband in September 2014 but that Mr Gerrard was not aware

of Dr Al Shamsi's appointment until 2015. He says that after Dr Al Shamsi's appointment he believes that the interviews went ahead with Mr Al Sadeq's and his lawyer's agreement. As noted by Counsel for Mr Azima in their submission, Mr Gerrard must implicitly accept (since he says that he was unaware that Mr Al Sadeq had a lawyer until some unspecified time in 2015) that the 2014 interviews with Mr Al Sadeq occurred without Mr Al Sadeq's lawyer being present.

9.5 **Attendance of lawyers from Al Tamimi**  Mr Gerrard said in his oral evidence that he went with lawyers from Al Tamimi to interview Mr Al Sadeq (Day 5, p.37, lines 11-13).  He now accepts that lawyers from Al Tamimi did not attend any of the at least four interviews that occurred in 2014, or the interview in April 2016 although he says that representatives from Al Tamimi did attend various meetings involving Mr Al Sadeq and Mr Gerrard.

9.6 **Mrs Al Sadeq** When asked in cross-examination whether he had interviewed Mrs Al Sadeq, Mr Gerrard said he did not think he had done: Day 5, p.176, lines 11-13.  He now accepts that he met with Mrs Al Sadeq on a number of occasions and asked her various questions and that some of these meetings could be regarded as interviews.  He offers no particulars or other evidence as to his interactions with Mrs Al Sadeq.

9.7 **Location of the interviews** Mr Gerrard was asked where he interviewed prisoners, and he answered that he did so in the prison on the outskirts of the main town (Day 5, p.37, lines 8-9).  He now states that he interviewed Mr Al Sadeq in: (i) the RAK general police headquarters after his initial arrest; (ii) a military prison where he was subsequently held (called Al-Barirat); and (iii) the RAK central courthouse.

9.8 **Interview before charge** In cross-examination, Mr Gerrard said that he did not believe that he interviewed Mr Al Sadeq while Mr Al Sadeq was in prison but before he had been charged although he noted that the criminal process operates

differently in RAK (Day 5, p.43, lines 7-8). (I note incidentally that his evidence on whether he had interviewed Mr Al Sadeq before charges were put was not consistent, see paragraph 201.7 of the Judgment).  He now accepts that there is no formal charge but that the allegations were formally put to Mr Al Sadeq on 11 September 2014 with the result that he did in fact interview Mr Al Sadeq before he was charged.

**The parties' submissions**

10. On behalf of Mr Azima, it was submitted as follows:

10.1 Mr Gerrard's explanation for providing false evidence in cross-examination – honest inadvertence – is highly implausible and should be rejected.  It is, for example, impossible to believe that, when giving evidence, Mr Gerrard simply forgot the fact that he had interviewed Mr Al Sadeq "at least" six times, rather than once. This is particularly so given that the circumstances of those interviews would clearly stick in the mind, as they (on Mr Gerrard's new account) took place in different and memorable locations, involved travel to a foreign country and concerned very serious matters. Moreover,  Mr Gerrard's evidence that he carried out "at least" six interviews is based on drawing a distinction between "interviews" (which count towards the six) and an unspecified number of other "meetings" (which on Mr Gerrard's account do not).  But given that Mr Al Sadeq was in custody, it is specious to characterise encounters between them as "meetings" and Mr Gerrard does not explain how attending a prison to speak to Mr Al Sadeq could constitute a "meeting" in any orthodox sense.  When he was questioned at the trial about his interactions with Mr Al Sadeq, he was clearly being asked about all the instances of personal interactions he had with Mr Al Sadeq, while he was in custody. It is similarly very difficult to attribute the other points now corrected to lapses of memory.

