UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
IN RE APPLICATION OF KARAM SALAH      :
AL DIN AWNI AL SADEQ FOR AN ORDER     :   Civil Action No. 1:20-mc-275-JPO
UNDER 28 U.S.C. § 1782 TO CONDUCT     :
DISCOVERY FOR USE IN FOREIGN          :
PROCEEDINGS                           :   Hon. J. Paul Oetken
                                      :
----------------------------------------X

## DECLARATION OF EDWARD JOHN WHITNEY ALLEN

EDWARD JOHN WHITNEY ALLEN declares as follows

1.  I am a solicitor in London, England, and partner at the firm Enyo Law LLP. I represent Dechert LLP ("Dechert UK"), an English limited liability partnership with its office in London, England, two of its current partners (Neil Gerrard and Caroline Black), and one of its former partners (David Hughes), in the case of <u>Karam Salah Al Din Awni Al Sadeq v. Dechert LLP, Neil Gerrard, David Hughes, and Caroline Black</u>, Claim No. QB-2020-000322 ("UK Litigation"), which was issued in the High Court of Justice of England and Wales, Queen's Bench Division, on January 28, 2020.[1]

**A.    Dechert Is An International Law Firm Made Of Many Distinct Legal Entities**

2.  Dechert UK is part of the international law firm commonly known as "Dechert", which is a combination of separate limited liability partnerships and other entities registered in different jurisdictions, and which operates as a single firm. The US partnership, Dechert, LLP ("Dechert US"), is a limited liability partnership, registered in Pennsylvania. All partners of

---

[1] Ms. Black was not a Defendant to the UK Litigation when the claim was originally issued, but was added later.

Dechert, wherever they are located, are partners of Dechert US. They may also be partners of the Dechert-related partnerships in the countries in which they practice.

3. Thus, Mr. Gerrard and Ms. Black are, and Mr. Hughes was, partners of both Dechert UK and Dechert US.

4. Although Dechert UK is the only Dechert entity to be named as a Defendant in the UK Litigation, I have been instructed by the general counsel of Dechert US and the general counsel of Dechert UK that Dechert intends to participate in those proceedings as if it were a single entity, and that it will not be seeking to draw distinctions between or among Dechert entities in the UK Litigation. Put differently: the full international firm, which includes both Dechert UK and Dechert US, is participating in the UK Litigation.

**B.    Status Of The UK Litigation**

5. By way of very high level summary, the UK Litigation arises out of Dechert's representation of the Investment and Development Office of Ras Al Khaimah ("RAK", one of the United Arab Emirates) and later RAK Development LLC, to assist with an investigation ("the Investigation") into transactions carried out by subsidiary companies of the Ras Al Khaimah Investment Authority ("RAKIA") which employed Mr. Al Sadeq, the plaintiff in the UK Litigation. Mr. Al Sadeq is currently in prison in RAK, having been convicted of fraud committed during his time at RAKIA. In the UK Litigation, he alleges that the Defendants to the UK Litigation violated his rights by using or directing or being complicit in threats and/or mistreatment and/or torture and/or other unlawful methods to force him to give false evidence.

6. Mr. Al Sadeq issued his claim on January 28, 2020. The Defendants filed their defense on July 31, 2020 and denied all of the claims made. Mr. Al Sadeq's reply is due on October 16, 2020. Under English law, these pleadings establish the issues in dispute in the UK

Litigation, and will be used to determine the scope of discovery (or disclosure as it is known in the UK).

7. After Mr. Al Sadeq files his reply, the next step in the UK Litigation will be for the parties to attend a case management conference in court where they will discuss with the court the scope of discovery as well as the timetable for the UK Litigation going forward and the court will make orders in relation to such matters. This conference has been scheduled for December 7, 2020. Discovery does not take place in the UK Litigation until after this conference occurs, although there will be discussions between the parties before the conference to discuss the scope of discovery.

**C.**   **Scope Of Discovery Under English Law**

8. Under English law, the Civil Procedure Rules ("CPR") govern the scope of discovery. Under CPR 31.6, a party must affirmatively disclose documents upon which it relies, documents that adversely affect any party's case, and documents that support any party's case.

9. Under CPR 31.8, a party is required to make this disclosure from documents within its "control." "Control" is defined to include documents that are or were in its "physical control," documents for which it "has or has had a right to possession," and documents which it "has or has had a right to inspect or take copies of."

10. Under CPR 31.8, all documents in the possession of any Dechert entity, including Dechert US, fall within the "control" of Dechert UK. The physical location of such documents is irrelevant under English law. Dechert UK has the ability to access, possess, inspect, and copy all documents held by other Dechert entities. Thus, any and all documents held by any Dechert entity, anywhere in the world, including documents held by Dechert US in the United States, are subject to the Defendants' discovery obligations in the UK Litigation to the same extent as if those documents were held by Dechert UK in London.

11. However, if there was otherwise any doubt about whether documents held by Dechert US were in the control of Dechert UK, the party named as one of the Defendants in the UK Litigation, I have, as indicated above, been instructed by Dechert US and Dechert UK to treat the entities as one and not to resist any discovery required of Dechert UK by the English court on the basis that the relevant documents are within the control of Dechert US and not Dechert UK.