10.2 Taken together, the nature of Mr Gerrard's evidence in relation to his dealings with Mr Al Sadeq is significantly altered and its entire tenor is changed. On the

face of things, Mr Gerrard is not simply a lawyer seeking to pursue his client's civil claim by asking questions under supervision and in a controlled manner but a regular fixture in Mr Al Sadeq's prolonged interrogation before and after charge in a series of military and civil prisons, appearing unaccompanied by either Mr Al Sadeq's lawyer or RAKIA's own local lawyers, and following no protocol to safeguard the fairness of the process or Mr Al Sadeq's basic rights.

10.3  Mr Gerrard's contention that he did not prepare to be questioned in detail on these matters is not credible.  Even on his own account, Mr Gerrard evidently expected to be questioned to at least *some* extent, as suggested by his use of the language "in detail".  However, Mr Gerrard would clearly have been aware that his interrogations of Mr Al Sadeq and others would be an important subject explored at trial and in his cross-examination, given that RAKIA's pleaded case (in its CPR Part 18 response) put in issue the question of whether Dechert was conducting illegal detentions and interrogations, by pleading that stories to that effect were "false".  Mr Azima's first witness statement (to which Mr Gerrard provided a responsive statement) referred to Mr Gerrard having a role in unlawful interrogations and detentions. The Project Update report referred in terms to Mr Gerrard's connection with the detention of prisoners in RAK, including Mr Al Sadeq. Mr Azima's skeleton argument set the issue of Mr Gerrard's role in interrogations and detentions out in detail and noted that Mr Gerrard had avoided addressing it in his witness statement.  It was made clear that these points would be explored further at trial.

10.4  The likely explanation for Mr Gerrard having given false evidence and for making corrections now is that he was deliberately lying on these issues at trial. There were various reasons why he would want to lie about his role:

(a)  Mr Gerrard's interrogations were a crucial element in the hacking narrative. It was Mr Azima's attempts to expose Mr Gerrard's wrongful misconduct that was the subject of Project Update and which motivated the Ruler to go after him and ultimately order the hacking of his emails.

(b)   Mr Gerrard's role in Mr Al Sadeq's interrogation and detention was directly in issue in RAKIA's case against Mr Azima on the media "campaign".

(c)   Mr Azima contended in his closing submissions that Mr Gerrard's aggressive and improper conduct of interrogations supported his case that Mr Gerrard threatened him and otherwise acted improperly.  Mr Gerrard had an obvious interest in reducing the power of that submission by minimising and sanitising his role.

(d)   As a Solicitor and Officer of the Senior Courts, Mr Gerrard had an obvious interest in minimising the apparent extent of, and whitewashing, his involvement in interrogations and detentions in general and in RAK in particular, which has a criminal justice system that has been stridently criticised by international NGOs (see Judgment, para 202).

10.5  During the trial Mr Azima was not in a position to challenge Mr Gerrard's evidence on his role with contemporaneous documents as there had been no disclosure of records of the interrogations.  However, following service of Mr Al Sadeq's claim, Mr Gerrard realised that his oral evidence can be contradicted and will be shown to be wrong by the disclosure he and his firm will now be obliged to give.  Mr Gerrard has therefore been forced to attempt to take the sting out of Mr Al Sadeq's complaint of perjury by lodging corrective evidence in these proceedings, at the eleventh hour.

10.6  Even if Mr Gerrard was honestly mistaken at the time of giving his evidence as to the matters he has now 'corrected', he could and should have corrected the record much sooner than he did.  The Court should conclude that Mr Gerrard was aware much earlier that he had given a false account, that he deliberately held back this explanation until after the Judgment was given, and that he has also misled the Court as to the time at which he could have corrected the

position. Mr Gerrard omitted to mention that the original Claim Form in the Al Sadeq Proceedings that he saw on around 28 January 2020 provided substantially more detail than the Amended Claim Form that he has exhibited to his witness statement.  That detail (as also contained in the SRA complaint) included the key point that, contrary to his evidence, Mr Gerrard had interviewed (or interrogated) Mr Al Sadeq repeatedly over a two-year period. Mr Gerrard saw this information some 50 days before (on his account) he developed symptoms of COVID-19. The trial then continued for more than two weeks thereafter. Mr Gerrard only provided an indication that corrective evidence would be forthcoming more than 4 months later and only after the Judgment had been handed down.