### D.      Scope Of English Litigation Privilege

11. Under English law, privilege is a *lex fori* issue, which means that the English court presiding over the case will follow English laws on privilege to determine whether material must be disclosed, regardless of where the material is located or how it was created.

12. Under English law, a document subject to disclosure may be withheld from production on the basis that it is privileged.

13. In the circumstances of this case, the relevant privilege under English law is described as "legal professional privilege," which is comprised of two separate privileges: "litigation privilege" and "legal advice privilege".

14. Litigation privilege involves a communication between a lawyer (acting in a professional capacity) and the client, or between either of them and a third party, which is made for the sole or dominant purpose of reasonably contemplated or existing litigation (whether for seeking or giving advice in relation to it, or for obtaining evidence to be used in it, or for obtaining information leading to obtaining such evidence). Such communication must be confidential.[2]

---

[2] See the summary of the requirements for a claim to litigation privilege as summarised by Hamblen J in *Starbev GP Ltd v Interbrew Central European Holding BV* [2013] EWHC 4038 (paragraph 11).

15. Legal advice privilege applies to confidential communications which pass between a client and the client's lawyer, and which have come into existence for the dominant purpose of giving or receiving legal advice about what should prudently and sensibly be done in the relevant legal context.[3]

16. English courts have emphasized repeatedly that privilege analysis is a document-by-document endeavor.[4]

17. In the UK Litigation, the question of privilege is of particular importance since the wrongdoing alleged by Mr. Al Sadeq arose during the course of a Dechert client engagement. The Defendants will be contending that the vast majority of disclosable documents will engage legal professional privilege (principally litigation privilege) and so have to be withheld from discovery. Such privilege will principally vest with Dechert's clients and so could not be waived absent their express consent (which has not been provided to date in respect of any category of document) or where the confidentiality of the document has already been lost. In limited instances, privilege may also vest with Dechert (for example, if it was conducting an internal investigation for the dominant purpose of litigation).

18. It will be open to Mr. Al Sadeq to challenge this position during the course of the UK Litigation and he has reserved his position regarding the Defendants' assertions of privilege. Any objection he might raise will be addressed by the English court applying English law.

---

[3] See the summary of the requirements for a claim to legal advice privilege as summarised by Lord Justice Hickenbottom in *The Civil Aviation Authority v The Queen on the Application of Jet2.com Limited* [2020] EWCA Civ 35 (paragraphs 35-42).

[4] See paragraph 100(i) of the *CAA v Jet2* judgment cited at footnote 3 above. See also paragraph 82 of Lord Justice Brooke's judgment in *United States of America v Philip Morris Inc & Others* [2004] EWCA Civ 330, which refers to the judgment of Lord Phillips in *Three Rivers District Council & Ors v The Governor & Company of the Bank of England* [2004] EWCA Civ 218.

E.      **Mr. Al Sadeq's Subpoena**

19.      I am aware that Mr. Al Sadeq has served a Subpoena on Dechert US that seeks documents that he believes will assist him in the UK Litigation.

20.      Mr. Al Sadeq's legal counsel did not inform my firm that Mr. Al Sadeq intended to invoke the jurisdiction of courts in the United States to serve this Subpoena. If anyone representing Mr. Al Sadeq had contacted me in advance to discuss this Subpoena, I would have informed them that Dechert is already participating in the UK Litigation in its entirety, meaning any and all documents that might be disclosable under English law would be made available in the UK Litigation <u>regardless of whether they were held by Dechert UK, Dechert US, or any other Dechert entity</u>. To the extent that the Subpoena is based on Mr. Al Sadeq's confusion about Dechert's corporate structure, I would have been happy to address that confusion and would have explained why an international Subpoena was entirely unnecessary to obtain discovery that is already obtainable through the UK Litigation.

21.      As I mention above, discovery in the UK Litigation is limited by reference to the pleaded issues in dispute. Accordingly, to the extent that any of the materials requested in the Subpoena meet the test set out in CPR 31.6 relating to the material issues in dispute in the UK Litigation, as set out in the parties' pleaded cases, Mr. Al Sadeq would be entitled to disclosure of those materials in the UK Litigation. Any other documents responsive to the Subpoena, meaning those that do not meet the test set out in CPR 31.6, would by definition be irrelevant to the UK Litigation under English law and so not disclosable.

22.      Additionally, to the extent that the Subpoena seeks documents that are disclosable under English law, which will be assessed as against the parties' pleaded cases, I can say that his broad requests will inevitably engage complex questions of English privilege law. As I have mentioned above, the English court will expect this to be assessed on a document-by-document

basis. However, it is already evident from the nature of Mr. Al Sadeq's requests that all of them will, at minimum, engage questions of legal professional privilege.

23. Mr. Al Sadeq's first request seeks all communications between Mr. Gerrard and Dechert's global policy committee that "refer or relate to" the legal work that Mr. Gerrard, Mr. Hughes, Ms. Black and/or Dechert were performing for their clients regarding to the Investigation. It is my opinion that the vast majority of documents that might fall within this category are likely to be covered by litigation privilege under English law since litigation was contemplated and the communications are likely to have related to the giving of legal advice to Dechert's client.