10.7   Even leaving that point aside, there is no good explanation for the passage of some six weeks between Mr Gerrard's recovery from COVID-19 on around (on his account) 4 or 5 April 2020, and Enyo Law's letter to the Court of 29 May 2020. By around 5 April 2020 Mr Gerrard would have appreciated that there was a serious question over the accuracy of his evidence.  It would not have been difficult for him to realise that, in particular, his evidence as to the number of occasions on which he had interviewed Mr Al Sadeq, and the circumstances in which he did so, was incorrect (as was his evidence that he had likely not interviewed Mrs Al Sadeq at all).  These are matters that, with the prompting provided by the Particulars of Claim, which were served on 31 March 2020, Mr Gerrard would have realised were incorrect immediately.  At that stage, he could and should have immediately written to the Court to, at the least, advise that some correction would be required and would be forthcoming as soon as the detailed position could be confirmed. Instead, that letter from Mr Gerrard came only some 6 weeks later.

10.8   Mr Gerrard suggests that the "client file" was needed to investigate the position and that this was not made available to him until 1 May 2020.  It is inherently unlikely that the question of corrections could not be explored without access to the client file. The prompting given by the detailed Particulars of Claim and

the original Claim Form would in all likelihood have jogged Mr Gerrard's memory at least to some extent. Mr Gerrard would have had access to his firm's own records (including time recording and billing information) that would allow him to check (or arrange for a subordinate to check) whether he had interviewed Mr Al Sadeq on the occasions referred to in the Particulars of Claim. Mr Gerrard would have his own working papers, including his emails and daybooks as was explored at trial. Mr Gerrard does not suggest that his working papers contained no relevant information; rather, he avoids mentioning the point.

10.9 Given these matters, the Court should infer that Mr Gerrard delayed providing any correction until after the Judgment had been given, in the hope that the Court would be disinclined to take any further action following receipt of it, and would essentially wave through the corrections. This tactical delay has, as a result, led the Court to make findings on Mr Gerrard's role and credibility without having been informed of all the facts. This is a clear breach of paragraph 1.4 of the Solicitors' Code of Conduct:

> "You do not mislead or attempt to mislead your clients, the court or others, either by your own acts or omissions or allowing or being complicit in the acts or omissions of others (including your client)."

10.10 Mr Gerrard can now only be regarded as a dishonest witness, prepared to mislead the Court. This has profound consequences for the Court's determination of the hacking issue and of the trial as a whole. The Court at paragraphs 377-379 of the Judgment summed up various matters that it considered pointed on the one hand to Mr Page having conducted the hacking on the Ruler's instructions, and on the other against RAKIA's responsibility for the hacking. The "significant features" pointing against RAKIA's responsibility include several factors that cannot stand if the Court accepts that Mr Gerrard was a dishonest witness, tipping the balance of the analysis clearly in favour of RAKIA bearing responsibility for the hacking. These features include: (i) the inherent improbability of Mr Gerrard as a solicitor providing false evidence or conspiring with others to do so; (ii) the acceptance of Mr

14

Gerrard's evidence that the View from the Window document, while referring to "frauds" by Mr Azima, was only describing suspicions and was not based on information from the hacked data;  and (iii) the acceptance of Mr Gerrard's evidence that at the July 2016 meeting, he did not threaten Mr Azima, and that his challenges to Mr Azima over "HeavyLift" and "Eurasia Hotel Holdings" were not based on information from the hacked material.  Moreover, Mr Gerrard's role in RAKIA's "innocent discovery" of the hacked data would also need to be reassessed. Taken with the Court's other findings supporting Mr Azima's case on the hacking issue, the overall conclusion reached in the Judgment as to RAKIA's responsibility for the hacking cannot stand.