24. Mr. Al Sadeq's second request seeks all documents that "refer, relate to, evidence, or memorialize" any meetings or communications with Mr. Gerrard that "refer or relate to" the legal work that Mr. Gerrard, Mr. Hughes, Ms. Black and/or Dechert were performing for their clients regarding the Investigation. To the extent that these documents memorialize privileged conversations, these documents will be privileged. It is my opinion that the vast majority of documents that might fall within this category are likely to be covered by litigation privilege under English law since litigation was contemplated and the communications are likely to have either related to the seeking or giving of advice, or obtaining information or evidence in relation to such litigation.

25. Mr. Al Sadeq's third request seeks documents "provided by" Mr. Gerrard, Mr. Hughes, Ms. Black and/or Dechert that "refer or relate to" the legal work that Mr. Gerrard, Mr. Hughes, Ms. Black and/or Dechert were performing for their clients regarding the Investigation. For the same reasons stated above, it is my opinion that the vast majority of the documents that might fall within this category are likely to be covered by litigation privilege under English law.

26. Mr. Al Sadeq's fourth request seeks all "documents concerning communications" between Mr. Gerrard, Mr. Hughes, Ms. Black and/or Dechert and Dechert's global policy committee that "refer or relate to any interrogation and/or investigation of Mr. Al Sadeq by any of Mr. Gerrard, Mr. Hughes, Ms. Black, and/or Dechert concerning RAKIA." Any investigation of Mr. Al Sadeq by a Dechert attorney "concerning RAKIA" would have been part of the legal work Dechert was performing for its clients. Any internal communication at Dechert about such work would highly likely be subject to litigation privilege. Although it is not clear that there are, in fact, any documents that are likely to be responsive to this request, it is my opinion that the vast majority of documents that might fall within this category are likely to be covered by the litigation privilege under English law.

27. Mr. Al Sadeq's fifth request seeks any documents relating to any internal investigation that Dechert may have performed regarding the legal work that Mr. Gerrard, Mr. Hughes, Ms. Black and/or Dechert were performing for their client, RAKIA, regarding the Investigation.[5] Even if such an internal investigation occurred, the vast majority of such documents would be subject to litigation privilege under English law since litigation would have been in contemplation (for example, a regulatory complaint to the Solicitor's Regulation Authority).

28. Mr. Al Sadeq's sixth request seeks documents transmitted to "any external authority" that "refer, relate to, evidence, or memorialize" the legal work that Mr. Gerrard, Mr. Hughes, Ms. Black and/or Dechert were performing for their client, RAKIA, regarding the Investigation. To the extent that any documents fall within this request, it raises privilege questions under English law because a disclosure of privileged documents to an external

---

[5] As noted above, Dechert did not act directly for RAKIA in connection with the Investigation.

authority does not necessarily waive an otherwise applicable assertion of privilege.[6]  Although it is not clear that there are, in fact, any documents that are likely to be responsive to this request, a detailed privilege analysis under English law will be required to determine which privileges apply, if any.

29.     Mr. Al Sadeq's subpoena also seeks testimony regarding Mr. Gerrard's confidential communications with the Dechert's Policy Committee concerning the work Mr. Gerrard was performing for his client, RAKIA, regarding the Investigation, as well as testimony about any potential investigation by the Policy Committee about Mr. Gerrard's conduct.  Such testimony would engage the same issues of privilege as set out above, and so any deponent would be unable to answer questions where the answers would be privileged.

30.     Finally, I have been asked to consider what the reaction of the English court might be if Mr. Al Sadeq obtains documents or information pursuant to the terms of the Subpoena which would be deemed privileged under English law (for example, because the English doctrine of litigation privilege provides materially stronger protection over communications with third parties than might otherwise be available under the US equivalent). The starting-point is that the English court does not generally regard applications for discovery under U.S.C. s.1782 as a matter which is oppressive or interferes with the jurisdiction of the English court.[7]  However, the English court retains the discretion to grant injunctive relief where such applications are abusive and oppressive and, on occasion, has exercised this discretion.[8]  I

---

[6] See Lord Hoffman's comments at paragraph 32 of *Special Commissioner and Another, Ex Parte Morgan Grenfell & Co Ltd* [2002] UKHL 21.

[7] See *South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien" NV* [1987] AC 24.

[8] See *Bankers Trust International Plc v PT Dharmala Sakti Sejahtera* [1996] CLC 252, *Omega Group Holdings Lrd v Kozeny* [2002] CLC 132. The Australian court also adopted the same.

think there is a strong likelihood that the English court would grant a prohibitory injunction to prevent Mr. Al Sadeq from using documents and information which are privileged under English law since he would be using a foreign court to obtain material to which, in the ordinary course, he would not be entitled to review. This would interference with, or undermine, the control of the English court of its own process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 5 October, 2020

*Edward Allen*

_____
Edward John Whitney Allen

---

approach in *Allstate Life Insurance Cov ANZ Banking Corp Ltd* (1996) 64 FCR 61 (Aust Fed Ct).