10.11   The Supreme Court in *In Re L* [2013] UKSC 8; [2013] 1 WLR 634 has explained that until a judgment is perfected in an order, the Court may reconsider and indeed reverse its judgment.  The Court overturned earlier authority suggesting that this power could be exercised only in exceptional cases.  Rather, the power is exercisable in order to deal with cases "justly", and is to be exercised "judicially and not capriciously" (para 38).

10.12   The submissions above set out a compelling basis on the face of the documents for the Court to re-open the Judgment, reassess the evidence given at trial and to reconsider the Judgment and conclude that RAKIA was responsible for the hacking and that RAKIA's claim is an abuse of process. It would be an error for the Court to proceed without providing Mr Azima with the opportunity to challenge Mr Gerrard's account through cross-examination and then to re-evaluate the (whole) matter in that light and with the benefit of appropriate further submissions.

11.   On behalf of RAKIA, it was submitted as follows:

11.1   The corrections which Mr Gerrard seeks to make are to minor inaccuracies which have recently come to his attention in the context of responding to separate proceedings. The corrective evidence relates to answers that Mr

Gerrard provided in cross-examination concerning his interactions with Mr and Mrs Al Sadeq between 2014 and 2016 which were extraneous to the events in issue in these proceedings and did not form part of either party's pleaded case. The corrections have no bearing on any findings in the Judgment or the orders that RAKIA is entitled to as a consequence of those findings.

11.2   The only substantive issue which Mr Azima alleges relates to Mr Gerrard's corrective evidence, namely the claim that Mr Azima had procured and promoted false stories about Dechert's involvement in the mistreatment of detainees in RAK, is one that has already been resolved in favour of Mr Azima in the Judgment.

11.3   Contrary to Mr Azima's submissions, Mr Gerrard's corrective evidence concerning his interactions with Mr Al Sadeq can have no conceivable bearing on the findings relating to the allegations that Mr Gerrard had threatened Mr Azima at a meeting in July 2016, a meeting that took place with a different individual, in a different country, on different dates and concerning different matters.

11.4   Mr Azima's attempt to link Mr Gerrard's corrective evidence to the "hacking case" does not bear examination. Mr Azima's case was that the Ruler was "enraged" that Mr Azima was an accomplice of Dr Massaad and involved in a critical press campaign. It was not suggested that the Ruler was, somehow, motivated by Mr Azima's threats to expose Mr Gerrard's conduct in relation to Mr Al Sadeq. The contention that Mr Gerrard lied about the number of interviews that took place, the presence of lawyers and their location in order to conceal the true motives for hacking is manifestly absurd.

11.5   Mr Gerrard's third witness statement makes clear that the errors in his oral evidence were made inadvertently while he was attempting to recollect the details of events that took place between four and six years previously, were not matters which he had been asked to address in his witness statements for trial

and concerned interviews in relation to which Mr Gerrard had not refreshed his memory before giving evidence.

11.6   The errors have been brought to the attention of the Court and corrected by Mr Gerrard as soon as reasonably possible following their discovery during the course of responding to the Claim Form and Particulars of Claim in the Al Sadeq Proceedings which were served on him after the trial in these proceedings concluded. In making these corrections, Mr Gerrard has complied with his ongoing professional duty not to mislead the court.

11.7   Mr Gerrard's correction of the minor errors in his oral evidence does not have any bearing on the Court's assessment of his credibility more generally. In particular the Judgment shows that the Court was well alive to the fact that Mr Gerrard's evidence might be unintentionally mistaken in some respects. The Judgment noted, for example, that Mr Gerrard had given evidence which in some respects was "*confused*" (Judgment, paragraph 307) and that Mr Azima had pointed out that Mr Gerrard's evidence concerning his compliance with PACE "*was not correct, on his own evidence*" (Judgment, paragraph 201.8). The Court held that Mr Gerrard's evidence was honest (Judgment, paragraph 63). Mr Gerrard's voluntary and proactive correction of non-material errors in one aspect of his oral evidence, in accordance with his ongoing professional duty to the Court, is entirely consistent with – and indeed reinforces – that conclusion.

11.8   It is hardly unusual for a witness who is cross-examined at length about peripheral factual matters which are not addressed in the parties' statements of case to make inadvertent errors in their recollection of events (particularly events that occurred several years previously). Such inadvertent errors do not constitute evidence of dishonesty. On the contrary, as Leggatt J as he then was explained in *Gestmin SGPS S.A. v Credit Suisse (UK) Limited* [2013] EWHC 3560 (Comm), human memory is fallible and honest witnesses often make errors when recollecting past events.

11.9   The allegation that Mr Gerrard deliberately held back his corrective evidence until after the Judgment was given in the hope that the Court would be disinclined to take any further action following receipt of it, and would essentially "wave through the corrections" is either an allegation of deliberate wrongdoing against both Mr Gerrard and his solicitors, Enyo Law, who on this argument must have been complicit in this wrongdoing, or an allegation that Mr Gerrard also lied to Enyo Law about when and how he became aware of the errors. In either case, this is wholly unsupported by evidence.

11.10  If, as Mr Azima contends, the Court's power to reconsider a judgment exists until the judgment is perfected in a final order, it would have made no sense for Mr Gerrard deliberately to "hold back" his corrective evidence until after the Judgment was delivered but <u>before</u> the final order was made to provide that corrective evidence. The timing of Mr Gerrard's corrective evidence is inconsistent with any suggestion of a deliberate "tactical delay" designed to prevent the Court from taking any "further action" in respect of his corrections.

11.11  In all the circumstances, no action is required from the Court in response to Mr Gerrard's Statement. The Court should therefore proceed to determine the consequential matters concerning interest and costs without further delay.

**The central issue**

12.   The central issue raised by Mr Gerrard's third witness statement and the parties' submissions is whether, as RAKIA contends, I should proceed to make a final order based on the Judgment as it currently stands or alternatively, as submitted by Mr Azima, I should re-open the Judgment, in particular my finding that Mr Azima had failed to establish that RAKIA was responsible for the hacking of his emails, and allow further cross-examination of Mr Gerrard.

**Mr Gerrard's evidence**

13.  Before addressing the central issue, it is necessary to make certain observations about
     Mr Gerrard's third witness statement and his evidence generally.

14.  First, I consider that RAKIA's characterisation of the admitted errors in Mr Gerrard's
     evidence in cross-examination as "minor inaccuracies" understates the seriousness of
     the errors. Although a number of the inaccuracies, such as the location of the
     interviews and whether or not Mr Al Sadeq had been formally charged, taken in
     themselves, are of no great consequence, others are clearly more important, such as
     the number of interviews conducted by Mr Gerrard, whether PACE was complied
     with and whether a lawyer was present during Mr Gerrard's interviews.  I agree with
     Mr Azima's submission that the corrected evidence cumulatively creates a materially
     different impression of the extent and nature of Mr Gerrard's dealings with Mr Al
     Sadeq.

15.  Second, I do not accept RAKIA's submission that the erroneous evidence goes to
     peripheral matters which were of no relevance to the substantive issues. There was a
     pleaded issue on RAKIA's own case in the proceedings as to whether the stories about
     human rights abuses and Dechert's involvement in those abuses were false (see
     paragraphs 197 – 198 of the Judgment).  The comment at paragraph 62 of the
     Judgment about "allegations of misconduct extraneous to the events in issue in these
     proceedings" was a reference to allegations of misconduct by Mr Gerrard made in
     pending proceedings brought by Eurasian Natural Resources Corporation against the
     Serious Fraud Office, which were put to Mr Gerrard in cross-examination, not to the
     allegations about involvement in human rights abuses in RAK in these proceedings.

16.  Third, I do not consider that Mr Gerrard has given an entirely satisfactory explanation
     for either the inaccuracies in his evidence in cross-examination or for the delay in
     providing corrective evidence. There was in this case, as noted above, a substantive
     issue of the utmost seriousness as to whether Dechert and Mr Gerrard personally had

been involved in human rights abuses involving detainees in RAK (see paragraphs 197 and 198 of the Judgment). That issue was flagged in Mr Azima's witness statement and in his skeleton argument before the trial. It was predictable that Mr Gerrard would be cross-examined about his dealings with Mr Al Sadeq.  Mr Gerrard should have refreshed his memory about the details of those dealings before his cross-examination by reviewing his and Dechert's contemporaneous records. If he had not done so, or was for any reason unable to recollect the events about which he was being cross-examined, he should have made that clear to the Court.

17.   Instead, in cross-examination Mr Gerrard gave evidence about these matters with bluster, volunteering additional details about his dealings with Mr Al Sadeq – which now turn out to be wrong – often in unambiguous terms and emphatic tone, with no suggestion that his memory could be faulty or that he had not prepared himself to answer such questions.   For example, on the subject of Mr Al Sadeq's lawyer consenting and being present (emphasis added):

Day 5, p.36: "Q. So you interviewed detainees who had been detained at the hands of RAK, did you?
A. Yes, **with their agreement and the agreement of their lawyers**"
Day 5, p.45: "**He had his own lawyers present** who were perfectly happy with the situation."

On the involvement of Al Tamimi (emphasis added):

Day 5, p.37: "Q. And you went there to interview prisoners?
A. I went there **with Al Tamimi, the local law firm, to meet prisoners at their agreement and the agreement of their lawyers**"

On PACE (emphasis added):

Day 5, p.39: Q. And that material hasn't been disclosed, has it, Mr Gerrard?
A. I have no idea whether it's been disclosed or not. My – the lawyers have had complete access to all our material. I don't know what was relevant or what was not.

Frankly, **I cannot see how an interview following PACE, which we insisted on**, whereby the detainee had agreed to be interviewed…"

18. Given the extent of the discrepancies between his original, somewhat slapdash evidence on these matters and the corrected evidence, it ought to have occurred to Mr Gerrard once he was able to reflect calmly after leaving the witness box, and at the latest when he read the Claim Form or the Particulars of Claim in the Al Sadeq Proceedings, that he had given, or might have given, inaccurate evidence about his dealings with Mr Al Sadeq at which point he should have checked the available records and not waited until much later on when material was made available for the purposes of the Al Sadeq Proceedings.

19. A solicitor in giving evidence to the Court is under a duty to be not only completely honest but also scrupulously accurate; see generally *Wingate v Solicitors Regulation Authority* [2018] EWCA Civ 366 at [97] to [101] and *Brett v Solicitors Regulation Authority* [2014] EWHC 2974 at [111] to [113]. Otherwise there is a particular risk of the Court being misled because of the trust which the Court places in solicitors as officers of the court to give their evidence reliably. I note that misleading the court, even inadvertently, is potentially a breach of paragraph 1.4 of the Solicitors Code of Conduct (2019) quoted at paragraph 10.9 above.

20. I am not prepared to decide, on the basis of Mr Gerrard's third statement, that his evidence either at the trial or in the third statement was deliberately untrue. For reasons set out below, I do not consider that it is necessary for me to do so. I accept that, as submitted by Mr Azima, Mr Gerrard had an obvious interest in minimising and sanitising his involvement in the questioning of Mr Al Sadeq, given the pleaded issue and the serious nature of the allegations, but I accept that, as noted by Leggatt J, human memory is fallible and honest witnesses often make errors when recollecting past events. It is possible that Mr Gerrard was confused during cross-examination as to, amongst other things, whether the meetings in 2014 were in the nature of interviews and that this and other errors were made in the heat of the moment and were inadvertent. It is likewise possible that, as submitted by Mr Azima, Mr Gerrard's

corrective evidence has been prompted by the realisation that the true facts will emerge in the course of the Al Sadeq Proceedings. That said, Mr Azima's submission that Mr Gerrard deliberately delayed giving corrective evidence long enough for the Judgment to be given, so that the court would be disinclined to revise its findings, but not long enough for the final order to be made, at which point the court could no longer revise its findings, does not make sense.

**My decision on the central issue**

21.    As to whether I should reopen the Judgment in the exercise of the jurisdiction to change one's mind up until the order is drawn up and perfected (as recognised by the Supreme Court in *Re L & B*), I am of the clear view that this would not be the right course to follow for the following reasons.

22.    First, the facts established by Mr Gerrard's third witness statement concerning his dealings with Mr and Mrs Al Sadeq do not affect any of my conclusions on any of the substantive issues. The new evidence, the general thrust of which is that Mr Al Sadeq was interviewed more frequently and with less safeguards than Mr Gerrard's oral evidence had suggested, is consistent with and supportive of my finding that RAKIA had failed to establish that the stories of human rights violations promoted by Mr Azima were false. It does not affect any of the other issues. Mr Azima's attempt to link this evidence with the hacking allegation is, as for the reasons given by RAKIA, unfounded.

23.    Second, I do not consider that the submissions made on behalf of Mr Azima concerning Mr Gerrard's credibility as a witness in the light of the third witness statement are a sufficient reason to reopen the Judgment for the following reason. Even if I were to conclude, following further cross-examination of Mr Gerrard, that he had knowingly given false evidence about his dealings with Mr Al Sadeq and compounded that dishonesty by falsely claiming that he was mistaken in giving that evidence and by deliberately withholding corrective evidence, I am in no doubt that this would not "tip the balance" in favour of a different conclusion on the claim

22

regarding responsibility for the hacking of Mr Azima's emails. My conclusion that Mr Azima had failed to prove that RAKIA was responsible for the hacking was not dependent on the veracity of Mr Gerrard's evidence at the trial. That conclusion was based on a wide range of evidence from different sources and, just as importantly, on an absence of cogent evidence establishing the hacking claim.

24. The four matters relevant to my conclusion on the hacking claim and which involved Mr Gerrard were the View from the Window document (paragraphs 301 to 309 and 379 of the Judgment), the meeting on 16 July 2016 (paragraphs 322 to 335 and 378.4), the circumstances of the discovery of the hacked material (paragraphs 342 to 356) and the alleged conspiracy involving RAKIA's main witnesses (paragraph 378.5). In relation to each of those matters, my conclusions were not based exclusively or primarily on Mr Gerrard's evidence but were founded on my assessment of the evidence in the round including the contemporaneous documents and the evidence of other witnesses. I noted in the Judgment that Mr Gerrard's evidence concerning the View from the Window document was confused (paragraph 307).  I found that Mr Gerrard could well have conducted the meeting on 16 July 2016 in a forceful and even aggressive way (paragraph 331). My conclusion as to the inherent improbability of RAKIA's witnesses conspiring together to conceal RAKIA's role in the hacking was based on my view as to their likely fear of detection rather than on any assumed disinclination on the part of Mr Gerrard to give false evidence (paragraph 378.5).

25. In these circumstances, it would not, in my view, be conducive to the overriding objective of dealing with the case justly to permit the further cross-examination of Mr Gerrard with a view to possibly revisiting the Judgment. Moreover, it would not be conducive to the overriding objective of dealing with the case justly and at proportionate cost, and it would be contrary to the public interest in the finality of litigation, to further delay the conclusion of these proceedings.

26. I therefore propose to admit Mr Gerrard's third witness statement and to make a final order based on my findings in the Judgment as it stands.